1

2  UNITED STATES BANKRUPTCY COURT

3  EASTERN DISTRICT OF NEW YORK

4  Lead Case No. 12-73024-reg  Adv. Proc. No. 13-08044-reg

5  - - - - - - - - - - - - - - - - - - - -x

6  In the Matters of:

7  JEFFREY AND CATHLEEN ST. CLAIR,

8              Debtors.

9  - - - - - - - - - - - - - - - - - - - -x

10 CADLES OF GRASSY MEADOWS II, L.L.C.,

11              Plaintiff,

12              - against -

13 ST. CLAIR, et al.,

14              Defendants.

15 - - - - - - - - - - - - - - - - - - - -x

16              United States Bankruptcy Court

17              Alfonse M. D'Amato U.S. Courthouse

18              290 Federal Plaza

19              Central Islip, New York

20              April 24, 2014

21              10:18 AM

22

23 B E F O R E:

24 HON. ROBERT E. GROSSMAN

25 U.S. BANKRUPTCY JUDGE

1

2   [36] Trial on Pre-Trial Conference

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20   Transcribed by:  Penina Wolicki

21   eScribers, LLC

22   700 West 192nd Street, Suite #607

23   New York, NY 10040

24   (973)406-2250

25   operations@escribers.net

1

2   A P P E A R A N C E S :

3   VLOCK & ASSOCIATES, P.C.

4        Attorneys for Plaintiff

5        630 Third Avenue

6        18th Floor

7        New York, NY 10017

8

9   BY:   STEPHEN VLOCK, ESQ.

10        STEVEN GIORDANO, ESQ.

11

12

13   DAHIYA LAW GROUP LLC

14        Attorneys for Defendants

15        75 Maiden Lane

16        Suite 506

17        New York, NY 10038

18

19   BY:   KARAM VIR DAHIYA, ESQ.

20

21

22

23

24

25

1              P R O C E E D I N G S

2              THE COURT:  Good morning, please be seated.

3              THE CLERK:  Trial on Cadles of Grassy Meadows v. St.

4    Clair.

5              THE COURT:  Can I get appearances, please?

6              MR. DAHIYA:  Karam Dahiya, good morning, appearing for

7    Mr. St. Clair and Cathleen St. Clair, the defendants and

8    debtors.

9              THE COURT:  Okay.

10             MR. VLOCK:  For the plaintiff, Your Honor, Stephen

11   Vlock, Vlock & Associates.

12             MR. GIORDANO:  Good morning, Your Honor.  Steven

13   Giordano from Vlock & Associates, on behalf of the plaintiff.

14             THE COURT:  All right.  As a preliminary matter, I

15   understand that all the exhibits that are going to be, have

16   been submitted.  There's no objections to the --

17             MR. DAHIYA:  There is, Your Honor.  I wanted to bring

18   to your attention about it.

19             THE COURT:  Well, let me finish my sentence --

20             MR. DAHIYA:  Yes.

21             THE COURT:  -- and then you can interrupt me.

22             That all the exhibits that have been submitted to the

23   Court in the joint pre-trial that was submitted, the parties

24   have stipulated to the admission of all those exhibits.  That

25   the defendants have neither no witnesses, no exhibits, and no

1    documents they introduced.

2              MR. GIORDANO:  Yes, Your Honor.  That's right.

3              THE COURT:  That's what I understand.

4              MR. DAHIYA:  Yes, but there is no witness and no

5    exhibits from our side.  But we have an objection to the

6    admissibility of the depositions -- the 2004 examination, Your

7    Honor.  That's D(7) in your pre-trial order.  Also, we could

8    bring an objection at the time under the Rule 402 or 403 of the

9    Federal Rules of Evidence.

10             This is not admissible in evidence, Your Honor,

11   respectfully, because one, this is not a deposition under the

12   Federal Rules 2004.  Second --

13             THE COURT:  You started the sentence by saying you

14   have no objection to the introduction of the depositions.

15             MR. DAHIYA:  No, I -- this is a -- my objection is to

16   the extent -- my objection was not that the deposition didn't

17   take place.  The deposition took -- did take place under Rule

18   2004.  But they're not to be admitted for the purpose of

19   evidence, their contents, because --

20             THE COURT:  Did somebody lie to me in the pre-trial?

21             MR. GIORDANO:  No, Your Honor.  Everything was

22   approved by Mr. Karam Vir Dahiya himself.  And he had no

23   objection at all.

24             THE COURT:  So why are you changing your position?

25             MR. DAHIYA:  I'm not changing my position, Your Honor.

1          THE COURT:  You're not?

2          MR. DAHIYA:  I'm strictly going by the -- the order of

3    the Court.  And it states that I could object under Section --

4    under Rule 402.  Now, other thing, Your Honor, respectfully,

5    very important thing, is I found it a little offensive, is I

6    requested -- I spoke to Mr. Giordano, and I said please give me

7    the binder.  I have no problem.  I agree that we receive no

8    documents.  He was supposed to send me the binder, the

9    exhibits.  He brings the exhibits now in this box for me.  And

10   there are no -- this is not how we expect the exhibits, no

11   binder, nothing.  And I am putting the numbers now.  I mean, he

12   could have done it as basic courtesy.  He has done a binder for

13   himself.

14         THE COURT:  So you've never seen any of the exhibits

15   that are being -- that you agreed --

16         MR. DAHIYA:  I've seen them, Your Honor, respectfully.

17   I've seen them before.  I've perused them, but you know --

18         THE COURT:  Right.  I'll let you -- do you want to use

19   my binder?  I mean, I'll let you use this one.

20         MR. DAHIYA:  No, I just -- it's just -- I don't know

21   why he did this what he did, that's all.

22         THE COURT:  Okay.  So you're objecting -- to get back

23   to the main issue here -- you're objecting to the use of the

24   depositions where previously it said that nobody's objecting to

25   them.  So now you want to object and your theory is that you

1  can't use a deposition -- you can't introduce into evidence a

2  deposition?

3          MR. DAHIYA:  That's -- respectfully, that's what I

4  said, Your Honor.

5          THE COURT:  I'll let counsel talk.

6          MR. DAHIYA:  Okay.

7          THE COURT:  Please respond to his objection.

8          MR. GIORDANO:  With regard to his objection, Your

9  Honor, this is the first I'm hearing of it.  He consented.  I

10 spoke to him on the phone.  He consented to all of the

11 evidence, which included the three 2004 transcripts.  They were

12 enumerated in the joint pre-trial memo to which he had no

13 objection to, as Your Honor stated, as he admits now.  And now

14 all of a sudden he wants to, I guess, raise for the first time

15 an objection which has no basis in the facts or the law.

16         The law is clear.  That is their sworn testimony.

17 There -- the evidence --

18         THE COURT:  It is what it is.  It is their sworn

19 testimony.  They are exhibits.

20         MR. GIORDANO:  They are exhibits.

21         THE COURT:  They will be introduced.  If the objection

22 is to any part of it, you guys are going to take these guys on

23 direct, right?  You're going to put them on the stand?

24         MR. GIORDANO:  No, Your Honor.

25         MR. VLOCK:  No --

1          THE COURT:  You had not intended to?

2          MR. VLOCK:  Not intended to, Your Honor.

3          MR. GIORDANO:  We do not intend to.

4          THE COURT:  Right.  If you want to object to the

5    deposition, I'm going to make them put your clients on the

6    stand.

7          MR. DAHIYA:  Yes, Your Honor.  I -- effectively -- the

8    witness are here.

9          THE COURT:  We're done.  That's what's going to

10   happen.

11         Put them on.  We're not going to go through the entire

12   deposition, but you know the elements you have to make.  I

13   would like to see them on the stand anyway.  I'm generally a

14   proponent of seeing witnesses.  So if you're prepared, that's

15   what I'd like to do.

16         MR. VLOCK:  Your Honor, they said that they were not

17   going to put on the defendants.

18         THE COURT:  They're not.

19         MR. VLOCK:  So that was -- if they were going to put

20   them on, and we had notice of that, that would be a different

21   story.  But that's not what we prepared to do for this trial.

22         THE COURT:  Okay.  So -- well, it's up to you.

23         MR. VLOCK:  Now we're being --

24         THE COURT:  I mean, if you want to rest on the

25   documents.

1        MR. VLOCK:  Well, we do have a witness, Your Honor.

2        THE COURT:  Good.

3        MR. VLOCK:  Okay.

4        THE COURT:  Because if you remember, on the summary

5    judgment -- there's no dispute in this case that I issued

6    orders, and there's no dispute that I issued an order in cont

7    of sanction that the defendants either individually or together

8    violated orders of this court, and that those violations, under

9    727, one has to show certain knowledge and intent.  Well, it's

10   a narrow issue, and that's why I denied summary judgment.

11       It appears the defendants' position is that can stand,

12   and so I can then infer my own view of whether they knowingly

13   and intentionally violated the order, and they don't have any

14   other position, because they're not taking one, which is okay

15   with me, if that's where you want to leave this.  I don't quite

16   understand it, but that's fine.

17       MR. DAHIYA:  That's the -- there's one thing that I

18   wanted to -- Your Honor, for the admissibility of these

19   deposition transcripts alone, I mean, they still have to

20   satisfy Rule 32 of the Federal Rules of Civil Procedure.  Their

21   live testimony -- live witnesses here.  So because they're

22   here, they cannot use their depositions.  That's our objection.

23       THE COURT:  That's their view.

24       MR. DAHIYA:  That's -- okay.

25       THE COURT:  They may have a different view.

1        MR. DAHIYA:  Okay.

2        THE COURT:  And I'll make a decision based on the law.

3        MR. DAHIYA:  Yes, Your Honor.

4        THE COURT:  I'm not going to argue it now.

5        MR. DAHIYA:  That's fine.  That's fine, Your Honor.

6        THE COURT:  But they're perfectly capable of

7   understanding whether they want to put a witness on and whether

8   they will rest with the depositions which were sworn to

9   depositions by your client.  Nobody's alleging it wasn't your

10  client in the deposition.  Nobody's alleging that anybody

11  changed the answers, to my knowledge.  Right?

12       MR. DAHIYA:  Yes.

13       THE COURT:  These are truth -- truthful -- they are

14  accurate copies of the transcripts taken at the deposition of

15  your clients.

16       MR. DAHIYA:  Two things, Your Honor.  In Rule 2004

17  examination, respectfully, there is no cross, there is no

18  objection --

19       THE COURT:  Put them on.  You can cross them.

20       MR. DAHIYA:  No, no.  I mean --

21       THE COURT:  Listen -- stop.  Listen to me.

22       MR. DAHIYA:  It's their burden.  They have to put them

23  on, Your Honor, not me.

24       THE COURT:  Stop --

25       MR. DAHIYA:  Yes, Your Honor.

1    THE COURT:  -- and listen.  Essentially, what they're

2  saying is that the deposition testimony of your client is their

3  direct testimony.  That's the testimony.  You have a right to

4  say okay, fine, we'll let it with the deposition, or you can

5  put either of these or both on and start with a cross-

6  examination.  You have the right to cross the live witness

7  that's here.

8    MR. DAHIYA:  Yeah, I mean --

9    THE COURT:  They are resting on the deposition.  So if

10  you want to call them on cross, call them.

11    MR. DAHIYA:  That's --

12    THE COURT:  If you don't, then you don't.

13    MR. DAHIYA:  I mean, the -- it cannot be the direct --

14  a deposition cannot supplant --

15    THE COURT:  I understand --

16    MR. DAHIYA:  -- the direct.

17    THE COURT:  -- your position.

18    MR. DAHIYA:  Okay, you understand.

19    THE COURT:  I got it.

20    MR. DAHIYA:  You got it, sir.

21    THE COURT:  Right.  I don't know that you're right or

22  wrong.

23    MR. DAHIYA:  They -- that's fine.

24    THE COURT:  But their pos -- listen to me.  Their

25  position is the depositions represent direct testimony.

1          MR. DAHIYA:  That's fine, Your Honor.

2          THE COURT:  They sit down, they turn to you and say

3    would you like to cross-examine?

4          MR. DAHIYA:  That's -- I'll do that.  Give me one

5    minute, Your Honor.

6          THE COURT:  Sure.

7          MR. DAHIYA:  One more thing.

8          THE COURT:  Absolutely.

9          MR. DAHIYA:  These transcripts, Your Honor, they're

10   note certified copies.  They have to be certified that these

11   are the true copies, and they're not, pursuant to Rule -- I

12   think it's 30(f) for the Rules of Civil Procedure.  They're not

13   even admissible --

14         THE COURT:  I will give you an opportunity in a post-

15   trial to put in on a very short document, any objections you

16   have that you want me to consider relative to anything in the

17   trial, including the depositions.  All we're saying is -- all

18   plaintiff is saying is --

19         MR. DAHIYA:  Okay.

20         THE COURT:  -- they're comfortable leaving the

21   depositions to speak for themselves.  So you get to cross, they

22   will get to redirect.

23         MR. DAHIYA:  That's fine, Your Honor.  That's -- thank

24   you.  Thank you.

25         THE COURT:  Okay.

1          MR. DAHIYA:  Jeffery?

2          THE COURT:  Does that work for you guys?

3          MR. VLOCK:  Yes.  Just one thing, Your Honor.

4          THE COURT:  Please, just --

5          MR. VLOCK:  Just for the record, with regard to the

6   admissibility, not with regard to his legal question of whether

7   they can be evidence in chief, which they can under the Federal

8   Rules, but with regard to any issue about certification or

9   otherwise, that's been waived, okay, because he had these, and

10  he had the opportunity to object to that at the -- with the

11  joint pre-trial memo, and he did not.

12         MR. DAHIYA:  No.

13         MR. VLOCK:  Okay?  So I'm putting that out for the

14  record.

15         THE COURT:  You'll each have an opportunity to say

16  that.

17         MR. VLOCK:  All right.

18         THE COURT:  I just want to move ahead with the main

19  event.

20         MR. VLOCK:  Okay.

21         THE COURT:  All these issues are already baked in.

22  They're done.  So --

23         MR. VLOCK:  You're right.

24         THE COURT:  So if he's waived it, he's waived it; if

25  he hasn't, he hasn't.  You've made your position.  They're not

1  going to go on the stand.

2          Now, remember, they're going to have the right to

3  "redirect".

4          MR. DAHIYA:  That's fine.

5          MR. VLOCK:  Okay.

6          MR. DAHIYA:  That's fine.

7          MR. VLOCK:  Okay, so --

8          THE COURT:  You don't have to take it, but you have

9  it.

10         MR. VLOCK:  Shall I call our first witness, Your

11 Honor?

12         THE COURT:  Hold it.  No, your first --

13         MR. VLOCK:  We're plaintiff.  So we're entitled to --

14         THE COURT:  I got that.

15         MR. VLOCK:  Okay.

16         THE COURT:  I'm viewing that the depositions are the

17 direct testimony of these parties.  Therefore, before you would

18 call another witness, he would have the right to cross them,

19 which is what he -- he's not calling a direct witness, he's

20 crossing this witness who was your -- you introduced through

21 the deposition.  You get to the same place, but at least it

22 keeps it more condensed.

23         Who would be your witness, anyway?

24         MR. VLOCK:  Counsel.

25         THE COURT:  He's not going anyplace, so he's staying

1  here.

2           MR. VLOCK:  Yeah.

3           THE COURT:  So let's start -- let's cross these, and

4  then you can redirect.

5           MR. VLOCK:  Thank you, Your Honor.

6           THE COURT:  And then you can put your witness on.

7           MR. VLOCK:  Yes.

8           MR. DAHIYA:  I'd like to call Mr. Jeffrey St. Clair,

9  Your Honor.

10          THE COURT:  Have him come up, get him sworn in.

11      (Witness sworn)

12          THE CLERK:  Please be seated, state and spell your

13  name into the microphone.

14          THE WITNESS:  Jeffrey St. Clair, 3001 Ann Street,

15  Brooklyn -- I'm sorry, Your Honor -- Baldwin, New York.  Good

16  morning, Your Honor.

17          THE COURT:  Now, remember this is a cross, so you're

18  limited -- I guess potentially what's in the deposition,

19  because that was the direct.

20          MR. DAHIYA:  That's fine.  I understand.

21  CROSS-EXAMINATION

22  BY MR. DAHIYA:

23  Q.   Jeffrey, what's your address?

24  A.   3001 Ann Street in Baldwin.

25  Q.   Jeffrey, what do you do for a living?

1    A.    I'm an attorney.

2    Q.    Are you married?

3    A.    Yes, I am.

4    Q.    And who's your wife?

5    A.    Cathleen.

6    Q.    What's her full name?

7    A.    Cathleen Susan St. Clair.

8    Q.    How long have you been married?

9    A.    It's kind of a running joke.  We have -- we don't really

10   know.

11   Q.    Why did you file bankruptcy?

12   A.    I filed bankruptcy because we just weren't able to put our

13   ends together to pay our bills and meet our expenses.

14   Q.    Did you -- you have a house?

15   A.    Yes.

16   Q.    Is it in foreclosure proceeding?

17   A.    Yes.

18   Q.    Is that why you filed bankruptcy?

19   A.    That's one of the reasons, yes.

20   Q.    Now, because -- you said you couldn't pay the bills.  Did

21   that take a toll of your health, peace of mind?

22   A.    Absolutely.  It's very stress -- I mean, it's very

23   stressful.  I mean, I went to school to become an attorney

24   because I thought I would be able to make a living and to take

25   care of my family.  Not to be gender biased, but as a man, I

1  felt like it's my -- I felt like it's my responsibility to take

2  care of my family.  I have four young children that depend on

3  me, and a wife.  And not being able to do that, it -- you know,

4  you can't imagine the toll that it wreaks on your psyche and

5  your personal feelings about yourself as well.

6  Q.    Did it disrupt your family life?

7            MR. GIORDANO:  Objection, Your Honor.  Relevance?

8            MR. DAHIYA:  No, that's going to stress.  The reason

9  for his conduct and behavior.

10           THE COURT:  Let me just ask you a thing.  Normally,

11  when you're in court, and somebody objects, do you make the

12  ruling or the judge?

13           MR. DAHIYA:  The judge.

14           THE COURT:  Right.  We do the same thing here.  What

15  was the objection?

16           MR. GIORDANO:  It was irrelevance, Your Honor.  I

17  don't know -- this has absolutely no relevance to this

18  proceeding or the deposition transcript itself, which we -- is

19  our evidence in chief.

20           THE COURT:  Well, I'm going to give him a little

21  leeway, because the real issue, if not the only issue, that we

22  have today is the intent of the parties; because we know what

23  was done.  And if counsel wants some leeway -- because I don't

24  know where he's going with it -- on that which ends up in that

25  issue, I'm going to give him some.

1           MR. GIORDANO:  Okay.

2           THE COURT:  So it's just the first couple of

3   questions.

4           MR. GIORDANO:  Thank you, Your Honor.

5           THE WITNESS:  Excuse me.  May I have some water?

6           THE COURT:  Sure.

7           THE WITNESS:  Is this water okay?

8           THE COURT:  Is there any over there?

9           THE CLERK:  Sir, please speak into the microphone, Mr.

10  Dahiya.

11          MR. DAHIYA:  Oh, all right.  Can I stand there?

12          THE COURT:  No, it won't pick you up unless you stay

13  by the podium.

14          MR. DAHIYA:  Yes, Your Honor.

15          THE WITNESS:  Thank you.

16  BY MR. DAHIYA:

17  Q.   Jeffrey, you said that you went through lot of stress.

18  Did that impact your professional life?

19          MR. GIORDANO:  Objection, Your Honor.  Leading.  Oh,

20  he's --

21          THE COURT:  This is cross.

22          MR. GIORDANO:  All right, I understand.

23  A.   Yes, it did.

24  Q.   How did it impact your life -- how did it impact your

25  professional life?

1   A.   Well, again, you know, with the -- with the stress and

2   anxiety of not being able to make the bills, you know, it's --

3   it kind of reflects on how I interacted with everybody.  So you

4   know, I may have come across, a couple of times, desperate to a

5   client, maybe a little more insistent than I would have

6   normally been, if I had money and, you know, I wouldn't have

7   been able to -- wouldn't have been pressing as hard to try to

8   get a fee and -- I don't know.  I just -- the clients just kind

9   of just stopped.  So it was very frustrating.

10  Q.   So when did you decide to file for bankruptcy?

11  A.   I believe it was roughly two years ago.  I -- we -- my

12  wife and I had discussed it, and despite being an attorney, I

13  didn't really understand the concept of bankruptcy.

14          MR. GIORDANO:  Objection.  Move to strike, Your Honor.

15  Nonresponsive to the question itself.  It was "when".

16          THE COURT:  All right, I'll sustain that.  But let's

17  try and just --

18          MR. DAHIYA:  Get --

19          THE COURT:  -- within the bounds of a record, let Mr.

20  St. Clair tell the story here.  That's all we're trying to find

21  out.

22  Q.   Jeffrey, what were the reasons that you picked a Chapter 7

23  bankruptcy as a petition for seeking bankruptcy protection?

24  A.   Again, despite being an attorney, I have really little

25  limited -- limited knowledge about what bankruptcy proceedings

1    entail.  And when I first sat down with Narissa Joseph, my

2    prior attorney, that's what she recommended.  And you know, it

3    sounded good, so I, you know, I went along with it.

4    Q.    Did she explain to you the consequences of filing Chapter

5    7 bankruptcy?

6    A.    I -- it was more like the benefits.

7    Q.    Did she tell that a trustee is appointed in this case, and

8    the creditors could object to your discharge?

9    A.    She did, I believe, yes.

10   Q.    Did you understand the consequences, then?

11   A.    I did -- I did, at that point, but I didn't understand the

12   full gravity of what we were getting into.  She -- I'm sorry.

13   Q.    Once the bankruptcy was filed, did you understand what was

14   happening with the court dates, court orders?

15   A.    I mean, I understand to an extent.  She really made it

16   appear like once we filed an application -- and I remember she

17   said this will be open three months.  And I was -- so I just

18   thought everything was like, you know, kind of pro forma

19   formality.  I had no idea we would still be in court on this

20   matter, at this point.

21   Q.    Did you receive a notice for your deposition?

22   A.    Yes, I did.

23   Q.    Did you see the notice -- the subpoena notice asking for

24   various documents?

25   A.    I believe so.  I can't -- I don't recall exactly what was

1  in there, but I do remember receiving some notice.

2  Q.    Did you make good-faith efforts to collect all the

3  documents?

4  A.    Absolutely.

5  Q.    What did you do when you collected all the documents?

6  A.    I submitted them to Narissa Joseph.

7  Q.    Was there any document that you kept behind willfully?

8  A.    Absolutely not.

9  Q.    Did you understand it was your duty to give all the

10  documents?

11  A.    Yes, I did.

12  Q.    Did you comply with that?

13  A.    To the best of my ability, yes.

14  Q.    Was there a time that you forgot to submit any document?

15  A.    It wasn't like we forgot.  It was that sometimes things

16  came up -- you know, our house was in a shambles.

17  Q.    Was what the shambles like?

18  A.    It was just a mess from the storm.  So a lot of stuff got

19  destroyed; a lot of stuff got misplaced.  In an effort to try

20  to preserve things, we moved stuff all over the place.  So it

21  was -- it's still -- we still haven't fully recovered.

22         MR. GIORDANO:  Objection, Your Honor.  This whole line

23  of questioning this witness here is really a direct witness.

24  He's called him.  He's testifying outside of the bounds of the

25  evidence in chief, which is the deposition transcript.  Here we

1  have a witness who has been called here out of order and he's

2  testifying with direct questions, and he's getting across his

3  side of the case before there's been any testimony from the

4  plaintiff at all.

5          MR. DAHIYA:  No, that's --

6          THE COURT:  Well, the testimony --

7          MR. GIORDANO:  So I think that --

8          THE COURT:  -- from the plaintiff would be the

9  deposition.

10          MR. GIORDANO:  And this is outside of the scope of the

11  deposition itself, Your Honor.  If he could point to me where

12  in the deposition transcript we've discussed all of his woes

13  with his family life and everything else, where he's going in

14  and explaining things that were not discussed here -- the

15  discussions between himself and Narissa Joseph, his prior

16  counsel, were not discussed at his 2004 examination.  I'm

17  sorry.  So that -- this whole line of questioning, I believe,

18  is improper.

19          UNIDENTIFIED SPEAKER:  May I respond?

20          MR. DAHIYA:  I'm --

21          THE COURT:  No.

22          MR. DAHIYA:  Hold on.  I'm talking about his intent,

23  his understanding, his capacity to comply with the orders of

24  the court.  In this deposition of him taken by them,

25  respectfully, Your Honor, they do ask what was the reason, how

1    did you lose the documents?  Why did you not give all the

2    documents?

3              THE COURT:  Yeah, I feel there's a number of instances

4    in the deposition when you focused on the orders, establishing

5    or at least asking as to why Mr. St. Clair failed, in your

6    opinion, in your argument, to do that which he was ordered to

7    do by the Court, which is the fundamental issue --

8              MR. DAHIYA:  Yeah.

9              THE COURT:  -- I'm dealing with.  So whether we're out

10   of order or not, Mr. St. Clair -- the facts can no longer

11   change.  We've already found the facts.  There was an order.

12   The order was entered.  It wasn't complied with.  But from

13   727 -- and that's on a sanction issue.  That's not what we're

14   dealing with.  What we're dealing with is the requirements

15   under 727.

16             And I think what counsel is attempting to do is show

17   that his client's behavior, while it may be -- this is my

18   interpretation -- subject to other enforcement mechanisms of

19   the Court, doesn't rise to the level of 727.  And since that's

20   what I need to figure out, I'm going to let them take their --

21   sort of within the bounds of evidence, their shot.  And if he's

22   arguing that I didn't do things because of X, Y, and Z, you'll

23   have a -- I'm going to let you redirect.  You can ask him.  And

24   I'm sure we'll get outside the scope of a lot things.  But --

25             MR. GIORDANO:  Your Honor, if this is for that -- the

1 purpose, however, of rebutting the -- what would be the

2 evidence -- our evidence in chief, which is what you're giving

3 him -- and not, of course, allowing him to put on a case where

4 he had no witnesses under the joint pre-trial order, now --

5         THE COURT:  No, no, this is -- I'm sorry.

6         MR. GIORDANO:  -- I'm following where you're going.

7         THE COURT:  I'm sorry.

8         MR. GIORDANO:  Then he needs to -- because otherwise

9 it just opens the door for him to do exactly that which is

10 improper -- he needs to then look at the deposition transcript

11 and say what he's responding to before he asks his client a

12 question.  Otherwise he's asking him questions all over the

13 place that have nothing to do with this.  So let him pick out

14 where -- he can say Mr. Giordano asked you about X, Y, Z, and

15 now I ask you this.

16         THE COURT:  All right.

17         MR. DAHIYA:  I can -- it's a cross.  Your Honor, your

18 order very explicitly stated that a statement of any objections

19 together the grounds they reserve as to the admissibility of

20 deposition designated by --

21         THE COURT:  I'm not arguing the admissibility of the

22 deposition right now.

23         MR. DAHIYA:  Okay, that's fine.

24         THE COURT:  And your cross tracks the deposition.

25         MR. DAHIYA:  That's fine, Judge.

1          THE COURT:  So try to keep it within those bounds.

2          MR. DAHIYA:  I'm keeping it to the intent and

3    willfulness.  That's all.  I'm not going to --

4          THE COURT:  We are no longer having a discussion about

5    whether orders --

6          MR. DAHIYA:  Yes, Your Honor.

7          THE COURT:  -- were entered or whether they were

8    violated.

9          MR. DAHIYA:  Yes.

10         THE COURT:  That ship has sailed.

11         MR. DAHIYA:  Yes, Your Honor.

12   BY MR. DAHIYA:

13   Q.    Jeffrey --

14   A.    Yes.

15   Q.    -- who keeps the records of mortgage bills, family bills,

16   utilities, in your home?  Is it your wife or is it you?

17   A.    I mean, it's rather haphazardly done, I'm ashamed to

18   admit.

19   Q.    I'm sorry, what?

20   A.    There's no -- we don't have a specific designation of

21   who's responsible for what in terms of that, in my household.

22   Q.    Jeffrey, is there any particular place that you keep your

23   documents, your employment, your bills, mortgage bills,

24   invoices?

25   A.    Some in the basement.  We used to keep some in the

1   kitchen.  And we -- again, it's -- again, I'm a little ashamed

2   to say it's a little haphazardly done, and that's part of why

3   we got into the trouble we did in the first place.

4   Q.    You said you keep documents in the basement?

5   A.    Yes.

6   Q.    Since how long have you been living there?

7   A.    Seven or eight years.

8   Q.    You just testified there was some kind of storm?

9   A.    Yes, Sandy -- super-storm Sandy.

10  Q.    Which one?

11  A.    Super-storm Sandy.

12  Q.    Super-storm Sandy.  Did that impact you -- your home?

13  A.    Greatly, yes.

14  Q.    What was damaged?

15  A.    Almost the entire basement was flooded.

16  Q.    Now, when Ms. Joseph told you to produce -- to bring the

17  documents, you said you gave her every document that you had?

18  A.    I gave her everything we could put -- get our hands on,

19  yes.

20  Q.    And did you provide all the documents that you could get

21  hold of?

22  A.    Yes, at that time.

23  Q.    Did you ever feel that you had not produced the documents?

24  A.    No, I felt -- I was actually impressed with what we were

25  able to produce, you know, under the circumstances.

1    Q.    Did you discuss this case, what was happening with the

2    case, with your wife?

3    A.    Yeah, we discussed it.  But it was often a source of -- it

4    added tension between us.  So again, when we retained Narissa,

5    we kind of breathed a sigh of relief.  She gave us the

6    impression everything was going to be okay.  So we kind of --

7    we literally put it out -- when I walked out of her office

8    after our initial meeting, we both were very relaxed.  We felt

9    like this was going to be over in no time, and we kind of put

10   it out of our heads.  You know, we said we have a lawyer now

11   who's on the case, and we'll let her do the thinking.

12   Q.    Jeffrey, did the trustee -- do you know who the Chapter 7

13   trustee is?

14   A.    I don't remember his name, but I remember meeting him.

15   Q.    Did the trustee ever ask you for any documentations?

16   A.    He -- we had an initial meeting, I remember --

17         MR. GIORDANO:  Objection, Your Honor.  That's outside

18   the scope of the exhibit itself.  We never discussed what

19   documents were turned over to the trustee.

20         MR. DAHIYA:  Your Honor, 727 -- he said -- one of the

21   allegations in the complaint, Your Honor, is --

22         THE COURT:  We're not dealing with the complaint.

23   We're only dealing with the cross-examination.  You've chosen

24   not to put a case on, so we're not dealing with the complaint.

25   All you're dealing with is a cross.  You're limited to the

1   issues that are in the "direct", which is the deposition.  That

2   is a little far, so I'll sustain that objection.

3           MR. DAHIYA:  All right.

4   Q.   Jeffrey, did you attend the deposition request made by the

5   plaintiff?

6           MR. GIORDANO:  Objection -- oh, sorry.

7   A.   Yes.

8           MR. GIORDANO:  Sorry, Your Honor.  Withdrawn.

9   Q.   Were you disturbed in any manner by the questionings?

10  A.   Initially, I was a little indifferent about the

11  proceedings, but as they went on, it just began to get more and

12  more insulting to me personally and professionally and also --

13  Q.   Why do you feel that you felt insulted?

14  A.   Well, I mean -- and again, I don't do civil practice, but

15  I have attended depositions in the past.  He literally sat down

16  with a stack of papers about six inches high with questions

17  which were beyond redundant.  I mean, he was asking me did I

18  have a boat, do I have an airplane, do I own an airstrip, do I

19  own oil fields.  And I understand that some of that stuff is

20  fairly standard, but I believe my financials were very clear

21  that none of that stuff is in my capacity, none of it.  Never.

22          And then he would ask my wife the same questions.  And

23  then he began -- he was almost -- he was very insulting in his

24  tenor and his attitude about how he was asking the questions.

25  And I was -- so I responded to it, because he was -- he was

1    insulting me.

2         He even attacked me and accused me of misappropriating

3    funds through my escrow account.  He attacked -- he attacked --

4    so attacking both my professional and my personal integrity by

5    saying that I somehow abused my escrow account or one of my

6    IOLA accounts.  And I just thought that was way out of line.

7    And if you want to talk about what's appropriate, that was so

8    inappropriate.  I mean, I don't even know how he got to that

9    point to even suggest something like that, which as I believe

10   we all know, that's a basis to be disbarred.  I would never do

11   something like that.

12   Q.   Did you feel humiliated?

13   A.   I felt more than humiliated.  I was already in a

14   humiliating experience.  You know, again, as a man, it's

15   humiliating for me to have to come with my tail between my legs

16   and beg the court for -- to help me with responsibilities that

17   I haven't been able to meet.  It's -- I was already humiliated.

18   And then to be degraded and demoralized by counsel for the

19   bank, it was just even worse.  And I -- I just -- I could not

20   imagine the need for some -- I mean, again, I answered the

21   questions to the best of my ability, but some of them just made

22   absolutely no sense.  They just -- it just went on and on and

23   on, and I can only imagine -- I was like -- where are you going

24   with this?

25   Q.   Did he -- did he ask you the country of your birth --

1  origin?

2  A.    I don't recall if he did or didn't, but I wouldn't be

3  surprised if he did.   I mean, he just asked some just

4  ridiculous questions, in my opinion.   I have -- respectfully.

5  And I know -- I understand at deposition -- I understand what a

6  deposition is.   It's a fishing exhibition (sic).   I understand

7  that.   And you want to try to determine as much information as

8  you can.   But at the same time, it just was beyond reasonable.

9  And his attitude towards me --

10          THE COURT:  Let's -- I'm sorry --

11          MR. GIORDANO:  Objection, Your Honor.

12          THE COURT:  -- let's move on.

13          MR. GIORDANO:  Move to strike.

14          THE COURT:  Stop.  Let's move on.

15          His -- the conduct of the parties during the

16  deposition, I have the depositions, I'll read them.

17          MR. DAHIYA:  You have it, sir?

18          THE COURT:  I have the depositions, and I'll read

19  them.   The inflection of voice and whatnot, I know in these

20  depositions, both sides made a record that the other side's

21  sarcasm or comments by the witness, they're all part of the

22  record.

23          All I'm interested in, guys -- and I'll give you time,

24  but all I'm interested in here is, orders I issued were

25  violated by these parties --

1          MR. DAHIYA:  I'm coming --

2          THE COURT:  -- let me just finish.

3          MR. DAHIYA:  Yeah.

4          THE COURT:  -- were violated by these two debtors.  A

5   violation of a court order with other elements as required by

6   727, will be the basis of a revocation -- not a revocation --

7   of a nondischargeability.  So if you want to get to the parts

8   of the depositions where the plaintiff outlined specific

9   documents or issues that were not turned over and were

10  subsequently found to be in the possession, I think that would

11  be a more fruitful place to go.  And if you then want to expand

12  on why he did that, I'll listen.

13         MR. DAHIYA:  Yeah.

14         THE COURT:  Because that's the issue.

15  BY MR. DAHIYA:

16  Q.   Jeffrey --

17         THE COURT:  I assume he was upset in the deposition.

18  Q.   Jeffery, can I ask you -- you just heard the judge -- that

19  some documents were given initially, and some documents were

20  not given, and you filed an affidavit.  You stated you'd given

21  everything you had.  But then you did come up with other

22  documents.  How did that happen?

23  A.   Again, because of the way our house was during that time,

24  and still, to an extent, things would just come up.  And there

25  were things that you asked -- he was asking for that we

1  weren't -- he was asking for like our cable bill and stuff like

2  that.  I mean, of course we had a recent cable bill that had

3  just come in.

4  Q.    Yeah.

5  A.    But you know, when we got the list, it wasn't clear to us

6  that those were -- that he wanted that kind of minutiae.  It

7  was just like -- come on really?  It just didn't -- it just

8  didn't -- I guess it didn't make sense to us what was being

9  asked of, and I would -- you know, without casting aspersions

10  on Ms. Joseph, it just wasn't explained to us exactly what was

11  required.  And we -- so we just weren't sure.  We gave

12  everything we thought was being asked for.

13      She basically gave us a list and we complied with it to

14  the best of our ability.

15  Q.    And did you get the documents as soon as they were

16  available to you?

17  A.    Yes, I did.

18  Q.    Did it ever occur to you that you might be disobeying the

19  court orders?

20  A.    No, not at all.

21  Q.    Why?

22  A.    Because again, we were doing everything we could.  There

23  was no intent on -- I mean, again, I'm an attorney, I'm an

24  officer of the court myself.  I would never do anything to

25  intentionally disobey a court order, not only because it would

1    impact this bar -- this bankruptcy proceeding, but it could

2    impact me professionally.  I'm having enough trouble

3    financially without putting my license in jeopardy.  I would

4    never do something like that.

5    Q.   So your testimony is that you complied with all the court

6    orders?

7    A.   To the best of my ability, absolutely.  Absolutely.

8    Q.   Did it ever occur to you that you might not have complied?

9    A.   No.

10   Q.   Do you respect our court system?

11   A.   I'm sorry?

12   Q.   Do you respect our court system?

13          MR. GIORDANO:  Objection, Your Honor.  Respect?

14          THE COURT:  He's a lawyer, let him say he does, or he

15   doesn't.  I don't know.

16   Q.   Do you respect our court system?

17   A.   Absolutely.  I love court.

18   Q.   Do you respect our bankruptcy court system?

19   A.   Yes, I -- I need the bankruptcy court system.

20   Q.   Do you respect the judges?

21   A.   I love the judges.  I'm -- sorry.  Yes, I do.

22          MR. GIORDANO:  Objection, Your Honor.  Really?

23          THE COURT:  You're going to object to a witness saying

24   he likes me?

25          MR. GIORDANO:  Your Honor, if you can't see --

1          THE COURT:  I understand.  I understand.  The

2    probative value may be limited.  But it's so rare that we get

3    such an announcement in court, that I'm going to leave it

4    there.

5    Q.   Jeffrey, in your bankruptcy case, have you disclosed all

6    your assets?

7    A.   Yes.

8    Q.   Have you disclosed all your liabilities?

9    A.   Yes, I believe so.

10   Q.   Do you understand that you were sanctioned in this case?

11   A.   Yes, I do.

12   Q.   What do you think you're sanctioned for?

13   A.   To the best of my understanding, I mean, like I said, I

14   thought I was complying, so I thought the sanctions was based

15   on, you know, the fact that things came into light later that I

16   didn't submit.  But again, I didn't have access to all of those

17   things.  I also thought, in part -- and this is just my

18   opinion -- I thought I was also sanctioned because of the way I

19   responded in the deposition.  But again, you know, I mean, I

20   apologize to Your Honor for some of the language I chose in the

21   deposition, but I do not apologize to plaintiff's counsel.  I

22   do not.

23   Q.   Why is it that you don't apologize to --

24             THE COURT:  Move on.

25             MR. DAHIYA:  Okay.

1    Q.    The plaintiff, Cadles, did you take a loan from them?

2    A.    No.

3    Q.    Who are these people?

4           MR. GIORDANO:  Objection, Your Honor.  Relevance.

5    It's not in the deposition transcript.  It's not relevant to

6    this proceeding at all.

7           MR. DAHIYA:  It's framing issues other than --

8           THE COURT:  Whether or not -- how this lending

9    relationship came up really has nothing to do with the narrow

10   issue in front of me.  So I'd say we'd move on from that.

11          MR. DAHIYA:  No, I wanted to bring out if he had past

12   relations with this so-called judgment buyer or this lender.

13   So --

14          THE COURT:  All right.  You can ask him if he's ever

15   had any dealings before with Grassy -- Cadles.

16   Q.    Who do you think Cadles is?

17          THE COURT:  No, what I said is --

18          MR. GIORDANO:  Objection.

19          THE COURT:  -- stop.  You can ask him what if --

20   Q.    Did you have any transactions, any dealings with Cadles?

21   A.    No.

22          THE COURT:  Move on.

23   Q.    Jeffrey --

24   A.    Yes.

25   Q.    -- do you know what is at stake here if you lose this

 1 | case?

 2 |      MR. GIORDANO:  Objection.

 3 |      MR. DAHIYA:  No?  Sorry.

 4 |      MR. GIORDANO:  Relevance.

 5 |      MR. DAHIYA:  727 --

 6 |      THE COURT:  I want -- I -- stop.

 7 |      I'm going to overrule the objection.  I think it's

 8 | important -- I want to hear what the witness thinks was at

 9 | stake.  Not that it affects -- the effects of all -- the

10 | sanctioning and what occurred has occurred.  But I want to get

11 | a picture of what was going through the debtor's mind at the

12 | time he did these things.

13 |      MR. GIORDANO:  Okay, Your Honor.  I understand, and I

14 | know where you're going with that.  However, that is direct

15 | testimony.  It's outside the scope of this particular witness.

16 | He's only on the stand for cross-examination purposes within

17 | the scope of the deposition transcript, which is our evidence

18 | in chief.

19 |      For him to go through, now, and put on direct

20 | testimony for his --

21 |      THE COURT:  I'm not going to let you use the

22 | deposition as a sword.  That's your direct testimony.  I want

23 | to get the full picture within the bounds of the rules of

24 | evidence.  That gives me a great deal of leeway as to what I

25 | allow a cross where we have the debtor -- this debtor's entire

1    issue is whether a 727 will be issued, which means any debt

2    that he has incurred up until the time he filed will never be

3    dischargeable, never.  It is the most serious remedy that this

4    Court can enter.  And I take that seriously.

5            The circuit takes it seriously, the Supreme Court

6    takes it seriously.  And so if I have to listen to a little

7    more about that, I'm going to hear it.

8            MR. GIORDANO:  Thank you, Your Honor.

9            THE COURT:  Okay.

10   BY MR. DAHIYA:

11   Q.    Jeffrey, do you know why you're being sued here by Cadles?

12   A.    For the money that I owed on the mortgage.

13   Q.    I'm sorry?

14   A.    For the money that I --

15           THE COURT:  No, we're not -- hold it.  I'm going to

16   let you ask him about the 727 --

17           MR. DAHIYA:  Yeah.

18           THE COURT:  -- not the underlying debt.

19   Q.    I repeat my question.  Jeffrey, do you know what is at

20   stake here if they deny you discharge?

21   A.    Yes.  I mean, I don't know what else I would do.  This is

22   my last recourse.  If I'm denied discharge and I'm not able to

23   get from under this rock on my shoulders, I honestly don't know

24   where else to turn.

25           As I said before, bankruptcy was an absolute last resort.

1  It was something that, again, as a man and as a provider, I was

2  very reluctant to pursue.  Somebody -- one of my friends said

3  don't be ashamed; Donald Trump had to file bankruptcy.  So you

4  know, when it was explained to me in that light, that's --

5  that's why I did it.

6       But the reality is, I don't know what I would do if

7  this -- you know, if our debts were not able to be discharged.

8  I don't have any other recourse.  This was -- this is my

9  last -- my last hope, if you will.

10  Q.   Do you have a family to support?

11  A.   I have four children and a wife.

12  Q.   Have you discussed that issue with your wife?

13  A.   My wife and I have discussed it, yeah.

14  Q.   Have you discussed it with your children?

15  A.   No.  I tried to, you know, to the best of my ability,

16  protect them from it.  My oldest son, he's aware of what's

17  going on.  In fact, he left college to try to find work.  And

18  he wasn't able to find any work, so he's now enlisted in the

19  military because, you know, the frustration was

20  unfortunately -- excuse me.

21  Q.   Jeffrey, do you --

22  A.   The frustration was impacting -- I'm sorry.  The

23  frustration was impacting him to the point where he felt it

24  would be easier for him to leave the house -- I'm sorry, Your

25  Honor.  He felt it would be easier for him to leave my house so

1  we wouldn't have the additional debt to take care of him.  So

2  he joined the military when he couldn't find work, to help us

3  out.

4  Q.    How old is your youngest child?

5          THE COURT:  Move on.

6          MR. DAHIYA:  Okay.

7          THE COURT:  I understand that --

8          MR. DAHIYA:  Okay.

9          THE COURT:  -- this is a taxing circumstance for both

10  Mr. St. Clair and his wife.  I accept that.  I certainly

11  understand the effects on families --

12          MR. DAHIYA:  Okay.

13          THE COURT:  -- but I hope Mr. St. Clair, at least as a

14  lawyer, can understand that what we're limited with in this

15  court, as opposed to maybe some other sources of -- is what

16  happens as a matter of law.  And so sympathies aside, I have to

17  just deal with that.

18          THE WITNESS:  I understand, Your Honor.

19          THE COURT:  Okay.

20          THE WITNESS:  Thank you.

21  Q.    In all fairness and honesty, do you feel you have complied

22  with the court orders?

23  A.    Yes, I do.

24          MR. DAHIYA:  That's all, Your Honor.

25          THE COURT:  Okay.

1            Now, is Mrs. Sinclair going to take the stand as well?

2            MR. DAHIYA:  Yes, Your Honor.

3            THE COURT:  Well, let's do --

4            MR. DAHIYA:  Briefly.

5            THE COURT:  -- let's do your -- this is, in theory,

6    redirect with some latitude, obviously, on Mr. St. Clair, and

7    then you can --

8            MR. GIORDANO:  Your Honor, it really is going to be

9    cross-examination, because he was -- he was --

10           THE COURT:  I've given up trying to keep track of it.

11           MR. GIORDANO:  Yeah.

12           THE COURT:  So we'll --

13           MR. GIORDANO:  I understand.  Thank you, Your Honor.

14           THE COURT:  -- counsel will object if he thinks it's

15   outside, and I'll rule.

16           MR. GIORDANO:  I understand.  Thank you, Your Honor.

17   REDIRECT EXAMINATION

18   BY MR. GIORDANO:

19   Q.   Mr. St. Clair, how long have you been an attorney for?

20   A.   Twelve years, maybe.

21   Q.   How many years?

22   A.   Maybe twelve years.

23   Q.   Maybe twelve years.  So you're admitted in New York State?

24   A.   Yes, I am.

25   Q.   So you were admitted in 2002?

1    A.    Yes.

2    Q.    Besides New York State, are you admitted in any other

3    states?

4    A.    No.

5    Q.    You're also admitted in the Eastern District of New York,

6    correct?

7    A.    Yeah.  Yes, I am.

8    Q.    And when did you get admitted in the Eastern District.

9          MR. DAHIYA:  Objection, Your Honor.  Not relevant.

10         MR. GIORDANO:  It's all under the same deposition

11   transcript --

12         THE COURT:  We're going to play by the same rules.

13   I'm going to let him bring out what he wants to bring out

14   within a range.

15   A.    I don't recall.

16   Q.    Okay.  So you've testified that you love the courts and

17   you love the judge and you love the system, and you've been an

18   attorney for over ten years.  So for the better part of a

19   decade, you have some understanding of the requirements to

20   follow subpoenas and court orders, don't you?

21   A.    To an extent.  But I don't practice civil law, so I'm

22   rarely in contact with any subpoenas or anything of that

23   nature.

24   Q.    You know that you're supposed to comply with court orders,

25   though, right?

1  A.   Yes, I do.

2  Q.   And you know you're supposed to comply with subpoenas,

3  right?

4  A.   Again, I don't deal with subpoenas.  I am not a civil

5  practitioner.

6         MR. GIORDANO:  Objection, Your Honor.  Move to strike.

7         THE COURT:  Okay.  Don't make any signs to the

8  witness.

9         Answer the question and move on.

10        MR. DAHIYA:  No, I'm just telling him to --

11        THE COURT:  I understand.

12        MR. DAHIYA:  -- calm down.  That's all.

13        THE COURT:  Nobody wants you to get upset.  Well --

14        Just try to answer the question, stay calm if you can,

15  and move on to the next one.

16        THE WITNESS:  I thought I answered the question the

17  first time he asked it, Your Honor.

18        THE COURT:  We're not having a dialog.  I'm just

19  telling you what I think you should do.

20 Q.   Again, Mr. St. Clair, you do know you're supposed to

21  respond to subpoenas, right?

22        MR. DAHIYA:  Asked and answered.  Objection, Your

23  Honor.

24        THE COURT:  Let him answer for it one time.

25 A.   I saw the subpoena.  I did the best I could to respond to

1    it.

2            MR. GIORDANO:  Objection, Your Honor.  It's

3    nonresponsive to my question.

4            THE COURT:  Ask him another question.

5            MR. GIORDANO:  Ask him another question?  I haven't

6    got an answer to the first one, which is --

7            THE COURT:  What do you want me to do?  If you say

8    it's not responsive, do you want me to strike it?  Do you want

9    me to --

10           THE COURT:  Direct him to answer the question that I

11   asked, Your Honor, respectfully.

12           MR. DAHIYA:  He answered.  He --

13           THE COURT:  Stop.

14           MR. DAHIYA:  Sorry.

15           THE COURT:  That's his answer.  Ask it five different

16   ways, maybe you'll get other answers.  That's his answer.

17           MR. GIORDANO:  But his answer to the question --

18           THE COURT:  Don't argue with me.

19           MR. GIORDANO:  I'm sorry, Your Honor.  I'm not trying

20   to argue.  I'm trying to explain.  My question begs a yes or no

21   answer, and he gave an explanation with regard to a specific

22   subpoena in this case.  So that's not responsive to my

23   question.

24           THE COURT:  The record will reflect what it does.

25           MR. GIORDANO:  Okay.

1           THE COURT:  Ask him more questions.

2           MR. GIORDANO:  Thank you, Your Honor.

3    BY MR. GIORDANO:

4    Q.   You testified, Mr. St. Clair, that you received the

5    subpoena and the order, the 2004 order, correct?

6    A.   I believe I did.  I don't recall.

7    Q.   Okay.  Isn't it true that that 2004 order was from July

8    2012?

9           MR. DAHIYA:  That's not a question, Your Honor.

10   Objection, Your Honor.

11   A.   I'm a little --

12          MR. GIORDANO:  Isn't it true?  That's a question.

13          THE COURT:  Guys this isn't a circus.  There was --

14   I've already ruled.  There was a subpoena issued for a 2004,

15   and Mr. St. Clair did not comply with it.  There's no longer an

16   issue about whether he got it.  It's no longer an issue about

17   whether he complied with it.

18          THE WITNESS:  I'm only --

19          THE COURT:  Don't say anything.

20          THE WITNESS:  No, I just -- I don't know what you mean

21   when you say 2004.  That's the problem.  I didn't follow --

22          THE COURT:  Mr. St. Clair, you and I are not having

23   conversations.

24          MR. DAHIYA:  Just keep quiet.

25          THE COURT:  Do you understand that?  You're a witness.

1  You'll do yourself a great deal of good if you only respond to
2  questions.  Listen to your lawyer.  That's what he's trying to
3  do when he waves his arms at you.  Just listen and answer.
4  This isn't a debate.

5          The 2004 subpoena, other orders that were the subject
6  of this Court's order have been established.  Whether he now
7  remembers getting it or not is not that relevant.  What's
8  relevant to me is there are certain things within this
9  deposition, there's an affidavit that he and his wife signed on
10  March 3, which attested to the Court that they have not
11  destroyed any documents, they've given over all documents,
12  blah, blah, blah, blah, blah.  The facts may belie that.  I
13  want to know if they do and why they do.

14          MR. GIORDANO:  I'm --

15          THE COURT:  If it's all in the deposition, don't ask
16  him anything.  If you think you've got to get the intent and
17  knowledge, ask him.

18          MR. GIORDANO:  That's what I'm getting, Your Honor,
19  so --

20          THE COURT:  Go ahead.

21          MR. GIORDANO:  -- his intent and knowledge of the
22  orders and his failure to comply.  Obviously, his failure to
23  comply has been decided.

24          THE COURT:  Don't arg -- it's not with me.

25          MR. GIORDANO:  Oh, I'm explaining.  I'm --

1          THE COURT:  So whether or not he remembers getting

2     something or -- I mean, use your own brains.  We've already --

3     that's history.

4          MR. GIORDANO:  Well, like I said, it goes to this

5     intent and knowledge of the order and failure to comply with

6     the order.

7          THE COURT:  Your set of questions.  You're a competent

8     lawyer.  Go ahead.

9          MR. GIORDANO:  Excellent, Your Honor.

10    BY MR. GIORDANO:

11    Q.   Mr. St. Clair, you testified a little while ago that your

12    records were destroyed in a flood after Hurricane Sandy,

13    correct?

14    A.   No.

15    Q.   No?  Okay.

16    A.   I testified that some of my records --

17         THE COURT:  Strike the last part of the answer.

18    Q.   Thank you, Mr. St. Clair.  So, Mr. St. Clair, you

19    testified that some of your records were destroyed in the flood

20    after Hurricane Sandy, right?

21    A.   Yes.

22    Q.   What records were destroyed?

23    A.   Again, they were destroyed --

24         MR. DAHIYA:  Objection, Your Honor.  Too general.

25    What records?  I mean -- a house has so many records; of what?

1          THE COURT:  Where's the house.

2          THE WITNESS:  Baldwin.

3          THE COURT:  Where?

4          THE WITNESS:  Baldwin.

5          THE COURT:  Baldwin, New York?

6          THE WITNESS:  Yes, South Baldwin.

7          THE COURT:  And you had flood in the house?

8          THE WITNESS:  Yes.

9          THE COURT:  Okay.  And your answer is that records

10  were destroyed?

11         THE WITNESS:  Yes.

12         THE COURT:  What about the records that were produced

13  after you said there were no records?

14         THE WITNESS:  No, I never said there were no records.

15  If I did, I misspoke.  I said some things that --

16         THE COURT:  I'll make that determination.  Just answer

17  me about -- there were documents, introduced in this

18  proceeding, that were introduced after representations to this

19  Court, by you and your counsel, that no more documents existed.

20  Then those documents found their way into the court.  I'm just

21  wondering, were those part of the documents that were

22  destroyed?  I mean, they couldn't have been destroyed if they

23  were produced.  How did that happen?

24         THE WITNESS:  I don't exactly recall, but some of the

25  things were recent documents.  For example, he asked for cable

1    bills that had just come in, so we -- we gave him some of the

2    more recent things that we had av -- that became available

3    since --

4            THE COURT:  Okay.  So let's focus, for a moment, on

5    the documents that the Court found were submitted -- I believe

6    there were -- after there were representations that there were

7    no documents.  That was one of the big issues in this case,

8    wasn't it, or not?

9            THE WITNESS:  Certainly, Your Honor, yes.

10           THE COURT:  Okay.

11           THE WITNESS:  Of course.

12           THE COURT:  So perhaps, if we narrow it down to that

13   universe for the moment, and find out what they were, why they

14   weren't produced, what his intent was.  We know he didn't

15   produce them, because I already made that order.  So if we

16   could maybe go there, we can make some progress.

17           MR. GIORDANO:  I understand Your Honor.  It's just

18   that the questioning -- the line of questioning that I am

19   pursuing here go to his intent to refuse to comply with the

20   Court's order itself, from July 2012.  So that's what I'm

21   getting to.

22           THE WITNESS:  Can he not --

23           THE COURT:  Don't --

24           THE WITNESS:  Sorry.

25           THE COURT:  There were court orders that I found you

1    did not comply with; whether you agree with me or not, I found

2    that, correct?

3              THE WITNESS:  Yes.

4              THE COURT:  Okay.  Why did you dec -- did you decide

5    not to comply with those orders?

6              THE WITNESS:  Absolut --

7              THE COURT:  What was your motivation?

8              THE WITNESS:  Judge, as I -- as I tried to explain

9    earlier, we gave what we had at that time.  Things were

10   discovered later.  Documents came in, subsequent to the order,

11   that he had asked for.  It was clearly explained, so some of

12   those things, once it was more clearly explained, we were able

13   to, you know, sort through some of the mess and -- and

14   uncover --

15             THE COURT:  But that's my question.  If the documents

16   existed, and they were there to be sorted through, why didn't

17   you sort through them when you got the notices of subpoena?

18             THE WITNESS:  Because we thought we did comply, Judge.

19   We -- from what was explained to --

20             THE COURT:  Well, you're just telling me that there

21   were documents you didn't bother going through.

22             THE WITNESS:  No, I did -- I'm not -- that's -- well,

23   it's not that simple, with all due respect; it's just that we

24   thought whatever was asked for we had provided to the --

25             THE COURT:  But unless you went through everything,

1    how would you know that?

2              THE WITNESS:  Again, it wasn't that clear to us what

3    was required.  So we gave what we thought was being asked for.

4              THE COURT:  But again, I'm asking you, Mr. St. Clair,

5    did you go through everything and make a decision not to turn

6    certain stuff over?

7              THE WITNESS:  Oh, no, never.

8              THE COURT:  Well, then if you went through everything,

9    how is it that certain stuff wasn't turned over?

10             THE WITNESS:  I -- I can't answer that, Judge.  I

11   mean, we did the best we could.  I don't -- I don't --

12             MR. DAHIYA:  I mean, respectfully, your questioning,

13   Your Honor, is --

14             THE COURT:  Is there a --

15             MR. DAHIYA:  -- that he went through the documents.

16   These are the documents --

17             THE COURT:  You don't get a chance to object to my

18   questions.

19             MR. DAHIYA:  I -- because you're con -- he's getting

20   confused by that.  I told you --

21             THE COURT:  I'll -- we'll let the record be what it

22   is.  Counsel, go on.  I'll give you -- you want to clarify

23   something?

24             MR. DAHIYA:  Yeah.

25             THE COURT:  Whether you believe he's confused or not,

1    that's a question of fact that I'll determine, or whether in

2    fact he's telling the truth, which is true of what the record

3    is.

4              MR. DAHIYA:  All I would say was there are two

5    documents here, documents that he requested, the demand letter

6    subpoena.  The other one is the paper what he has all the

7    records of his house.

8              THE COURT:  Sir, you can't testify.

9              MR. DAHIYA:  I'm not -- okay.

10              THE COURT:  All I'm trying to establish here is, by

11    definition, if a document is ultimately produced, it was never

12    destroyed; it had to have existed.  And if it existed, where

13    was it?  And if they went through everything, then there had to

14    be a decision not to turn something over, or they didn't go

15    through everything.  It's only one of those two answers.

16    That's all I'm trying to figure out, guys.

17              Go ahead.

18    BY MR. GIORDANO:

19    Q.   So Mr. St. Clair, going back to my questioning, you

20    testified earlier that you made a good-faith effort to produce

21    the documents.  Isn't it true that you didn't produce any

22    documents at all --

23    A.   No.

24    Q.   -- from the date --

25              THE COURT:  Wait.  Let him finish the question.

1            THE WITNESS:  I thought he was finished.

2            THE COURT:  Okay.

3    Q.   -- from the date --

4            MR. GIORDANO:  Let me start over again.

5    Q.   Going back to my line of questioning regarding your

6    statement that you made a good-faith effort to produce all of

7    the documents, isn't it true that you produced no documents,

8    whatsoever, from the date of the 2004 order, in July of 2012,

9    until 2013, in January?

10   A.   I didn't get an order in 2004.

11           MR. DAHIYA:  Unintelligible, Your Honor.  Objection.

12   He needs to be --

13           THE COURT:  What's your objection?  Just tell me the

14   objection.

15           MR. DAHIYA:  He doesn't understand what Rule 2004 --

16   this --

17           THE COURT:  What's your objection?

18           MR. DAHIYA:  Unintelligible.  He is not understanding

19   the --

20           THE COURT:  To your or to the witness?

21           MR. DAHIYA:  I am objecting to the question.

22           THE COURT:  You want him to clarify the question?

23           MR. DAHIYA:  Yes, sir.

24           THE COURT:  Clarify it.

25           MR. GIORDANO:  Sure.

1    Q.    Mr. St. Clair, you testified that you received the

2    subpoena and the 2004 order.  And when I mean "2004 order", I

3    mean pursuant to the Bankruptcy Code, there was an order set

4    forth that you produce your documents and appear for 2004

5    examinations.  So you testified that --

6    A.    No, I --

7    Q.    -- you received that order and the subpoena, and that you

8    made a good-faith effort to produce all the documents.  But

9    isn't it true that you produced no documents, between the date

10   of the order and subpoenas, in July of 2012, until January of

11   2013?

12   A.    I don't recall.

13   Q.    Isn't it true that plaintiff made a motion to dismiss your

14   bankruptcy in September of 2012?

15            MR. DAHIYA:  Objection, Your Honor, he doesn't --

16   A.    I don't know.

17   Q.    Were you aware that plaintiff made a motion to dismiss

18   your bankruptcy in 2012?

19   A.    I honestly don't know.

20   Q.    Did you ever appear, in this Court, before Judge Grossman,

21   for any of the return dates or hearings for plaintiff's motion

22   to dismiss your bankruptcy?

23   A.    I appeared here many times.  Many times I was not clear on

24   what the nature of the proceedings were, so I can't honestly

25   answer that.

1   Q.   At the time when you appeared, was there ever any

2   discussion regarding your failure to produce documents required

3   by the Court's orders and subpoena?

4   A.   At what time?

5          MR. DAHIYA:  Objection, Your Honor.

6          THE COURT:  What's the basis?

7          MR. DAHIYA:  Discussion with whom?  I mean, he said

8   you had discussion.

9          THE COURT:  Do you understand the question?

10          THE WITNESS:  No, I don't.

11          THE COURT:  Rephrase the question.

12  Q.   Discussion in court regarding your failures to comply with

13  the subpoena and the order.

14  A.   Okay.  I don't understand what he means.  Discussion with

15  who?  Me and my lawyer?  Me and my wife?  There could have

16  been; I don't know.

17  Q.   Well, I'll simplify it for you, Mr. St. Clair.  Discussion

18  in court with Judge Grossman, on the record, with your counsel

19  present and your wife present as well.

20  A.   Discussion about what?

21  Q.   Your failures to comply with the multiple orders of the

22  Court and the subpoena.

23  A.   I remember sitting in this box and being questioned

24  regarding whether or not I'd produced certain documents.  And I

25  remember the judge made a ruling that I -- that I didn't.

1    So --

2    Q.    Did you have any discussions with your lawyer regarding

3    your failures to submit documents pursuant to the Court's order

4    and subpoena?

5            MR. DAHIYA:   Objection.   He assumes facts, Your Honor.

6            THE COURT:   What facts is he assu --

7            MR. DAHIYA:   He testified he didn't fail in submitting

8    documents.   He is saying that your failure to --

9            THE COURT:   No, I found he failed to put documents in.

10   What he's asking is did he have conversations with his lawyer

11   about it.   It may be a different issue, but --

12   A.    I don't recall what I discussed with my lawyer.

13   Q.    Why didn't you produce any records between July 2012 and

14   October 2012?

15   A.    I don't know that I didn't.

16   Q.    Did you?

17   A.    I thought I did.   I made every effort I could to produce

18   whatever records I had.   I don't know what happened in between

19   those specific dates.   I don't recall what happened in those

20   specific dates.

21   Q.    Who did you produce records to, between July --

22   A.    Any time I produced --

23   Q.    -- two thou --

24   A.    -- any record --

25           THE COURT:   Let him finish the question; then you get

1  to answer.

2          THE WITNESS:  I'm sorry, but he hesitates and --

3          THE COURT:  Let him finish the question.

4          THE WITNESS:  I can't tell when he's finished.

5          THE COURT:  You really don't want to get crosswise

6  with me.

7          Go ahead.

8  Q.   Who did you produce records to between July 2012 and

9  October 2012?

10 A.   If I produced any records, I gave them to my attorney at

11 the time.

12 Q.   So you don't know if you produced any records between

13 those dates?

14 A.   If I produced records between those dates, I would have

15 given them to my attorney.

16 Q.   Mr. St. Clair, you swore in an affidavit, from March 2013,

17 that you had no other records, other than what was produced to

18 plaintiff --

19         THE WITNESS:  Could he show me --

20 Q.   -- in your possession, custody or control, isn't that

21 true?

22 A.   I don't --

23         MR. DAHIYA:  Objection, Your Honor.  But he

24 compounded -- can he make it simple, like --

25         THE COURT:  No, it's pretty simple; he knows what the

1  question is.

2  A.    I don't recall exactly what the affidavit said, but I

3  remember the judge --

4          THE COURT:  Show him the affidavit.  It's an exhibit.

5  It's Exhibit 11 in your book, or 10.  Show it to him, please.

6          MR. GIORDANO:  Oh, okay.

7          May I, Your Honor?

8          THE COURT:  Please.

9          The witness is being shown Exhibit 10 in the exhibit

10 books.

11 Q.    Mr. St. Clair, after you have an opportunity to read

12 that --

13 A.    Yes, I have.

14 Q.    -- please answer my question.

15 A.    Can you repeat the question?

16 Q.    Isn't it true that you swore in that affidavit that the

17 records -- that you had no other records, other than what you

18 produced to the plaintiff, in your possession or control?

19         MR. DAHIYA:  The document speaks for itself, Your

20 Honor.  Objection.

21         THE COURT:  He can answer the question.

22 A.    It said in the doc -- I swore that the documents here

23 submitted to counsel for Cadles are the only requested

24 documents in our possession and control.

25 Q.    Isn't it true that you actually did have other records in

1  your possession or control?

2          MR. DAHIYA:  Objection, assuming facts.

3  A.    Not that I was aware of at that time.

4          THE COURT:  No, it's a question.  I'm sorry, I didn't

5  hear the answer.

6          THE WITNESS:  I'm sorry, not that I was aware of at

7  that time.

8  Q.    Isn't it true that when you gave document responses to

9  plaintiff, you objected in those document responses --

10  A.    No.

11  Q.    -- to the pro --

12  A.    I never gave documents to plaintiff; I gave them to my

13  lawyer as I said.

14  Q.    Isn't it true that while I took your deposition during

15  that 2004 examination that you objected to the production of

16  documents?

17  A.    I don't recall.

18  Q.    Isn't it true that you refused to answer certain questions

19  during that --

20  A.    That's probably true.

21  Q.    -- deposition?

22          MR. DAHIYA:  Wait, objection.

23          THE COURT:  Overruled.

24          MR. DAHIYA:  What question, Your Honor, there's so

25  many questions said.  These are the questions.

1          THE COURT:  Go into the transcript; get a couple of

2     occasions where you asked specific questions, you got a

3     response.

4          MR. GIORDANO:  Okay.

5          THE COURT:  Let's see what his -- there's no need to

6     be generic.

7  Q.    Mr. St. Clair, do you recall a line of questioning

8     regarding who your brother-in-law was, at your deposition?

9  A.    No, I don't.

10  Q.   Do you recall setting forth that you represented a brother

11    of yours during your deposition?

12  A.    No, I would not have said that.  I don't have a brother.

13  Q.    Do you recall refusing to answer any questions regarding a

14    brother-in-law that you represented, during your deposition?

15  A.    I don't recall.

16  Q.    Do you recall objecting when I had asked you questions

17    during your deposition?

18  A.    I can't hear you --

19          MR. DAHIYA:  Objection, Your Honor.

20  A.    -- I'm sorry.

21          THE COURT:  Overruled.

22  Q.    Do you recall objecting at all during your deposition?

23  A.    I don't know if I objected; I don't recall, counselor.

24  Q.    Do you recall refusing to turn over documents when I made

25    the demands, or reiterated our demands, during your deposition?

1  A.   I don't make -- I don't recall that as specific refusals.

2  Q.   Did you refuse at all?

3  A.   I don't recall.  If you --

4  Q.   Do you recall questions regarding your IOLA account --

5  A.   That I recall.

6  Q.   -- from your deposition?  And do you recall me making a

7  demand for records referable to any operating accounts?

8  A.   I don't specifically recall that.

9  Q.   Did you object and refuse to turn over any IOLA accounts

10 or operating accounts for your practice as a lawyer?

11 A.   I don't understand that question, I'm sorry.

12 Q.   Did you refuse to turn over any information regarding any

13 operating accounts or your IOLA accounts from your practice as

14 an attorney?

15 A.   I may have refused to turn over IOLA accounts.

16 Q.   So on the date of your deposition, which was March 13 and

17 March 14, you knew that you had records in your possession or

18 control that you were refusing to turn over, isn't that true?

19 A.   No.

20 Q.   Mr. St. Clair, you testified that you were disturbed by my

21 questioning and that you were attacked.  Isn't it true that I

22 never cursed at you once?

23 A.   You made some --

24        MR. DAHIYA:  Objection, Your Honor.

25 A.   You made some --

1          THE COURT:  Move on.

2    A.    You made some untoward remarks, counselor?

3          THE COURT:  Guys, I'm not interested in the

4    intramurals.

5          MR. GIORDANO:  Well, Mr. St. Clair testified at

6    length, Your Honor, regarding his intent and his mental state,

7    and how he was very disturbed during his deposition.  And Your

8    Honor permitted that line of questioning.  I want to show the

9    Court --

10         THE COURT:  I've read the deposition; I understand

11   what went on.

12         MR. GIORDANO:  Okay, thank you, Your Honor.  I just

13   wanted to show the Court that contrary to what he states --

14         THE COURT:  What I'm curious about is in the

15   deposition, you were asked about your records from your law

16   practice.  Where are those records?

17         THE WITNESS:  I gave them what I had, Judge.

18         THE COURT:  So if they got no records from your law

19   practice, then there were no records?

20         THE WITNESS:  No, I did -- I'm sorry, I didn't mean --

21   I don't know if you were done, but I did submit them.  I gave

22   them to Narissa, I gave her a bunch of stuff from my practice.

23         THE COURT:  Because in the --

24         MR. GIORDANO:  Your Honor, he said he didn't remember

25   what he gave to Narissa.  Now he's saying he gave them to

1  Narissa.

2          THE COURT:  This is getting very hard.  Guys, in the

3  deposition -- let's try to stay with what actually exists, you

4  were asked a number of questions about your records.  You say

5  they got destroyed in the flood, because you kept them in the

6  basement of the house.  Now are you saying they weren't

7  destroyed, they were given to your counsel, your lawyer?

8          THE WITNESS:  No, I was -- there were some -- I did --

9  I do a lot of work at the house, so there was some records.

10 And I have a basement office; there were some records there

11 that were destroyed.

12          What wasn't destroyed I gave to Narissa.  The problem

13 was I didn't understand, as I said before, Your Honor, what was

14 exactly being asked.  I had no idea --

15          THE COURT:  But they asked you were all the records

16 that you maintained down there destroyed, or were some

17 salvageable.  You said nothing was salvageable, everything was

18 destroyed.

19          THE WITNESS:  At that time that was my impression,

20 Judge.  And there were some things that were soaked that we

21 were able to dry out.

22          THE COURT:  So things that you said were destroyed

23 weren't?

24          THE WITNESS:  Most of the things were just not -- even

25 though they weren't destroyed, they were just not -- that's not

1  something I would want to produce to a court, because they --

2  we had sewage go into our basement.

3         THE COURT:  So -- I'm just trying to get this.  So

4  there were records that were not destroyed, but because of some

5  reason, you decided they were not going to turn them over, and

6  you didn't?

7         THE WITNESS:  When I say destroyed -- when you say

8  destroyed, I think totally obliterated and not -- there were

9  things that were not destroyed, but they had raw sewage on it.

10        THE COURT:  I'm using your words, there were --

11  nothing was salvageable, nothing?

12        THE WITNESS:  Well, then there was -- then I stand by

13  that, there was nothing salvageable because there was sewage on

14  it.  I was not -- I didn't want to touch it; it was disgusting.

15        THE COURT:  So you threw them out?

16        THE WITNESS:  I felt like I had no choice, we were in

17  a crisis, Judge, and we were --

18        THE COURT:  I got it.

19        THE WITNESS:  -- cleaning out our basement, and we

20  just -- we just had to get that out of our house; I couldn't

21  have that around my children.

22        THE COURT:  When was the 2004 originally served?

23        MR. GIORDANO:  I believe it was in August of -- 2004

24  order served?  Your Honor, it was posted on the --

25        THE COURT:  When was the document request?

1          MR. GIORDANO:  The docket --

2          THE COURT:  Document request.

3          MR. GIORDANO:  Document request.

4          THE COURT:  Demand.

5          MR. GIORDANO:  I believe there was an e-mail from July

6     2012 from my office to Narissa.

7          THE COURT:  I signed an order, guys; just tell me when

8     I signed it?

9          MR. GIORDANO:  The order was July 26th, 2012, Your

10    Honor.

11         THE COURT:  2012?

12         MR. GIORDANO:  Yes.  Yes.

13         THE COURT:  If I recall, the storm was November of

14    2012.

15         THE WITNESS:  Of June.

16         MR. GIORDANO:  June --

17         THE WITNESS:  I'm sorry.

18         MR. GIORDANO:  June 26th, 2012.

19         THE COURT:  The storm was November of 2012.

20         THE WITNESS:  October.

21         THE COURT:  Well, yeah, it was the day after my

22    birthday; I remember exactly when it was.  It was the end of

23    October.

24         So what happened between June and October that you

25    didn't turn the documents over?

1          THE WITNESS:  Again, Judge, when Narissa asked me to

2   give certain things, I gave what I thought she was asking for.

3          THE COURT:  Okay.  So you gave what you thought she

4   should have?

5          THE WITNESS:  No.  I think you're misstating what I've

6   said.  I gave what I believed she was asking for.  And when I

7   submitted it to her, she didn't ask for anything further, so I

8   relied on that.

9          THE COURT:  Did you tell her you had other things?

10         THE WITNESS:  No, I gave her what I had --

11         THE COURT:  How would she know she didn't get it all,

12  if you didn't tell her there was other things you weren't

13  giving her?

14         THE WITNESS:  Because I would imagine she would

15  compare what was given, as to what was being asked for.  And

16  tell me, okay, I've got A, B, C, but I don't have C -- you

17  know, D, E, F.

18         THE COURT:  I got it.  Move on.

19  BY MR. GIORDANO:

20  Q.   Mr. St. Clair, isn't it true that you objected to

21  documents that you had in your possession or control?

22         MR. DAHIYA:  Objection, Your Honor, asked and answered

23  so many times.  We've gone through it.

24         THE COURT:  Let him answer it once, and then we'll

25  move on.

1  A.    I don't recall.

2  Q.    Didn't you just testify a little while ago that you

3  recalled me asking about your IOLA accounts?

4  A.    That's what I said, yes.

5  Q.    Did you object to the production of any information

6  concerning your IOLA accounts?

7  A.    I think you're oversimplifying what I said.

8          MR. GIORDANO:  Objection, Your Honor.  Move to strike

9  as nonresponsive to my question.

10          THE COURT:  When he asked for your IOLA account what

11  was your answer?

12          THE WITNESS:  I told him that's something that I

13  didn't believe I had a right to turn over.  Because it's IOLA

14  account it's not my money; it's my client's money --

15          THE COURT:  Okay, that was your answer.

16          THE WITNESS:  -- so I --

17          THE COURT:  Fine, that's your answer.

18  Q.    So now as you sit here, do you recall objecting to

19  documents which you had in your possession or control?

20  A.    I don't recall objecting to anything.  I recall making a

21  statement in response to your question.

22  Q.    Do you recall ever being ordered to produce a privilege

23  log?

24  A.    I don't understand that question.

25  Q.    Do you recall ever being ordered by this Court to produce

 1  a privilege log for the documents which you claimed were
 2  privileged or confidential, or otherwise objectionable in your
 3  responses to the order and subpoena?
 4          MR. DAHIYA:  It's too general, Your Honor.  Too many
 5  questions.
 6          THE COURT:  Are you asking whether, as the debtor he
 7  knows what a privilege log is?
 8          MR. GIORDANO:  No, I'm just asking if he actually
 9  recalls being ordered to submit a privilege log for the items
10  that he objected to.
11          THE COURT:  Let him answer it.
12          Do you recall ever being --
13          THE WITNESS:  I don't recall that specifically, Judge.
14  Q.   Do you recall, during your testimony here before this
15  Court with regards to Plaintiff's motion to dismiss and/or for
16  sanctions, being questioned regarding a privilege log?
17  A.   I don't know what testimony you're referring to.
18  Q.   Did you ever produce a privilege log for any of the items
19  that were objected to?
20  A.   I'm not certain if I did or didn't.  If I did I would have
21  given it to Narissa.  And I'm sure if I gave it to Narissa, she
22  would have turned it over to you guys.  So if you have it, then
23  I think that would answer your questions.
24  Q.   Okay.  What discussion did you have with Narissa Joseph
25  regarding any privilege log?

1    A.    I don't recall have any discussion with her regarding a

2    privilege log.

3              MR. GIORDANO:  Just one moment, Your Honor.

4              With that, Your Honor, I have no further questions.

5              THE COURT:  Okay, step down.

6              THE CLERK:  Please raise your hand.

7        (Witness sworn)

8              THE CLERK:  Please be seated.  State and spell your

9    name for the record.

10             THE WITNESS:  Cathleen St. Clair.

11   DIRECT EXAMINATION

12   BY MR. DAHIYA:

13   Q.   Ms. St. Clair --

14             MR. DAHIYA:  Your Honor, can my client be excused for

15   five minutes; he has to call a client.  He'll be back in five

16   minutes.

17             THE COURT:  He can stay or go.

18             MR. DAHIYA:  Right.

19             MR. GIORDANO:  Your Honor, just I'm going to take

20   number 10 back from the witness that I --

21             THE COURT:  Okay.  Hold it, stop, stop, stop.

22             MR. GIORDANO:  All right.  I got it, thank you, Your

23   Honor.

24             THE COURT:  Okay.

25   BY MR. DAHIYA:

1    Q.    Ms. St. Clair, are you married?

2    A.    I'm sorry?  Yes, I am.

3    Q.    Are you married?

4    A.    Yes.

5    Q.    You have kids?

6    A.    Yes.

7              THE COURT:  Let the record reflect that Mr. St. Clair

8    has left the courtroom.  And, counsel, you're willing to

9    proceed without him here, correct?

10             MR. DAHIYA:  Yes, Your Honor.

11             THE COURT:  Okay.

12   Q.    Ms. St. Clair, do you have children?

13   A.    Yes, I do.

14   Q.    How many kids do you have?

15   A.    Four.

16   Q.    Where do you live?

17   A.    3001 Ann Street, Baldwin.

18             MR. GIORDANO:  Your Honor, I'm going to object to this

19   line of questioning, as well.  I mean, it's redundant, we've

20   heard it already before, and it's outside of the scope,

21   actually, of what we --

22             MR. DAHIYA:  I'm just --

23             THE COURT:  Are all of Mr. St. Clair's, that you know

24   of, children, your children?

25             THE WITNESS:  Yes.

1          THE COURT:  Okay.  So we know he's got four children.

2    They have four children.

3          MR. DAHIYA:  Yeah, together.  This is --

4          THE COURT:  That's been established.

5    BY MR. DAHIYA:

6    Q.   Do you know what's the age of your children, how old your

7    children are?

8          MR. GIORDANO:  Objection, Your Honor.  Relevancy, and

9    he's just wasting time here.

10          MR. DAHIYA:  Respon -- sense of responsibility that

11    bona fide --

12          THE COURT:  Even I know, one is in the army.  So let's

13    move on.

14    Q.   What's the other three children, what do they do?

15    A.   They're all in school.

16          MR. GIORDANO:  Objection, Your Honor.

17          THE COURT:  It will go through faster.  He's going to

18    do it.  I'm going to have to answer you, then him.  I'm going

19    to give you two minutes, stop, to get --

20          MR. GIORDANO:  Thank you.

21          THE COURT:  -- in all the family relationships you

22    want, starting now.

23          MR. DAHIYA:  Okay.

24    Q.   What's the age of the children?

25    A.   22, 17, 8 and 7.

1  Q.   The children are staying with you?

2  A.   All -- the last three are.

3  Q.   Do you love your children?

4  A.   Yes, I do.

5  Q.   Would you do anything for them?

6  A.   Of course, yes.

7  Q.   If this -- I'm asking the same question I asked him:  do

8  you know what is at stake here?

9  A.   Yes, from a mother's point of view, I'm looking at what to

10 me what is at stake, yes.  Losing my home that my children live

11 in.  That is the main thing that it is, you know, not providing

12 a home, a safe environment for my children.

13 Q.   And you would do anything for your children, won't you?

14 A.   I would do anything to keep them safe, yes.

15 Q.   If the Court asked you, and the authority, to comply with

16 this order, would you comply with his orders?

17 A.   Yes, I would.

18 Q.   Do you understand if you don't comply with the orders of

19 the Court, it can have consequences?

20 A.   Yes.  Yes, the judge made it very clear.

21 Q.   What do you do for a living?

22 A.   I'm a physician's assistant.

23 Q.   What does it entail?

24 A.   Taking care of the sick.

25 Q.   Are you a caring person?

1  A.    Definitely, yes, I am.

2  Q.    You don't get excited or lose temper like Jeffrey too

3  easily?

4  A.    No, I don't.

5           MR. GIORDANO:  Objection, Your Honor.

6           MR. DAHIYA:  It's  --

7           THE COURT:  You're objecting that she's calm?

8           MR. GIORDANO:  No.  But --

9           THE COURT:  I understand.

10 Q.    Do you always stay calm, Ms. St. Clair?

11          MR. GIORDANO:  Objection, Your Honor.

12          THE COURT:  All right.  Ms. St. Clair, do you know

13 that I entered an order that found that both you and your

14 husband failed to comply with orders of this Court?

15          THE WITNESS:  I -- yes, I would say I believe so, yes.

16          THE COURT:  And did you know that that order was the

17 result of the failure by you and your husband to produce

18 documents that the Court, that others, that you were required

19 to produce, did you know that?

20          THE WITNESS:  It's like a two-part answer to that.

21          THE COURT:  Okay.

22          THE WITNESS:  Okay.  It's -- I was told I need to give

23 more information.  And then, you know, and that's how it went.

24 Giving more information because not all the information was

25 given, that's how I felt it meant.  That's what I felt it

1  meant.

2          THE COURT:  Were the documents that were to be

3  produced, in your possession, or your husband's possession?

4          THE WITNESS:  It's not possession; it's in the

5  household.  So storage of documents were in the basement, as

6  well as upstairs in different parts.  It's not like it was in

7  one section.  And as my husband said before, I think that was

8  part of why we are in the problem that we are in.

9          THE COURT:  So the documents were stored in the

10  basement and upstairs?

11          THE WITNESS:  Yeah, upstairs.  I mean, it's not even

12  stored, it's not like there's a file cabinet with everything in

13  it; it's like placed somewhere.  So in the process of children

14  doing homework, the children, and everything else, things get

15  placed in different places.

16          THE COURT:  How did you know what was there?

17          THE WITNESS:  I don't know what was there; I have to

18  look through them.

19          THE COURT:  Did you ever look through them?

20          THE WITNESS:  Yes, actually, when I was asked for

21  paperwork -- when I was initially asked for paperwork, I went

22  through what was upstairs, and gave what I have.

23          THE COURT:  So did you give everything that was

24  upstairs, or --

25          THE WITNESS:  What was on that list, yes.  And I can

1  give --

2          THE COURT:  But how did you determine whether what you

3  were giving was on the list or not?

4          THE WITNESS:  I made a check.  Like if it asked for a

5  cable bill or a phone bill, I would make a check and say okay,

6  I have this one here, I will give that one.

7          THE COURT:  And what about the documents in the

8  basement?

9          THE WITNESS:  Documents in the basement were things

10  like -- like marriage license or passports, and different

11  things like that.  Those were kept more in the basement.  So if

12  that was --

13          THE COURT:  Were there any client -- any of your

14  husband's client files down there?

15          THE WITNESS:  Can I tell you, I don't even -- I

16  wouldn't know that, I wouldn't have --

17          THE COURT:  So did you look at the documents in the

18  basement, that's all?

19          THE WITNESS:  No, not for his -- when it comes to his

20  client files and everything, I didn't go through that.

21          THE COURT:  So Mr. St. Clair was the only person to

22  look through the documents?

23          THE WITNESS:  In reference to his client.  In

24  reference to client things --

25          THE COURT:  So there was a section for the client

 1  files --

 2          THE WITNESS:  In that -- on the list.

 3          THE COURT:  -- in the basement?  Yeah.

 4          THE WITNESS:  In the basement, or in the --

 5          THE COURT:  In the basement?

 6          THE WITNESS:  Not that I know of.

 7          THE COURT:  So if there were --

 8          THE WITNESS:  Basement is like -- can I explain?

 9          THE COURT:  Sure.

10          THE WITNESS:  A desk, and a chair.  And he would have

11  either his stuff on the floor, you know in a crate or something

12  like that.  To say that I go through that, no, because that's

13  like a whole different language to me, so I will not even touch

14  that.

15          THE COURT:  Now, the bills to pay for the office and

16  to pay -- and the client's payments to him, where were those

17  kept?

18          THE WITNESS:  I don't know.

19          THE COURT:  Were they in the basement?

20          THE WITNESS:  I don't know.  That's --

21          THE COURT:  So you never saw any of that?

22          THE WITNESS:  That I don't even know.  Ask me about

23  things for the home, yes, I do know.

24          THE COURT:  But all his business records, he kept?

25          THE WITNESS:  He would know where they are, yeah.

1        THE COURT:  So you never saw any of that?

2        THE WITNESS:  No.  If you ask me about the children,

3   about household bills, about medical bills, I can answer all --

4        THE COURT:  What about tax returns, where were they

5   kept?

6        THE WITNESS:  Tax returns were kept in the basement.

7        THE COURT:  And those you saw?

8        THE WITNESS:  Those I saw.

9        THE COURT:  And you always paid your taxes?

10       THE WITNESS:  I paid my taxes, yes.

11       THE COURT:  You filed jointly?

12       THE WITNESS:  We filed jointly.  And then I think last

13  year we filed separately, or something like that.  Or the year

14  before, separately.

15       THE COURT:  And you always filed your taxes, every

16  year?

17       THE WITNESS:  Yeah, I always filed my taxes.

18       THE COURT:  You always paid your taxes?

19       THE WITNESS:  I always pay my taxes.

20       THE COURT:  Okay.

21  BY MR. DAHIYA:

22  Q.   Ms. St. Clair, do you respect people?

23  A.   Definitely.

24  Q.   Do you respect authority?

25  A.   Yes, I do.

1  Q.   You respect the government?

2  A.   Yes, I do.

3  Q.   Were you ever examined by the plaintiff?

4  A.   The other plaintiff, yes, I was.

5  Q.   Where did the deposition take place?

6  A.   In this building.  In this building.  I don't know if it's

7  in this -- in here, or somewhere else, but in this building.

8  Q.   Do you feel you were properly respected by the plaintiff?

9           THE COURT:  Move on.

10          THE WITNESS:  Do I answer it?

11 Q.   Did you feel comfortable while you were being questioned?

12          THE COURT:  Move on.  Don't answer any questions --

13 Q.   Did you feel comfortable, they were asking you the proper

14 questions?

15          THE COURT:  Objection --

16          MR. GIORDANO:  Objection.

17          THE COURT:  -- move on.

18 Q.   Did you feel that you answered everything honestly,

19 whatever was asked?

20 A.   Yes.

21 Q.   Was there anything you feel that you didn't answer

22 properly?

23          MR. GIORDANO:  Objection, Your Honor.

24          THE COURT:  No, I'll let her answer that.

25 A.   I -- I felt like I answered everything appropriately.

1    Q.   Did you feel any questions were not proper?

2              MR. GIORDANO:  Objection.

3              THE COURT:  Sustained.

4              MR. GIORDANO:  That was the proper time and place for

5    objections to questions.

6              THE COURT:  Sustained.

7    Q.   What did you feel after the deposition?  How many times

8    were you deposed?

9    A.   At the end of an extremely long day is when I was asked

10   those questions.

11   Q.   What did you feel after the examination was over?

12             MR. GIORDANO:  Objection, Your Honor.

13             THE COURT:  Sustained.

14             MR. DAHIYA:  Your Honor, it goes to the intention --

15             THE COURT:  No, it doesn't.

16             MR. DAHIYA:  -- that she's complying, giving the

17   paperwork, everything.

18             THE COURT:  Not -- sir, not to me.  So move on.  I'm

19   sustaining the objection.

20   Q.   Do you feel you have given all the papers that were asked

21   for?

22   A.   Yes.

23   Q.   Did Narissa Joseph ever explain to you what each and every

24   document was?

25   A.   No, it was just a list.

1    Q.    Did you ever see a copy of the subpoena?  Did you feel you

2    ever see the court paper?

3    A.    I don't know what a subpoena is, and I don't know if I

4    received one.

5    Q.    Did your lawyer ever ask you if you received the subpoena?

6    A.    No.

7    Q.    Did she ever give you a copy of subpoena?

8    A.    No, not that I know of.

9    Q.    How many times did you see Narissa Joseph?

10   A.    I saw her at -- when I came to court -- every time I

11   saw -- came to court.  I saw her the first time we went to her

12   office.

13   Q.    How long -- how much time did you spend with her in the

14   office?

15   A.    Maybe thirty minutes.

16   Q.    Did she ever say to you that you're not complying with the

17   court orders?

18   A.    No, she did not.

19   Q.    So is it safe to say that you feel that you always

20   complied with the order?

21   A.    I felt like I've always complied.

22   Q.    If you feel you didn't comply, do you think you would have

23   done something different?

24   A.    Yes, if I was asked for something else, I would provide

25   it.  I'd try my best to get the information, yes.

1   Q.   Why do you feel that way?

2   A.   Because I want to save my home, and I want to get out from

3   this -- you know, this stress, this burden, this thing that I

4   felt like was keeping us back for such a long time.  It's like

5   I want to move forward, but feel like you can't, because --

6   Q.   Do you feel you have been properly dragged here in this

7   case?

8             MR. GIORDANO:  Objection, Your Honor.

9             MR. DAHIYA:  Your Honor, simply --

10            THE COURT:  Hold it, what was the question.

11  Q.   Do you feel --

12            THE COURT:  Do you feel properly what?

13            MR. DAHIYA:  Dragged here in this case?

14            MR. GIORDANO:  It's irrelevant, Your Honor.

15            MR. DAHIYA:  It's relevant.  I mean --

16            THE COURT:  Hold it, hold it, hold it.

17            MR. GIORDANO:  I don't even know what that means,

18  anyway.

19  Q.   Do you think --

20            THE COURT:  Can we stop for a second, while I maybe --

21            MR. DAHIYA:  Okay.

22            THE COURT:  -- maybe make a ruling.  What do you

23  mean --

24            MR. GIORDANO:  No, I'm just listening, I couldn't --

25            THE COURT:  Counsel, what do you mean dragged?

 1          MR. DAHIYA:  Improperly sued.

 2          THE COURT:  You want to know whether she thinks she

 3   should have been sued?

 4          MR. DAHIYA:  I want to know if -- what this --

 5          THE COURT:  Do you think you should have been sued in

 6   this case?

 7          THE WITNESS:  I don't even understand why I'm even

 8   here, you understand?

 9          THE COURT:  Okay, fine.  There's your answer, move on.

10   Q.   Do you feel harassed?

11   A.   I feel this is long and drawn out, and yes, yes.

12   Q.   Did you ever have a dealing with this plaintiff before

13   this court?

14   A.   No, this is a -- no.  The name of this company is the

15   first time I ever saw it, when I had to come to court for it.

16   Q.   Have they taken over your mortgage?

17   A.   I don't even think so; I don't know.

18   Q.   Are you making any mortgage payments to them?

19   A.   No.

20   Q.   What do -- who do you think they are?

21          MR. GIORDANO:  Objection, Your Honor.  It's --

22          THE COURT:  Sustained.

23   Q.   Did you feel -- did you go through any stress in this

24   case?

25   A.   It is highly stressed.

1            MR. GIORDANO:  Objection, Your Honor.

2            MR. DAHIYA:  No, that's important, memory.

3            MR. GIORDANO:  We've gone through how many times now.

4            MR. DAHIYA:  No.

5            MR. GIORDANO:  She feels upset, she feels harassed,

6    she feels this.  Where are we going?

7            THE COURT:  Counselor says you feel stressed and

8    harassed, are you?

9            THE WITNESS:  This is stressful, harassful (sic).

10           THE COURT:  Okay, move on.

11           THE WITNESS:  Harassment.

12   Q.    When you were sued in this case, when they filed complaint

13   against you in the bankruptcy court, did Narissa Joseph tell

14   you, the attorney, what this lawsuit is about?

15   A.    She did not tell me what it was about.  I think my husband

16   tried to explain it to me.

17   Q.    And what was your understanding?

18   A.    That another company is claiming that we owe them money.

19   Something like that.  Okay?  That there's -- yeah, another

20   company is claiming that we owe them money, but we never had

21   any dealings with them before.  So my question is how do I --

22   who are these people and what money do I owe them.  I never

23   borrowed any money from them.

24   Q.    So is that your impression about this case?

25   A.    Yes.

1  Q.    That you owe them money, that's all?

2  A.    Yes, that I owe them money, yes.

3  Q.    Is that why you think they're suing you?

4  A.    Yes.

5  Q.    Do you feel this is a lawsuit to get money from you?

6         MR. GIORDANO:  Objection, Your Honor --

7         MR. DAHIYA:  Well, it's --

8         THE COURT:  Let her answer.

9  A.    To get money from me that I did not borrow from them, I

10 never borrowed money from them.

11 Q.    Had you read the complaint, the initial lawsuit, the

12 lawsuit they filed against you, the plaintiff, the complaint,

13 the lawsuit, did you read it?

14        MR. GIORDANO:  Objection, Your Honor.  It's outside of

15 the scope of the deposition, number one.  Number two, he's not

16 being very specific, because there was an underlying lawsuit in

17 district court here, as well.

18        MR. DAHIYA:  I'm talking the bankruptcy court.

19        MR. GIORDANO:  Either way, Your Honor, it's

20 irrelevant.

21        MR. DAHIYA:  It is relevant.

22        THE COURT:  Do you want -- Ms. St. Clair, do you

23 understand why you're here today?

24        THE WITNESS:  I just -- when my husband was up here,

25 that's when I really realized why we were here.  It's because I

1  think -- are you saying that we lied about something, or we did
2  not -- are they claiming that my husband and I lied about
3  something.
4       THE COURT:  What they're claiming is in documents.
5  I'm not going to try to go over it.  But you engaged Ms. Joseph
6  as your counsel, correct?
7       THE WITNESS:  Yes.
8       THE COURT:  And you appeared in front of me on a
9  number of occasions --
10      THE WITNESS:  Yes.
11      THE COURT:  -- correct?  And on a number of those
12 occasions, do you recall me telling you and your husband that
13 you had to produce all the documents that were being called
14 for?
15      THE WITNESS:  Yes.
16      THE COURT:  And do you recall making representations
17 that you had produced all the documents?
18      THE WITNESS:  Yes.
19      THE COURT:  What they're -- what the argument is, that
20 after you made representations that you had produced all the
21 documents, you didn't.  I know you didn't because I found you
22 didn't.  The only question is, that's the issue, why you
23 didn't.
24      So any of your feelings about the lawsuit, while I
25 respect it, this is a stressful exercise, what I'm trying to

1  figure out is there was a whole bunch of documents in your

2  house.  They were there, maybe other places.  You were required

3  to look through them from June until the storm, if you want to

4  use that date.  Representations were made that everything was

5  turned over, and they weren't.  I'm trying to figure out why

6  you did not turn over documents that you should have.  That's

7  all.

8           THE WITNESS:  Can I respond to that?

9           THE COURT:  Sure.

10          THE WITNESS:  I have made photocopies of lots of

11  documents.  And, like I said, I went through a checklist, and I

12  gave it to my husband to fax to Ms. Joseph what we made on

13  there.  But documents were given, so if someone went through

14  the list with me, and said that the -- for example, I didn't

15  know I was just supposed to submit that I have a student loan,

16  okay.  It wasn't until the deposition that he -- that I said I

17  have a student loan, and then the lawyer said you were supposed

18  to turn in your student loan.  Or that I was supposed to make

19  copies of BJ's bills and support.

20          THE COURT:  Did you ever tell Ms. Joseph that you had

21  a student loan?

22          THE WITNESS:  Be -- no, no.

23          THE COURT:  So how would Ms. Joseph know to tell you

24  to turn it over or not?

25          THE WITNESS:  Because on the checklist a student loan

1  never came about to --

2          THE COURT:  So you made a decision, based on that

3  checklist of what to turn over, and what not to turn over?

4          THE WITNESS:  No.  On -- based on the checklist,

5  whatever was there, to the best of my ability, I turned in.

6          THE COURT:  So you made the decision that the

7  documents you didn't turn over were not called for?

8          THE WITNESS:  They were not on the list, exactly.

9          THE COURT:  So that was your decision?

10          THE WITNESS:  That was the decision from what was on

11  the list, yes.

12          THE COURT:  Okay.

13  BY MR. DAHIYA:

14  Q.   Ms. St. Clair, have you ever disobeyed any local

15  authority?

16  A.   No.

17  Q.   Have you always paid your taxes?

18  A.   Yes.

19  Q.   Filed your tax returns?

20  A.   Yes.

21  Q.   How important is it for you to discharge your debts, these

22  debts?

23  A.   It's extremely important.

24  Q.   Why is it important?

25          MR. GIORDANO:  Objection, Your Honor.  Relevance?

1          THE COURT:  Let's assume I agree that she understands

2    that it's important.  Move on.

3    Q.   Do you ever feel, in this case, on the start of this

4    lawsuit, or before start of the bankruptcy, what's your

5    feeling, did you ever comply with all the orders?

6    A.   I believe I've complied with everything.

7    Q.   Is there anything you feel you didn't comply with?

8    A.   No, no.  To my understanding, I feel like I've complied

9    with everything.

10         MR. DAHIYA:  That's all.

11         THE COURT:  Okay.

12   CROSS-EXAMINATION

13   BY MR. GIORDANO:

14   Q.   Ms. St. Clair, let's start right there.  It's your

15   understanding you complied with every order of this Court,

16   correct?

17   A.   Yes.

18   Q.   And you're aware that the Court found that you failed to

19   comply with multiple orders, correct?

20   A.   That the Court -- yes, that the Court said I did not, yes.

21   Q.   Okay.  So contrary to what the Court already determined,

22   do you feel that you did --

23         MR. DAHIYA:  Objection, Your Honor.

24   Q.   -- comply with all the orders?

25         THE COURT:  You can ask the question.

1  Q.    Contrary to what the Court found, you still feel that you

2  complied with all the orders?

3          MR. DAHIYA:  Objection, Your Honor, not a question.

4          THE COURT:  Overruled.

5  Q.    Contrary to what the Court already found, you still feel

6  that you complied with all the orders, correct?

7  A.    I feel --

8          MR. DAHIYA:  Objection.

9          MR. GIORDANO:  Your Honor, he can't keep objecting to

10 the same question over and over again.

11         THE COURT:  He can, but she answered.  So let's move

12 on.  She says she does.

13         MR. GIORDANO:  Okay.

14 Q.    And you're aware that the Court sanctioned you for your

15 failure to comply with all the orders in the amount of 7,500

16 dollars?

17         MR. DAHIYA:  Objection, it's a statement, it's not a

18 question, Your Honor.

19         THE COURT:  Turn it into a question.

20 Q.    Are you aware that the Court issued a sanction in the

21 order where it found that you did not comply with all its

22 orders?

23 A.    I speak a medical language, okay.  This is more -- I do

24 not understand being sanctioned and so forth.

25         THE COURT:  Stop -- ma'am, stop.  All he's asking you

1    is are you aware that I entered an order sanctioning you and

2    your husband for 7,500 dollars?

3             THE WITNESS:  I'm aware of 7,500 dollars we have to

4    pay.

5             THE COURT:  Okay.

6             THE WITNESS:  That -- that I understand.

7             THE COURT:  Okay.

8             MR. GIORDANO:  All right.

9             THE COURT:  She's not aware of the concept of sanc --

10   that's fine.

11            THE WITNESS:  Yeah, okay.

12            THE COURT:  She answered the question.

13            MR. GIORDANO:  Thank you, Your Honor.

14   BY MR. GIORDANO:

15   Q.   Isn't it true that you've never complied with that order?

16            MR. DAHIYA:  Too general, Your Honor.

17            THE COURT:  Yes.

18            MR. DAHIYA:  "That order" never complied, what order?

19            MR. GIORDANO:  Your Honor, we're talking --

20            THE COURT:  The Court entered an order that you're

21   required to pay 7,500 dollars; have you done that?

22            THE WITNESS:  No, it was not asked for us to pay it a

23   certain amount -- amount of time or anything, no.

24            THE COURT:  All I'm asking is the court entered the

25   order, to your knowledge, have you complied with that order?

1          THE WITNESS:  No, no.

2          THE COURT:  Okay.

3   Q.    You testified that you're a physician's assistant --

4   A.    Yes.

5   Q.    -- and that you've had some loans.  Isn't it true that you

6   never produced any of your documentation for either the loan

7   applications, the loans, the statements, or anything like that?

8   A.    I did --

9          MR. DAHIYA:  Objection, compounded, too many --

10          THE COURT:  Overruled.  Answer the que -- you know

11   what the question is; answer the question.

12          THE WITNESS:  Answer it you said?

13   A.    I don't have any loan application for that, no.  That is

14   not in my possession.

15   Q.    Wouldn't it be in your control to contact your loan

16   servicing company, or the loan -- whoever holds your loan to

17   obtain your documentation regarding that loan?

18   A.    The --

19          MR. DAHIYA:  Objection, assumes facts not in evidence,

20   Your Honor.

21          THE COURT:  Sustained.  I don't --

22   Q.    What about the statements --

23   A.    I did --

24   Q.    -- why didn't you produce those?

25   A.    I did produce them.

1          MR. DAHIYA:  Objection, Your Honor, what statements?

2          THE COURT:  Okay.  What we're going to do is if you

3   have an objection, you're going to phrase an objection.  You'll

4   stop talking, I'll rule, and we'll go on.

5          MR. DAHIYA:  That's fine.

6          THE COURT:  We're not doing it from the bleachers

7   here.

8          Ask the question.

9          MR. GIORDANO: Okay.

10  Q.   Isn't it true that you did not produce any statements

11  referable to any of your student loans?

12  A.   Okay.  I did.  I did produce that after the first

13  checklist that I went through, and it was -- it was said that I

14  was missing some information.  At the deposition I was missing

15  some information.  You asked for receipts from BJ's and Costco.

16  You asked for student loan information.  That was given to Ms.

17  Joseph.

18         MR. GIORDANO:  Your Honor, may I hand her Plaintiff's

19  10?

20         THE COURT:  Show counsel what you're giving.

21         THE WITNESS:  I know what the 10 says.  I saw it

22  before.

23         THE COURT:  No, no, no, no, no.  Just --

24         THE WITNESS:  Oh, okay.

25  Q.   Ms. St. Clair, just do me a favor and take a look at that,

1    and when you've had an opportunity to move on, let us know.

2         Are you ready?

3    A.    Yes.

4              MR. DAHIYA:  Did you read it?  Just read it.  Now,

5    don't push your pace.  Just -- yes.

6    A.    Okay.

7    Q.    Okay.  You're aware that that's an affidavit stating that

8    you produced all of the records --

9    A.    That were req -- yes.

10   Q.    -- in your possession --

11   A.    Yes.

12   Q.    -- or control?

13   A.    Yes.

14   Q.    Who asked you to sign that affidavit?

15   A.    This was done by my attorney at the time.

16   Q.    And you're talking about Narissa Joseph?

17   A.    Yes.  Yes.

18   Q.    So you're aware at that time there was a question whether

19   or not you complied with the Court's orders to produce

20   documents, right?

21   A.    Yes.

22   Q.    And you set forth that you produced all of the documents

23   in your possession or control.  Right?

24   A.    Yes.

25   Q.    What was the date of that affidavit?

1    A.    It says 2013.  It says -- it doesn't have a day.  It just

2    says March, 2013.

3    Q.    Okay.  When did you sign that affidavit?

4    A.    March, 2013.

5    Q.    You're not aware of the day?

6    A.    No.  I don't recall.

7    Q.    After you signed that affidavit, do you recall appearing

8    for your deposition or 2004 examination?

9    A.    When was the deposition?

10   Q.    It was -- just answer my question, please.

11          MR. DAHIYA:  If that's --

12          THE COURT:  If you don't recall or can't answer the

13   question --

14          THE WITNESS:  I don't recall.

15          THE COURT:  Then that's your answer.

16          MR. GIORDANO:  Okay.

17   Q.    Did you sign that affidavit before your deposition?

18   A.    I -- I don't recall.

19          MR. DAHIYA:  Answered, Your Honor.  Objection.

20          THE COURT:  No, it wasn't answered, because she can't

21   recall.

22          MR. DAHIYA:  She can't recall here.  That's the

23   answer.

24          THE COURT:  Well, let her answer it again.  This is a

25   different question.

1          Go ahead.  Go ahead.

2    Q.    During your deposition, do you recall being asked about

3    certain documents?

4    A.    God, certain is such a broad term.  Certain documents.

5    What documents?

6    Q.    Do you remember being asked about any documents during

7    your deposition?

8    A.    Actually, I don't recall being asked about documents.

9    Q.    Didn't you just testify a little while ago that you were

10   asked at your deposition regarding loan documents at the

11   deposition?

12         MR. DAHIYA:  Objection.  Ambiguous.  Very

13   unintelligible, Your Honor.  He needs to keep it simple.

14         THE COURT:  Good try.  Overruled.  Answer the

15   question.

16   A.    Can you repeat what -- your statement?

17   Q.    Isn't it true that while Mr. Dahiya was questioning you

18   and the Court you testified that during your deposition you

19   were asked about loan documents and that --

20   A.    I didn't say documents.  Loan documents.  Yeah.  Okay?

21   Q.    So that's true.

22   A.    It was true that you asked, that student loan came up.

23   Q.    Okay.  Before you signed that affidavit, did you ever

24   produce --

25         MR. GIORDANO:  Strike that, Your Honor.

1  Q.   Before that affidavit was signed, isn't it true that you

2  never produced any loan documents?

3         MR. DAHIYA:  Objection, Your Honor.  Very vague.

4         THE COURT:  Overruled.

5  A.   Does overruled mean I have to answer it?

6         THE COURT:  That means you get to answer it.

7         THE WITNESS:  Answer.  Oh, okay.

8  A.   In March of 2013, I cannot say I recall.

9  Q.   Okay.  Before you set forth that you were given a

10 checklist regarding the documents you had to produce, right?

11        MR. DAHIYA:  Objection, Your Honor.  She never -- she

12 never said she was given a checklist.

13        MR. GIORDANO:  Your Honor, she testified that she had

14 a checklist.

15        MR. DAHIYA:  She had a --

16        THE COURT:  Overruled.  Just answer.  She gave that

17 answer to me four times.

18 Q.   Who gave you that checklist?

19 A.   It came from the attorney's office.

20 Q.   Who prepared the checklist?

21 A.   I don't know.

22 Q.   How did she give it to you?

23 A.   It was -- was -- I'm not -- I don't know.

24 Q.   And you personally went through the checklist and marked

25 off whether or not you had the documents on that checklist?

1    A.    Yes.

2    Q.    What was on the checklist?

3    A.    I don't recall.

4    Q.    Do you recall anything that was on the checklist?

5    A.    I'm -- I recall, maybe, the bills for the household.  You

6    know what?  I -- not fully.  I can't say I recall, but bills

7    for the household, like, but to say that I recall that

8    checklist, no.

9    Q.    How many pages was the checklist?

10            MR. DAHIYA:  Objection, Your Honor.  This is --

11            THE COURT:  Overruled.

12   A.    I'm not sure.

13            MR. DAHIYA:  -- not relevant.

14            THE COURT:  Overruled.

15   A.    I don't recall.

16   Q.    Was it more than one page?

17   A.    That's the same question.  I don't recall.

18   Q.    Was it a thick stack of papers on this checklist or

19   something else?

20            MR. DAHIYA:  Objection.  Asked and answered, Your

21   Honor.  She doesn't recall.

22            THE COURT:  He can explore it.  Overruled.

23   A.    It -- it came with a pack -- whatever it was was a package

24   of, a list, a stack of papers, so I don't know if it was the

25   checklist was the stack of papers, if it was one paper or two

1  paper, I don't recall.

2  Q.   When was this checklist given to you?

3  A.   Oh, that I don't recall.

4  Q.   Do you recall what season it was when this checklist was

5  given to you?

6  A.   No, sir, I do not.

7  Q.   Was it before Hurricane Sandy or after Hurricane Sandy?

8  A.   I don't recall.

9  Q.   Okay.  Isn't it true that the checklist was just a rider

10 to our subpoena that was served on you?

11 A.   I don't know.

12 Q.   Have you ever seen the subpoena and rider?

13 A.   I don't know what a rider is, and I don't know what the

14 subpoena is.  Okay?  You asked me for the checklist.  I can

15 answer that about the checklist.

16 Q.   Were there boxes next to the things that you had to check

17 on the checklist?

18 A.   No.  It was just a list.  A list of things to give.  A

19 list.  And I will make my check.  I call it a checklist,

20 because once I completed it I made a check.

21 Q.   And after you made your check, what did you do with that

22 checklist?

23 A.   I don't know.  That I -- I don't recall.  Once it was

24 completed, all the paperwork that I collected, it was given to

25 the attorney.

1  Q.   And how did you give those papers to the attorney?

2  A.   It was mailed to her.

3  Q.   And who did you go through the checklist with?  Did you do

4  it with your husband?

5  A.   Whatever was missing that was for him to do, I would tell

6  him, you know, he need to do that.

7  Q.   And what were those items?

8  A.   That I don't know.

9  Q.   Okay.  So for some of the things on the checklist you

10 referred them to your husband?

11 A.   And some to me.  Anything, yes.  Yes.

12 Q.   And --

13        MR. GIORDANO:  Okay.  Thank you, Your Honor.  No

14 further questions.

15        THE COURT:  Okay.  We're going to resume at 2 o'clock.

16 Thank you.

17     (Recess from 12:14 p.m. until 2:06 p.m.)

18        THE COURT:  Please be seated.  Okay.  Let's go.

19        MR. VLOCK:  Thank you, Your Honor.  I'd like to call

20 Steven Giordano to the stand.

21        THE CLERK:  Please stand.

22        MR. GIORDANO:  Stand?

23     (Witness sworn)

24        THE CLERK:  Please be seated.

25        THE WITNESS:  Thank you.

1          THE CLERK:  State and spell your full name for the
2     record, please.
3          THE WITNESS:  My name is Steven Giordano,
4     G-I-O-R-D-A-N-O.
5          MR. VLOCK:  Lower the mic a little bit.  There you go,
6     that's better.
7     DIRECT EXAMINATION
8     BY MR. VLOCK:
9     Q.   Okay, Mr. Giordano, how long have you been working on the
10    St. Clair file?
11    A.   It's been, I believe, over four years now, since the time
12    that our client had called us up and set forth that they had
13    been discussing the note with the St. Clairs and trying to get
14    some payments.
15         They attempted for a while, in good faith, to try to get
16    any payments towards the note itself.  And the St. Clairs were,
17    I guess, unresponsive to their attempts to try to resolve the
18    matter.  And then our clients, I guess, hired us to go and
19    bring the action on the note itself.  So it was about four
20    years ago in the district court.
21    Q.   And then did you also work on the file when it was
22    bankruptcy was brought here, and the adversary proceeding?
23    A.   Yes, when we had obtained summary judgment in the district
24    court action, at that time, the St. Clairs really didn't have
25    any defense to the judgment.  And I believe we were the

1    reason --

2          MR. DAHIYA:  Objection, Your Honor.

3    A.   -- we were the --

4          THE COURT:  Excuse me?

5          MR. DAHIYA:  Objection, Your Honor.  That's not

6    responding to the question.  It's a whole narration of

7    something.

8          THE COURT:  Let's try to articulate.  What's the

9    objection?

10          MR. DAHIYA:  Objection is his answer should be

11   confined to the question that's been asked, and then --

12          THE COURT:  He's asking the question.

13          MR. DAHIYA:  Yeah.

14          THE COURT:  He's giving an answer.  What's your

15   objection?

16          MR. DAHIYA:  My objection is the answer ought to be

17   confined to the question, not the whole --

18          THE COURT:  That's kind of up to the questioner.

19          MR. DAHIYA:  All right.

20   A.   So going back to what I said, they really had no defense

21   to the judgment.  And I believe that we were the reason why

22   they declared bankruptcy in the first place.  So that was, I

23   think, over two years ago that I -- you know, that once the --

24   I guess, we obtained summary judgment in district court, and

25   then the St. Clairs filed their bankruptcy petition.

1   Q.    Okay.  If you could take a look at Plaintiff's Exhibit 1.

2   A.    Yes.

3         MR. VLOCK:  And Your Honor, I can refer to these being

4   in evidence at this time, since they're unobjected to in terms

5   of the joint pre-trial?

6         THE COURT:  If all the exhibits have been unobjected

7   to, are you moving them all into evidence?

8         MR. VLOCK:  Yes, Your Honor.

9         THE COURT:  Any objection?

10        MR. DAHIYA:  I mean, these are pleadings.  I mean,

11  they're --

12        THE COURT:  Yeah, he's moving all the exhibits in.

13        MR. DAHIYA:  Yeah.

14        THE COURT:  And the pre-trial says there's no

15  objection to any of them.

16        MR. DAHIYA:  Yeah, the objection is only to the

17  depositions.  That's also one of the exhibits.  The three

18  depositions that he has --

19        THE COURT:  Well, that's not an objection to

20  introducing them.  It's how we use them, I guess.

21        MR. DAHIYA:  Yeah.

22        THE COURT:  All right, so all the exhibits will be

23  moved without objection, other than the objection counsel has

24  raised earlier this morning, concerning the proper use of the

25  deposition.

1    (Various documents were hereby received into evidence as

2    Plaintiff's Exhibits 1 through 14, 18, 24, as of this date.)

3            MR. VLOCK:  Thank you, Your Honor.

4    Q.   Okay, so if you take a look at Plaintiff's Exhibit 1 in

5    evidence, can you identify that, first of all?

6    A.   It's our complaint declaring the defendants' debt

7    nondischargeable under 727 of the Bankruptcy Code.

8    Q.   Okay, and what necessitated the filing of that adversary

9    complaint?

10   A.   Well, in simplest terms, we were told by the Court to file

11   the adversary --

12           MR. DAHIYA:  What?

13   A.   -- complaint.  The conduct by the defendants and their

14   attorney was obstructive, to say the least.  They were ordered

15   to produce documents on a number of occasions, and they failed

16   to comply with that.  They lied on the record before the Court.

17   The submitted false and fraudulent affidavits, and they

18   withheld documents pursuant to -- that were ordered to be

19   produced.  So it was a whole continuing course of conduct which

20   necessitated the filing of the adversary complaint.

21   Q.   Okay.  Would you take a look at Plaintiff's Exhibit 2 in

22   evidence?  Okay, tell us what that is.

23   A.   This is the order for examination pursuant to Rule 2004 by

24   the Court.  It's dated June 26th, 2012.  It's an order from the

25   Court which directs the appearance -- or production of

1  documents and the appearance by the debtors at the time -- I

2  guess, Jeffrey St. Clair and Cathleen St. Clair.

3  Q.   And did the defendants comply with that order?

4  A.   No.  In fact, they made it impossible to obtain compliance

5  with the order, despite the attempts by us to get full

6  compliance, and even the Court's own orders to comply with that

7  order.

8  Q.   And what did you -- what, if anything, did you do

9  initially to obtain compliance?

10  A.   Well, initially, we tried working with the debtors'

11  counsel, Narissa Joseph, in good faith.  We, you know, made

12  phone calls to her.  We sent her e-mails and letters trying to

13  get some voluntary compliance with the Court's order, if you

14  may, even though there should be -- it's -- they were ordered.

15  It shouldn't have to be a voluntary.  It's their bankruptcy.

16  They should have been the ones complying with the 2004 order.

17  Q.   Okay.

18  A.   But we still tried, in good faith, for a long period of

19  time, months, before actually even seeking any type of Court

20  intervention.

21  Q.   All right.  Take a look at -- if you would, Plaintiff's

22  Exhibit 3 in evidence.  Tell us what that is.

23  A.   Well, that's an e-mail to Narissa Joseph.  Apparently --

24  Q.   What date?

25  A.   From July 18th, 2012, actually.  The subject is actually

1  this case, Jeffrey and Cathleen St. Clair.  There -- the

2  attachment is a stipulation to extend the time to -- for them

3  to comply with the 2004 order.

4        During one of the conversations with our office and Ms.

5  Joseph, we had agreed that they would produce the documents

6  required by the 2004 order and that they would appear for their

7  2004 examinations.  And this e-mail is reiterating that

8  agreement, and you know, attaching the stipulation, which was,

9  I guess, hashed out over the phone with Ms. Joseph.

10 Q.    Okay, and that was hashed out by you personally, correct?

11 A.    Yes.

12 Q.    What, if anything, happened with regard to that --

13 Plaintiff's Exhibit 3?

14 A.    Nothing.  They never complied with it.  They -- after --

15 she actually was the one to ask for an adjournment for time to

16 comply with the order --

17        MR. DAHIYA:  Objection.  It's hearsay -- hearsay, Your

18 Honor.  I mean --

19 A.    I'm telling what --

20        MR. DAHIYA:  -- he's talking about what happened --

21        THE COURT:  Sustained.

22 A.    Well, the request for, I guess, these dates was never

23 complied with.  In fact, they never complied with the

24 stipulation.  She refused to even sign the stipulation, after

25 agreeing to stipulate to do it, for the purpose of getting an

1  adjournment of the dates for compliance.

2      In fact, there was no communication in response to this

3  e-mail itself, after that, you know, point in time, despite,

4  you know, our phone calls saying hey, listen, you know, we're

5  trying to get you to sign this stipulation and agree to the

6  dates that we agreed to comply with the --

7          MR. DAHIYA:  Objection, Your Honor.  I mean, it's --

8  A.    But there was --

9          MR. DAHIYA:  I move to strike that because he's

10  talking about what she said.

11          THE COURT:  No, he's not.

12  A.    No.

13          MR. DAHIYA:  Yeah, well, he --

14          THE COURT:  Overruled.

15          Go on.

16          MR. DAHIYA:  Okay.

17  A.    Needless to say, there was no compliance with any

18  agreements or the Court's order itself.  That's -- and this is

19  going back to July of 2012.

20  Q.    All right, and then if you'd take a look at Plaintiff's

21  Exhibit 4 in evidence.  Tell us what that is, please.

22  A.    Plaintiff's Exhibit 4 is actually the subpoenas that were

23  served with the -- I guess pursuant to the Rule 2004 order

24  itself.

25  Q.    Okay.

1  A.    The subpoenas required the production of documents before

2  going forward with the 2004 examinations or depositions.  The

3  subpoenas actually listed the documents which were required in

4  what's listed as a rider.  The riders are very specific, and

5  it's at least four pages worth of items that were required to

6  be produced, pursuant to the Court's orders and subpoena.

7  Q.    And what, if anything, did the defendants do with regard

8  to the subpoenas?

9  A.    Again, nothing.  The subpoenas were not complied with.  In

10  fact, they didn't produce even one document for -- you know,

11  despite all of our attempts to try to get it done without

12  further court intervention.

13  Q.    And what did you do to attempt to get them to comply with

14  the subpoena?

15  A.    Everything.  Again, I mean, phone calls, e-mails, you

16  know, letters directly to Narissa Joseph, sent from, you know,

17  our office, you know, requesting in good faith, you know,

18  please, comply with this order and our subpoenas or we're going

19  to have to seek court intervention.  And we gave them

20  deadlines.

21  Q.    And during this period of time, were there any responses

22  given?

23  A.    None, none at all.

24  Q.    Take a look at Plaintiff's Exhibit 5 in evidence and tell

25  me what that is, please.

1  A.    Like I was referring to before, there was letters that we

2  sent to Ms. Joseph, the debtors' counsel at the time.  That's a

3  letter dated September 5th, 2012, which is, you know, I guess,

4  three months after the 2004 order.

5      And here, we're just imploring the defendants' counsel to

6  produce the documents, pursuant to the order of Judge Grossman

7  and the subpoenas, under Rule 2004 and informing her, as she

8  knew already, that to date we didn't receive even one document

9  and setting forth that unless we receive the -- you know, some

10 documents, or a response at all, that we would have no

11 alternative but to seek court intervention.

12 Q.    And what, if anything, happened as a result of that

13 letter?

14 A.    Again, nothing.  There was no response.

15 Q.    Take a look at Plaintiff's Exhibit 6 in evidence.  What is

16 it?

17 A.    It's, as promised, a motion to dismiss and offer

18 sanctions, or in the alternative, compelling the debtors to

19 comply with the 2004 order and subpoenas.  You know, when we

20 received no response at all to the order, to the subpoenas, to

21 our letters, to our e-mail, to our phone calls, you know, we

22 had no choice but to move to dismiss.

23     Now, the interesting thing is that I say we had no

24 response.  The -- we did speak to Ms. Joseph, and she did agree

25 to comply, at one point, but then there was no response

1    thereafter.

2        So it was, you know, on one hand it was like, you know, we

3    were trying to operate in good faith, and get some compliance

4    voluntarily.  But on the other hand, they were completely

5    ignorant of the Court's orders.

6    Q.    And what, if anything, happened after we filed the motion

7    to dismiss?  Did you receive any type of contact from the --

8    Ms. Joseph or the defendants?

9    A.    Yeah, actually, it was like another, you know,

10   conversation with Ms. Joseph where she agreed to adjourn the

11   motion and to have her -- her clients fully comply with the

12   2004 order and the subpoenas and then appear for, you know,

13   specific dates to come in for their 2004 examinations.

14       And this time, actually, she agreed -- she signed the

15   stipulation and we submitted that to the Court via ECF --

16   there's a proposed order -- and had it so ordered itself.

17   Q.    Okay, and is Plaintiff's Exhibit 7 in evidence, is that

18   the so-ordered stipulation that you're referring to?

19   A.    Yes.

20   Q.    Okay.

21   A.    Yeah, that's the so-ordered stipulation to comply with the

22   2004 order and the subpoenas and to adjourn this matter.

23   Q.    All right, now after the Court -- after the stipulation

24   was signed and so-ordered by the Court, what happened?

25   A.    Again, just like the entire course of conduct for months

1  and months beforehand, nothing happened.  In fact, this so-

2  ordered stipulation required, you know, documents required by

3  the subpoena by October 8th and also adjourned the depositions

4  of the defendants until October 24th and 25th.

5      But -- and despite the fact this is so-ordered, it's

6  entered on the docket, and -- and, you know, we have a 2004

7  order, and we have subpoenas, there was still not one document

8  produced, at all.  And obviously, they didn't appear for their

9  2004 examinations, either.

10  Q.   Now, were their appearances made in the interim on the

11  plaintiff's motion to dismiss?

12  A.   This so-ordered stipulation adjourned, I believe, the

13  first appearance so that they could comply with the order.  So

14  I do not believe there was -- it was on the calendar, but I

15  believe it was adjourned voluntarily by all the parties in lieu

16  of this stipulation itself.

17  Q.   All right.  And did there come a time when the motion was

18  heard in court, or at least there was a time when there was a

19  hearing in court on the motion?

20  A.   Yes, the first hearing that was adjourned, that we agreed

21  to adjourn it to, there was no appearance by the debtors or the

22  defendants.

23  Q.   Did you appear at that time?

24  A.   Yes, I did.

25  Q.   Okay.

1    A.    And --

2    Q.    And at that time, neither the defendants nor Ms. Joseph

3    appeared?

4    A.    Yes, and this is a agreed-upon date.

5    Q.    Okay, and what happened at that time?

6    A.    At the time, the Court agreed to give them every benefit

7    of the doubt and adjourned it on its own.  And that was

8    registered in the docket, the adjourn date.  And on that date

9    there was no appearance by the defendants or their counsel

10   again.  And I believe this happened one more time.  So I think

11   at least three times where the motion to dismiss was on the

12   calendar and I was the only one who was appearing.

13        So eventually, it got to the point where the Court set

14   forth that I was to, I guess, send a letter to Narissa Joseph,

15   copy the defendants, and post a letter on ECF setting forth

16   that from then on both the defendants, or the debtors at the

17   time, and their counsel were required to appear at every

18   appearance.  Because they obviously were not complying with the

19   return dates for a motion to dismiss and/or for sanctions.

20   Q.    Okay.  Now, was it approximately six times that they had

21   to appear?

22   A.    At least six times on our motion --

23   Q.    On that motion?

24        MR. DAHIYA:  Objection, leading, Your Honor.

25   Q.    How many times was it on the motion, if you recall?

1  A.    I would say at least six times we appeared on a motion to

2  dismiss and/or sanctions in this case.  And in fact, the reason

3  why it was so many times that we had to keep coming back is

4  because every single time we came back there was either no

5  appearance at all by the defendants and their counsel, and

6  there was no opposition submitted by them, and it was readily

7  admitted that they still failed to comply with the Court's

8  orders, which were ongoing.

9       So we had an order from -- a 2004 order from June, and

10  every time they're still not complying with that same order,

11  despite the fact that they're facing sanctions and a motion to

12  dismiss.

13  Q.    Okay.  Now, was there a appearance on the motion to

14  dismiss and/or for sanctions on January 30th, 2013?

15  A.    Yes, there was.

16  Q.    Okay, and what happened at that time?

17  A.    At that time, it was -- it was ordered that the defendants

18  comply with the 2004 order by producing all their records, and

19  by -- and appearing for their -- and they were to provide sworn

20  responses.  They were to provide a privilege log.  They were

21  supposed to -- and they were supposed to appear for their 2004

22  examinations.

23  Q.    Okay, and was the motion adjourned at that time?

24  A.    Yes.

25  Q.    Okay.

1  A.    Again.

2  Q.    And there was a return date -- a subsequent return date of

3  February 27th, 2013, correct?

4  A.    Yes.

5  Q.    Okay, and what happened at that time?

6        MR. DAHIYA:  Objection, Your Honor.  I mean, he should

7  not be asking leading questions.  Make it simple.

8        THE COURT:  Well, we gave you some latitude as well,

9  so we'll allow it.

10       MR. DAHIYA:  Okay.

11 A.    I'm sorry, Mr. Vlock, can you repeat the question because

12 I was kind of --

13 Q.    Sure.  Sure, when you came back on February 27th, 2013, on

14 the motion to dismiss and for sanctions, what happened at that

15 time, if you recall?

16 A.    I believe that date was the date that the Court set

17 forth -- because there was a lot of -- the argument by the

18 defendants was that initially, when they gave us responses,

19 their responses were that they objected to certain things.

20 They didn't produce all the documents.  They objected to things

21 like relevance and confidentiality and privilege.  And that

22 they were supposed to, you know, provide, I guess, a privilege

23 log.  And the Court, on that -- I think on that February 27th

24 date, ordered them to produce an affidavit setting forth, you

25 know, whether or not they produced all of the records, and if

1   not, what happened to them, or a privilege log.  And the Court

2   also scheduled their depositions, I believe, for some time in

3   March, and set forth if they did not appear that they would be

4   arrested by the U.S. Marshal and brought to court, you know,

5   for their depositions at that time.

6   Q.    Now, what, if anything, did the defendants produce, if you

7   recall, in terms of documentation?

8   A.    Well, in terms of documentation, they produced very little

9   as to what was required in the -- I think it was sixty-four

10  points in the rider, each person.

11       For example, there were a ton of things completely left

12  out, and they were objected to.  Mr. St. Clair is a practicing

13  attorney.  He has his own law practice, and he operates his law

14  firm in Brooklyn.  And he had a Web site.  We saw from his Web

15  site that he had associates working for him.  And we saw the

16  practice areas which he practices listed on his Web site.  But

17  yet, there was no information provided regarding anything with

18  regard to his law practice.  There was not one receipt, not

19  one, you know, document.  They didn't give any information at

20  all which would be able to show us -- forget about whether or

21  not his -- you know, there's any dischargeability here, but we

22  couldn't determine what his income or expenses were, at all,

23  since he's an attorney and runs his own practice.

24       So you know, that, right away, we knew he wasn't producing

25  all the documents that he had in his possession, custody, or

1  control, pursuant to the Court's orders and subpoenas.

2  Q.   Okay, and what about Ms. St. Clair, what documents were we

3  aware of that she was missing?

4  A.   Well, we knew that Ms. St. Clair had a very good job.  She

5  was making approximately 100,000 dollars a year.  Maybe it was

6  ninety-something-thousand dollars at the time, but the bottom

7  line is that she is a physician's assistant.  And although the

8  riders to the subpoena are very specific and they set forth

9  that if you have any type of loans or anything like that, that

10 you would, you know, require -- you would be required to

11 produce those items.

12      There was also really nothing, you know, referable to her,

13 actually, in the production at all.  What we got from Narissa

14 Joseph was a mishmash of documents which were all -- like they

15 were all post-bankruptcy proceeding.  Every single document

16 that we got was all post the filing of their bankruptcy

17 proceeding.

18      And they -- even the documents for the underlying judgment

19 itself, which would be relevant to this proceeding, were not

20 produced.  There was nothing with regard to our loan.  There

21 was nothing with regard to any financial statements give to

22 banks to obtain credit or loans.

23      The W-2s were missing from the defendants.  I mean, we

24 would have really found out for the first time, actually, even

25 at his 2004 exam, that Mr. St. Clair was a law professor.  We

1    didn't even have one document about that.  And you know, it was

2    really just the tip of the iceberg as far as what was missing.

3    Q.    Take a look at Plaintiff's Exhibit 8 in evidence, please,

4    and tell us what that is.

5    A.    This is a document from defendants' counsel, Narissa

6    Joseph.  It's undated, but from my recollection, I believe we

7    got this either sometime in January -- late January, early, you

8    know, or early February.  And it's a response to the

9    defendants' -- to the subpoena and order for 2004.  It

10   supposedly lists, I guess, what documents they were producing,

11   and what, you know, documents they were objecting to.

12   Q.    How many items did they object to, if you know?

13   A.    Well, like a third of them, approximately thirteen,

14   fourteen.  And their objections themselves, I mean, for

15   instance, you know, the objections were that the demands were

16   broad, vague, incapable of precise interpretation, not

17   relevant, the --

18           MR. DAHIYA:  Your Honor, can I -- he's just reading

19   the document.  The document speaks for itself.  What -- I mean,

20   he doesn't need to read the document that has been accepted in

21   evidence.  He's reading the debtors' paperwork, what is

22   missing, not missing from it.

23           THE COURT:  So you would have no questions on this

24   document, either?

25           MR. DAHIYA:  No, no questions.  It's -- that just

1  speaks for itself.

2          THE COURT:  Okay, well, I have a question.

3          This document was, after all the months of attempting

4  to get documents, the first response to the production of

5  documents that you all got?

6          THE WITNESS:  Yes.

7          THE COURT:  All right.

8          THE WITNESS:  After -- exactly, Your Honor.  What

9  happened was --

10          THE COURT:  Did you look through this document?

11  Because both the St. Clairs testified this morning that to

12  their knowledge there were -- there may have been responsive

13  documents, but they were destroyed due to the hurricane.  Can

14  you look at this document and see if any place in it there's a

15  reference to documents being destroyed by the hurricane?

16          THE WITNESS:  There is, Your Honor, like for things

17  like their passport.

18          THE COURT:  Other than the passport?

19          THE WITNESS:  Let me look through the document, Your

20  Honor, to refresh my recollection.  You know, other than the

21  passport, I really don't see anything else where they say any

22  of these documents, or any of these --

23          THE COURT:  Okay, so other than the passport, there

24  was no contemporaneous representation that any documents, which

25  may have existed were destroyed by a flood, other than a

1   passport?

2           THE WITNESS:  No.

3           THE COURT:  All right.

4   BY MR. VLOCK:

5   Q.   So it was after this response that actually the hearing on

6   February 27th was held, correct?  I think I might have reversed

7   them when I asked you before.

8   A.   Yeah, basically, what happened was I think on the January

9   30th appearance they were supposed to provide sworn responses.

10  And this is the -- as you could see, there's electronic

11  signatures by the defendants on this response itself.  So I

12  believe that this was supposed to be their sworn responses,

13  after, as the Judge said, months and months and months of us

14  trying to get any documents, whatsoever, referable to the

15  Court's orders.

16  Q.   Okay.  On the record, on February 27th, did the defendants

17  or their counsel make representations as to what documents they

18  had, or didn't have?

19  A.   Yes, as a matter of fact --

20  Q.   And what happened at that time?

21  A.   Well, before that appearance, I believe I had uploaded on

22  ECF a letter to the Court setting forth to the Court exactly

23  how, you know, we were being dealt with here, and that, you

24  know, that now that they're, you know, supposed to produce

25  documents, they're objecting to all these items.  And they're

1  still not fully complying.  They're still missing documents.

2  They were supposed to comply.

3      So on that date, I made those representations to the

4  Judge, and Judge Grossman asked debtors' counsel, and debtors

5  themselves, you know, why all of a sudden now are you objecting

6  to documents, and -- because my argument was that they've

7  waived any objections at this point.  They were served with the

8  order.  They were served with the subpoena.  They can't come

9  into court now and object to, you know, a significant portion

10 of these items.

11     And they now were faced with, you know, this statement

12 from the Court, why are you objecting to these items, and on

13 the spot, the debtors' counsel and the debtor were both saying

14 we don't have any of those documents, anyway.  Although we

15 objected, we don't have any of those documents.  And you know,

16 all those documents were destroyed in floods or whatever.  I

17 mean, for the first time they were saying this stuff.

18     And it was at that point that, you know, as you keep

19 questioning -- or the Court kept questioning them, that then

20 they started saying well, some of those documents they can't

21 produce.  They're privileged, or you know, or they're

22 confidential in some way.

23     So that's why that there was some sort of now -- now it

24 becomes a question as to whether they actually have any of

25 these docu -- you know, items in their possession, custody, or

1   control.  And which the Court was, you know, again, lenient and

2   set forth, you know, then you give a sworn statement, on the

3   record, that you either produced all the documents or the

4   documents have, you know -- or don't exist, basically.

5   Q.    Okay.  And the Court directed them to do that?

6   A.    Yes.

7   Q.    At that hearing on February 27th?

8   A.    Yes, the Court directed -- that was -- that was part of

9   it, actually.  It was -- it was from the bench.  It was

10  reiterated, I believe, on the docket that the debtors were

11  required to provide sworn affidavits as to -- that the only

12  things that they produced were the only documents that they

13  had.  They had no other records in their possession or control.

14  And that was supposed to be uploaded by ECF prior to them

15  coming in for their 2004 examinations.

16  Q.    Okay.  And did the Court also direct them to appear for

17  the Rule 2004 examinations?

18  A.    Yes.

19  Q.    Okay.

20  A.    The Court directed, and gave specific dates, and ordered

21  that the 2004 examinations be held in the courthouse.

22  Q.    Okay.

23  A.    Or -- and it was made very specific and clear that the

24  Court was not very happy with their course of conduct over the

25  previous six or seven months, in their failures to comply with

1    the Court's orders.  And the Court said if you don't appear, if

2    you don't do these things, that we're going to send the U.S.

3    Marshal to come arrest you.

4    Q.    Okay.  Take a look at Plaintiff's Exhibit 9 in evidence,

5    and tell us what that is, please.

6    A.    This is the docket, and on the docket itself I believe it

7    reiterates the Court's order from that February 27th

8    appearance.  Specifically, I believe, it's dated 2/27/2013.

9    There's no document.

10        It says, "Hearing held and adjourned.  Motion to dismiss

11   filed by Cadles of Grassy Meadows."  That was our -- because it

12   was on for our motion.  Sets forth a deposition on 3/13 and

13   3/14 at 2 p.m. in the courthouse, unless agreed on another

14   location.  Affidavit and response to documents to be filed

15   within one week.  If debtors cannot make it, marshals will be

16   sent to make sure they appear.  And also it sets for

17   stipulation extending time to object to discharge to be filed.

18   So in other words, we were extending our time to object to

19   discharge because of all of this fruitless chasing after them

20   for the documents and their 2004 examination.

21   Q.    Okay.  Did the defendants file -- or the debtors file an

22   affidavit thereafter, in accordance with the Court's

23   requirement?

24   A.    Yes, they did file an affidavit, you know, and I guess it

25   was a joint affidavit.  And I believe they said it twice, you

1    know, that they -- other than what they produced to plaintiffs

2    they had no other documents in their possession or control.

3    Q.    Okay.  So take a look at Plaintiff's Exhibit 10 in

4    evidence, and tell me if that's the affidavit that you're

5    referring to.

6    A.    Yeah, this is the -- the affidavit which was, I guess,

7    sworn to by the -- both of the defendants.  You know, and yeah,

8    they set forth, "The documents we have submitted to counsel for

9    Cadles are the only requested documents in our possession and

10   control."  It's dated March 3rd, 2013.  It's electronically

11   signed by Narissa Joseph as notary, and says, "Sworn to me this

12   day."  It's blank but it has electronically (sic) signature and

13   it has both of the debtors' handwritten signatures on the

14   affidavit itself.  It says --

15          MR. DAHIYA:  Objection, Your Honor.

16   A.    It says also that they didn't destroy --

17          THE COURT:  Hold it.

18          MR. DAHIYA:  Your Honor, these documents -- he doesn't

19   need to rehash all this document.  This affidavit has been

20   accepted in evidence.  It's a clear document.  It speaks for

21   itself.  I don't know why we need to get through this

22   narration.

23          THE COURT:  All right, I heard it.

24          MR. DAHIYA:  And he was not a party to -- for

25   example --

1          THE COURT:  Sir, I heard your objection.

2          MR. DAHIYA:  Okay.

3          THE COURT:  Just limit the question and move on.

4          MR. VLOCK:  Okay.

5   Q.   Was this affidavit -- were the statements in this

6   affidavit that they had no further documents in their custody

7   or control, was that truthful, to your knowledge?

8   A.   Absolutely not, actually, because I know possession or

9   control --

10          MR. DAHIYA:  Objection to this --

11          THE COURT:  Don't do that.  If you've got an

12   objection, make it.  Otherwise, don't say anything.  You'll

13   have an opportunity --

14          MR. DAHIYA:  So objection --

15          THE COURT:  You will have an opportunity to cross.

16          MR. DAHIYA:  Okay.

17          MR. VLOCK:  He may proceed?

18          THE COURT:  Go ahead.

19          MR. VLOCK:  Thank you.

20          THE WITNESS:  Thank you, Your Honor.

21   A.   Absolutely not.  It was not a truthful statement, and I

22   knew it was a complete fabrication because I knew that they had

23   other documents in their possession or control.  Like I said,

24   we knew that Mr. St. Clair was a practicing attorney with his

25   own law firm, yet we did not receive even one document

1  referable to his law firm, not one document.

2       Now, as a practicing attorney, I know you're required to

3  keep records of, you know, your, you know, clients' cases.  And

4  you're required to maintain records regarding your IOLA

5  account, and your operating accounts, because at any time, the

6  bar could audit you and find out, you know, what's going on.

7  If there was ever a disciplinary proceeding against you, all of

8  your records have to be called into question.  And here this --

9       THE COURT:  Well, you're in fact -- did you in fact

10 know that he had documents, or did you think he should have had

11 documents?

12      THE WITNESS:  Well, considering he was a practicing

13 attorney, Your Honor, I was 99.9 percent certain that he had

14 documents that he was not turning over.

15      THE COURT:  But you didn't know that.

16      THE WITNESS:  But I knew with respect to in his

17 control he had documents with regard to certain, you know,

18 items that were requested under the order, because it doesn't

19 take much to call up one of your creditors to obtain the

20 documents underlying those debts or the loans.  All you have to

21 do is, it's in your control to make --

22      THE COURT:  Okay.

23      THE WITNESS:  -- the attempts to get the documents,

24 and there was no documents made -- produced with -- with a ton

25 of things that were required.

1          THE COURT:  All right.

2    BY MR. VLOCK:

3    Q.   And with regard to -- just to follow up on the judge's

4    question -- with regard to that, when you say call up someone,

5    are you referring to, for example, the bank that he banks at?

6    A.   Yes, the banks that he banks at, the -- you know, any one

7    of the credit cards that he had before, the loan that we had on

8    this very case, he could have gotten the documents referable to

9    his loan, his loan applications.  All that stuff is -- is all

10   within your control to get.  But it was never produced.

11   Q.   Take a look at Plaintiff's Exhibit 11 in evidence and tell

12   us what that is, please.

13   A.   It's the transcript of the 2004 examination of Jeffrey St.

14   Clair, from March 13th, 2013.

15   Q.   All right, what happened when -- so you were able to take

16   the deposition of Mr. St. Clair on that date, on March 13th,

17   2013, correct?

18   A.   Well, we proceeded with the 2004 examination on that date,

19   approximately -- it was nearly a year after the 2004

20   examination.  Looking at the dates now, I'm shocked.

21   Q.   From the order?

22   A.   From the order.  But from the very start of the 2004

23   examination, it became abundantly clear that there were other

24   documents that were not produced.  And if I had any question

25   that there were other documents that were not produced, and

1  that this affidavit was a complete fabrication, they were

2  completely eliminated from the first, you know, ten minutes of

3  the deposition itself.

4  Q.    Okay.

5  A.    The -- actually, the reason why I say that is because when

6  I asked Mr. St. Clair certain questions, he refused to answer

7  questions about his practice, about any particular client,

8  about his brother-in-law, who he admitted that was a client.

9  He refused and objected to producing any documents referable to

10  his IOLA accounts, his operating accounts, his -- any type of

11  retainer agreements, his letters of -- I guess, you know,

12  representation for -- for certain clients.

13       He didn't produce even one client file, nothing.  He

14  didn't give us the names of any of the cases that he worked on.

15  In fact, I think he told me it's all public record; go find it

16  yourself.  So when, you know -- right from the start, when I

17  was facing this type of, you know, I guess, roadblocks, I

18  said -- we were right next door, here, to this courtroom

19  conducting this.  I said, you know, we have to take a break.

20  And I told Narissa Joseph that, you know, we have to go next

21  door for a ruling because if he's going to object and refuse to

22  answer certain questions, then we need to have this resolved,

23  because it makes our purpose in the 2004 examination

24  impossible.  I mean, it's next to impossible to go forward with

25  a 2004 examination when the person's objecting and refusing to

1  answer questions.

2  Q.    And did you in fact go for the ruling?

3  A.    Yes, we did, actually.  We came next door.  There was a

4  calendar call going on, and at the conclusion of the calendar

5  call, you know, I asked to be heard by Judge Grossman.  And you

6  know, I made my point, and the Court set forth to make a

7  record, and that, though there was not going to be any rulings

8  on the fly, and that, you know, we could, you know, follow up

9  with the appropriate motion, I guess, at the appropriate time,

10  you know, on the issue itself.

11      But really, my intent was to, like, pause this whole

12  proceeding and either have him directed to answer questions and

13  reserve any, you know, refusals to answer questions to things

14  that, you know, were appropriate or, you know, to answer the

15  questions, you know, as you're supposed to do at any

16  deposition.

17      You know, your objections are very limited, and you know,

18  here is a bankruptcy proceeding, and Mr. St. Clair, at the

19  time, I guess, is the debtor, and he's opening himself up, and

20  made all of his life as something that's discoverable and

21  relevant to his proceedings, especially his income, assets, and

22  expenses.  And all of the questions I was asking were

23  completely relevant.  So it was -- it was impossible to really

24  go through, at least to get a fruitful, you know, 2004

25  examination.

1  Q.   Take a look at page 114 of the transcript from March 13th,

2  2013.  I'm going to ask you to tell me what was specifically

3  refused to be -- that Mr. Sinclair refused to answer or

4  produce.

5  A.   Yeah, from page 38 of the deposition, these -- this is the

6  information and documents requested during the course of the

7  first day of the 2004 examination of Mr. Sinclair.

8       I found out for the first time that he was a law professor

9  at Medgar Evers College.  We're talking about, you know, a

10 person who filed the bankruptcy petition a year before, and

11 we -- nobody knew that he was a professor.  And obviously, he

12 didn't produce any documents with regard to being a professor.

13      I demanded, you know, proof of all of his payments as a

14 professor, which he downplayed and said aw, you know, it's not

15 that much money.  You know, I get paid, you know, it's really

16 nothing.  But nevertheless, I made the demand for that.

17      I never had any W-2s for his employment and payment as a

18 professor at Medgar Evers College.  Also, any contracts or

19 documentation which demonstrates, you know, the course of his

20 employment as a professor from Edgar Evers College, we never

21 received anything like that.

22      Letters of engagement for the last five years, and

23 apparently Mr. St. Clair, he testified that he rarely --

24 although he does use them sometimes, he rarely uses retainers.

25 He uses letters of engagement, usually uses them.  We made a

1    demand for that, although it was objected to.  Obviously, that

2    was never produced pursuant to the 2004 order, and contrary to

3    the affidavit from March 3rd, 2013.

4         The phone records, all phone records -- throughout the

5    course of his deposition, Mr. St. Clair testified he's got,

6    like, I don't know how many different phone accounts.  We never

7    received any phone records, cell phones, house phones, phone at

8    his office.  There was not one thing that we ever received with

9    regard to, you know -- and a lot of that, as an attorney, I

10   mean, you would show exactly how much work he's doing,

11   depending on, like, you know, his type of phone bill, or

12   anything like that, and especially, you know, in this day and

13   age with cell phones, as well.

14        The Web site records, like I said before; this -- he's an

15   attorney operating, you know -- his Web site actually said he

16   had two offices.  Later, Mr. St. Clair testified that he only

17   has one.  His Web site also said he had multiple associates,

18   like two or three, on the Web site.  Never -- Mr. St. Clair

19   said that he doesn't have any associates.  And the Web site was

20   pretty extensive, and generally, I know that, you know, when

21   you set up a Web site you've got to pay a company to do it.

22   Sometimes you pay a company to promote it.  Mr. St. Clair

23   testified that he had somebody, you know, create the Web site

24   for him, yet we never received even one document, you know,

25   referable to that, nor did he even make any attempts to find

1  any documents referable to any of this stuff.

2      The other thing is actually the Cablevision records, you

3  know, whenever I asked questions related to this, it's usually

4  because the people have, you know, computer equipment in

5  their -- in their house and in their office.  In Mr. St.

6  Clair's case, we never received any computer equipment, despite

7  the fact that Mr. St. Clair said he uses Cablevision as his

8  Internet service provider.

9      And then Mr. St. Clair identified a whole bunch of items,

10  you know, multi-thousand-dollar items:  flat-screen TVs, you

11  know, stuff like that.  And he said that he -- he bought them

12  at BJ's or Costco.  He didn't remember when.  They were right

13  before his bankruptcy petition, yet we have not one record

14  referable to, you know, any of the purchases at BJ's or Costco,

15  which generally, when you make those purchases there, they

16  save -- on those -- in those types of companies, they save, you

17  know, what the purchases are.  So we didn't receive any of

18  those items at all.

19  Q.    Okay.  Now, you did mention the documents from the law

20  practice.  Was it -- did Mr. St. Clair state that he didn't

21  have them, or was it that he refused to produce them?

22  A.    From my recollection is that he refused to produce them.

23  He objected to producing them.  He said that they were

24  confidential, that it was his clients' documents, and you know,

25  you're not entitled to that, too bad.  And that was also, you

1    know -- I also made a demand for all invoices or receipts

2    issued by Mr. St. Clair for his law practice itself.

3    Q.    Take a look at Plaintiff's Exhibit 12 in evidence.  Tell

4    us what that is, please.

5    A.    This is the continued -- the transcript for the continued

6    2004 examination of Mr. St. Clair, which was taken the next

7    morning.  It was started the next morning on March 14th, 2013.

8    You know, we adjourned the deposition from the day before, at

9    like kind of 5:30, 6 o'clock, or something like that.  You

10   know, it was getting late in the day, so we decided to continue

11   the next morning, and hopefully finish up, you know -- you

12   know, on that day.

13   Q.    All right.  And on the continued deposition, were there

14   further refusals --

15   A.    Yes.

16   Q.    -- to provide documents?

17   A.    Yeah.

18   Q.    Or information?

19   A.    Yes.

20   Q.    Okay.

21   A.    You know, there were further refusals.  And -- and really,

22   it was with every question there was some sort of, you know, an

23   unprofessional remark.  The conduct itself was extremely

24   unprofessional.  He was threatening.  He was cursing.  He was

25   calling me names on the record.  This coming from an admitted

1  attorney was --

2          MR. DAHIYA:  Objection, Your Honor.  Move to strike.

3  Not relevant for this.

4          THE COURT:  Overruled.

5  A.   This coming from an admitted attorney, who I expected to

6  at least understand the nature of the questions, the proceeding

7  that he was involved in.  You know, he had been admitted for,

8  you know, like I said, years beforehand.  I knew that he had

9  some familiarity with how you're supposed to conduct yourself,

10  especially in a court proceeding, that you would be a little

11  bit respectful and try not to disrupt the purpose of the

12  deposition.  It was the exact opposite of that, and his conduct

13  was really deplorable.  And the more it went on the worse it

14  got, as the deposition continued.

15      One thing I'd like to say is that to say that he was

16  obstructive during the course of my questioning, on both days,

17  would be an understatement.  He -- it was constant -- like

18  pulling teeth to try to get him to just answer any type of

19  question.

20          MR. DAHIYA:  Objection, Your Honor.  He was not asked

21  a question.

22  A.   He --

23          THE COURT:  Stop.  That's enough.  Depositions are

24  quite clear as to -- while it doesn't have any tonal reference,

25  the depositions are very clear as to what happened, and they're

1    an exhibit.  So let's move on.

2            MR. VLOCK:  I'd like to read into the record, Your

3    Honor, some of the -- following up on that, some of the

4    comments from one of the pages on this deposition.

5            THE COURT:  Okay.

6            MR. DAHIYA:  Which --

7            MR. VLOCK:  Page 2017, line 5.  This is Mr. St. Clair.

8    Actually, all of these, from here --

9            MR. DAHIYA:  This is an exhibit?

10           MR. VLOCK:  This is the same exhibit we're working on

11   right now, Exhibit 12.

12           MR. DAHIYA:  12?

13           MR. VLOCK:  In evidence.  On page 217, starting at

14   line 5, Mr. St. Clair says, "I'm fucking broke."  No, I'm

15   sorry.  "There's nothing coming in.  I'm fucking broke."

16           On page 217, at line 8, just three lines down:  "I'm

17   fucking suffering here.  And you're trying to bleed me for

18   something I don't have and have no way of obtaining."

19           Moving down a few lines, to line 13, same page:  "God

20   damn, this is depressing.  It's depressing."

21           Same page, a few -- ten lines down, at line 23:

22   "Fucking collecting bottles to make a few dollars sometimes,

23   please."

24           On the next page, 218, starting at line 9:  "You think

25   I want to keep going over this shit; looking at it, and

1  realizing how inadequate I've been?"

2          And then a couple lines down from there, line 12, on

3  page 218:  "Have some fucking compassion."

4  BY MR. VLOCK:

5  Q.  Mr. Giordano, what -- besides the screaming tirades, did

6  Mr. St. Clair do anything else, showing his behavior towards

7  you at the deposition?

8  A.  Yeah, besides the screaming tirades, he -- I mean, and

9  those things that you were reading before actually brings back

10  the memory.  There wasn't even a question pending.  He just

11  decided to go on this rant where he just, you know, spewed a

12  bunch of obscenities out, more than once.

13      He also would do, like, really childish, like things, like

14  he knew -- as an attorney, you know that there's a court

15  reporter there, and the court reporter is just taking down, you

16  know, verbal responses to questions and answers.

17      But he also knows that I could -- he could just give me

18  the finger during the deposition, and that the court reporter

19  is not looking at the person's gestures.  So he was giving me

20  the finger during the deposition, while I was asking him

21  questions.  Like, you know, just, you know, like this, across

22  the table at me, while I'm asking questions.  And the --

23  Q.  Indicating your middle finger?

24  A.  Oh, yeah.

25  Q.  Across the table to you.

1  A.    And I was saying, you know, this is really great.  That's

2  real adult, like now you're giving me the finger.  And does he

3  deny it?  Does he say no?  No, he couldn't because it's all

4  there.  And he says oh, yeah, oh, I'm sorry.  I'll -- I won't

5  do it again.  You know?

6      But that type of conduct happened throughout the course of

7  the deposition, where he would do something completely

8  outrageous, and you know, unprofessional, to disrupt the

9  deposition, to attack me.  I'm floored that he said that he

10  felt attacked and he felt, you know, so upset before when he

11  testified.  Because here he is; he's the attacker the entire

12  time, for two days, during 2004 examinations.  He's attacking

13  me, attacking our client, you know, attacking my questions,

14  commenting about the questions, setting forth that, you know,

15  that's a ridiculous question, or whatever it is.  He's

16  making -- all these things --

17         THE COURT:  Okay, okay, I got it.  Move on.

18  A.    The bottom line is that I just -- I just want to sum up,

19  you know, it is mind blowing that somebody would treat another

20  person who's just trying to do their job that way, when I'm

21  just asking simple, straightforward questions.  And the reason

22  behind it is because he doesn't want to give the answers to

23  those questions.

24  Q.    All right, let's take a look at Plaintiff's Exhibit 13 in

25  evidence.  Tell me what that is.

1    A.    This is the transcript of the 2004 examination of Cathleen

2    St. Clair, from March 14th, 2013.

3    Q.    So after you finished the deposition of -- the continued

4    deposition of Mr. St. Clair you went right into the deposition

5    of Ms. St. Clair?

6    A.    I believe --

7    Q.    Or after lunch, or something like that?

8    A.    Yeah, I don't remember if we had a break or not, or if

9    we --

10   Q.    But it was the same day.

11   A.    -- continued straight through.  We may have -- yeah, same

12   day, exactly.

13   Q.    And what, if anything, happened during that deposition, in

14   terms of produce -- ask -- questioning and answering of -- and

15   producing documents or information?

16   A.    I -- you know, quite surprisingly, it was -- I expected

17   different, you know, conduct, but it was really more of the

18   same type of obstructive conduct.  The question-and-answer

19   process was completely disrupted by constant, you know,

20   discussions between the two debtors, during the deposition.

21       Mr. St. Clair would chime in or Ms. St. Clair would write

22   down something on a piece of paper, and then he would look at

23   it, and they would giggle about it.  It was -- every question I

24   asked was asked to be repeated, or rephrased, or -- even though

25   they were simple, straightforward questions.

1      And it was -- it was next to impossible to get a straight

2   question and answer in any circumstance, because it was clear

3   that Ms. St. Clair was very calculated as to how she was

4   answering the questions itself.  It wasn't, you know, somebody

5   who was just trying to, you know, get through the day.  It was

6   somebody who was trying to, you know, not give me an answer,

7   you know, to my question.

8   Q.    Now, what about -- did you learn at the deposition about

9   any documents that were in Ms. St. Clair's custody and -- or

10  possession or control that had not been produced?

11  A.    Yes.

12  Q.    Okay.

13  A.    I -- there were a number of them, just like Mr. St. Clair,

14  that -- documents that, you know, were clearly requested in our

15  rider to the subpoena and the 2004 order.  And you know, Ms.

16  St. Clair, who was not an unsophisticated person -- she's a

17  physician's assistant; you have to go to school for that sort

18  of thing; you have to be very smart -- she -- she knew, right

19  off the bat, that she had documents or could get them but just

20  simply never produced them and had really no reason why, you

21  know, these documents were not sought after or produced.

22      Just, you know, off the top of my head, I could tell you,

23  I mean, you know, she -- as somebody who's filing bankruptcy,

24  you would have to know that your tax returns, you know, any tax

25  information or financial information would be relevant.  Yet,

1  no information regarding, I guess, an accountant that she has

2  was ever provided, who does her taxes, or anything like that.

3          MR. DAHIYA:  Objection, Your Honor, there's no -- it's

4  inadmissible opinion of a lay witness.  I mean, he is -- taxes

5  need to be filed, and all he's saying -- what needs to be done

6  by her as a debtor, or I don't know.  That's not --

7          THE COURT:  Did you get copies of tax returns?

8          THE WITNESS:  Not at first, Your Honor.  Actually,

9  what happened was they -- I think at the 341 meeting, it came

10 to light that they hadn't filed taxes for, like, I don't know,

11 three years.

12         THE COURT:  Did they ultimately produce the tax

13 returns?

14         THE WITNESS:  The produced partial tax returns to us,

15 but none of the underlying information or information that they

16 gave to their accountants --

17         THE COURT:  Okay.

18         THE WITNESS:  -- to have those documents produced.

19 And there was documentation given to their accountants because

20 how else could the accountant go through and do the tax

21 returns?  And it was also testified to that they gave -- well,

22 Ms. St. Clair, particularly gave information --

23         THE COURT:  Let's just try -- sir, let's just try to

24 stay with what you know, not what you think they should have

25 done.

1          THE WITNESS:  Ms. St. Clair testified that she gave

2  information to a new accountant and was waiting to have her

3  taxes prepared.

4          THE COURT:  All right.

5          THE WITNESS:  But she didn't produce any of that

6  information, Your Honor.  And she also testified that she, you

7  know, was, you know, a student, you know, to become a

8  physician's assistant, and she had student loans and, you know,

9  that she's current on her student loans and she pays them.  And

10 yet, there were no statements.  There were no underlying loan

11 documents.  There was no financial information that you give to

12 your -- your creditors to obtain the loans, provided at all.

13 BY MR. VLOCK:

14 Q.   And what about household expenses; were those produced?

15 A.   Nothing.  Nothing with regard to any of the household

16 expenses was produced.  In fact, I believe they both testified

17 that Mrs. St. Clair is the one who handles that, you know --

18 those things for them.

19 Q.   I'm sorry, Mrs. or Mr.?

20 A.   Mrs. St. Clair is the one that handles that, yet they --

21 Q.   The wife.

22 A.   -- yeah, but yeah, they didn't produce anything there, as

23 well.

24 Q.   With regard to the new accountant that you mentioned, do

25 you know where that appears in the transcript of Mrs. St.

1  Clair?

2  A.    I'd have to go through and look for it.

3  Q.    If you -- okay.

4  A.    Do you want me to go through it?

5  Q.    No, I don't want you to go through the whole transcript.

6  I can see if you're -- take a look on page 73 and tell me if

7  you see it.

8  A.    Okay.  Hold on.  You said 73?

9  Q.    73.

10  A.    Yes.

11  Q.    Okay.

12  A.    Yeah, she -- she didn't have the name of the new

13  accountant.  I asked her what the name was.  She said he's in

14  Queens.  We'd said we'd leave a space in the transcript.

15  Q.    And was that provided?

16  A.    No.  It was never provided.  In fact, that she said, you

17  know, you -- she hasn't, you know, filed, you know, her taxes

18  yet, you know, but that if I wanted to wait, she would provide

19  the documents.

20  Q.    But she did not?

21  A.    No.

22  Q.    And take a look at page 96 and tell me if that relates to

23  what you testified about with regard to the student loans.

24  A.    Yeah.  I asked why she didn't produce any of the monthly

25  statements with regard to her student loans.  She said it was

1  not asked for.

2  Q.    Okay.  And did she subsequently produce any documents

3  regarding student loans?

4  A.    No.  And, in fact, that -- she testified that her balance

5  on the student loans was 37,000 dollars, so --

6  Q.    She knew the balance but she didn't have the statements?

7  A.    Yeah.

8  Q.    Or she didn't produce the statements?

9  A.    Yeah, yeah, exactly.

10 Q.    Take a look at page 127 and tell me if that relates to

11 what you testified to about her household expenses.

12 A.    Yes, exactly, actually.  Yeah, her telephone bill.  She

13 actually said, do you want telephone bills?  You want what

14 other stuff?  Water bills?  LIPA bills?  Things like those?

15 Those are in my control, she said.  If you want those, yes, you

16 can have them.

17 Q.    And did she produce them?

18 A.    No.  Mind you, this is all after they had already filed

19 affidavits setting forth they had no other documents in their

20 possession or control.

21 Q.    So to date, standing here today, were any of those

22 documents produced?

23 A.    Not -- none of them; not at all.

24 Q.    When you appeared in court thereafter on May 13th, 2013,

25 you appeared on the motion to dismiss and for sanctions, right?

1   A.   Yes, it was the continuation of our hearing sub, you know,

2   to us on our motion to dismiss.  This is post these affidavits

3   and the 2004 examinations of the debtors.

4   Q.   Okay.  And what happened at that hearing?

5   A.   We had a full hearing on the motion to dismiss and the

6   sanctions.  Actually, Narissa Joseph was here.  Mr. St. Clair

7   was put on the stand and he was questioned by myself, by Ms.

8   Joseph, by the Court, regarding his testimony at his 2004

9   examination and also the affidavits and the entire course of

10  conduct over the -- you know, this matter itself.  And the

11  Court made the determination that, you know, its orders were

12  not complied with, that there was a continuing course of

13  conduct by the defendants which was unacceptable.  That they

14  obviously lied in their affidavits, that there were other

15  documents.

16      And during the course of the hearing, I believe, you know,

17  the -- Mr. St. Clair set forth that some documents were

18  privileged.  He tried to pin some of the blame on his counsel

19  for not producing some of the documents by setting forth he

20  produced everything to his counsel, not to us.  And he -- and

21  his counsel set forth that there were no privileged documents

22  and there are no other documents and that they told her that

23  there's no other documents.

24      So, you know, it was the finding of the Court that their

25  conduct was unacceptable and it's clear that they didn't

1   produce all of the documents and it's -- it was supposed to be

2   an ongoing thing because, you know, they still had an open-

3   ended order which had not been complied with, or five of them

4   had not been complied with.

5   Q.   Now, at that hearing did -- you said Mr. St. Clair took

6   the stand?

7   A.   Yes.

8   Q.   And at that time, did he admit that there were other

9   documents but he chose not to produce them or what happened?

10  A.   That's exactly what happened actually.  I believe, you

11  know, when I questioned him, he was evasive and he feigned that

12  he didn't remember what he testified to or what documents he

13  produced, what documents he didn't produce, but then when the

14  Court questioned him, he seemed to remember certain things and

15  said that he didn't produce them, you know?  Sometimes part of

16  it, I remember, when I questioned him, he did admit certain

17  things that he didn't produce like his -- all the records

18  referable to his law practice, his IOLA accounts, his operating

19  accounts but he objected to those still, you know, and, you

20  know, that there were other things, as well, obviously that

21  we've discussed that he still hasn't produced.

22  Q.   Okay.  And -- all right.  Take a look at Plaintiff's

23  Exhibit 24 in evidence.

24  A.   I'm ready.

25  Q.   Tell me what that is?

1  A.    This is the transcript of the proceedings from May 13th

2  before the Court regarding our motion to dismiss and/or for

3  sanctions.  There was also, I guess, an application made by one

4  of the other debtors or of the trustee regarding the compromise

5  of nonexempt assets and some sort of settlement between them,

6  regarding, I guess, accounts receivable and some other

7  docket -- document of I guess possession, I believe.  And this

8  is the full record of the proceedings on that date where we had

9  a hearing, really on the noncompliance with the multiple court

10 orders, the submission of false and fraudulent statements which

11 were sworn to in the course of this proceeding, and the

12 withholding of documents itself.

13 Q.    Now, on page 12, can you turn to that on Plaintiff's

14 Exhibit 24; is there a reference there to the letters of

15 engagement that you spoke about?

16 A.    Yes.

17 Q.    Okay.  And I'm going to read specifically from page 12.

18        "THE COURT:  Go to the podium, please.

19 "Q.  Mr. St. Clair, isn't it true that you testified that you

20 usually do letters of engagement when you have a client retain

21 your services?

22 "A.  No.

23 "Q.  You didn't testify that 'When was the last time you used a

24 retainer for any client?  Answer:  I don't recall.  I usually

25 just do a letter of engagement.'  You didn't say those words

1 during your deposition?

2 "A. If I did, I must have misspoke and if it --" and then

3 there's an end to that.

4     Take a look at what we looked at Plaintiff's Exhibit 11 in

5 evidence. Sorry. Still remain on 24. I'm sorry. On page 16

6 of Plaintiff's Exhibit 24 in evidence:

7       "THE COURT: All right. Striking the ceiling for the

8 laws of physics, do you -- do you have records at 16 Court

9 Street?

10       "THE WITNESS: I have some records. Yes, Your Honor.

11       "THE COURT: Have all the records dealing with

12 invoices, receipts, retention, been turned over?

13       "THE WITNESS: No, they have not."

14     On page 17 of the same exhibit:

15 "Q. Isn't it true that we made a demand for all documents

16 referable to any operating accounts?

17 "A. I don't recall that.

18 "Q. Isn't it true that you failed to produce any documents

19 with regarding to operating accounts you maintained?

20 "A. Yes.

21 "Q. Isn't it true that we also demanded records referable to

22 your attorney escrow account?

23 "A. Which I objected to. That's not my money, Judge. It's an

24 escrow account."

25     On page 19 of the same exhibit, Plaintiff's Exhibit 24 in

1  evidence:

2  "Q.  Mr. St. Clair, isn't it true that you never turned over

3  any records for any credit account referable to your practice

4  as an attorney?

5  "A.  As I explained during the deposition, I have no credit

6  accounts.

7  "Q.  For the ones that you had, did you turn over any records?

8  "A.  I have no remaining records of any credit accounts.

9  "Q.  Did you make any efforts whatsoever to locate any

10 Signature Bank records that you had?

11 "A.  Why would I do that?  The Judge instructed me that I --

12 whatever was produced is what was produced.  He was not

13 requiring me to recreate or re -- or redo anything.  So I gave

14 all I had and that's all I can give."

15      And on page -- starting on page 21 of Plaintiff's Exhibit

16 24 in evidence, I'm reading:

17      "THE COURT:  What's before me is a question on whether

18 or not sanctions should be imposed on this debtor for failing

19 to abide by court orders with regards to the production of

20 documents.  It's clear to me that the debtor has embarked on a

21 process here which is designed to make as difficult as

22 possible, this discovery process.

23      "Now, difficult and sanctions are two different things

24 but here the debtor, I think, has gone beyond what the Court

25 deems permissible.  I gave a series of direct orders.  The

1   debtor was here, in fact, on several occasions.

2          "The argument that the debtor disagrees with its

3   counsel, even in today's hearing, is not persuasive.  The

4   debtor is represented by counsel.  Counsel's actions are deemed

5   to be the actions of the debtor.  If the documents were turned

6   over to the debtor's counsel and then not produced, that will

7   be another issue.  But where we sit a -- there's a whole range

8   of things that this debtor has refused to produce.  They range

9   from documents that are declared to be privileged and then the

10  Court's told there are no privileged documents.  Documents that

11  existed but now they're on the ceiling or the floors or the

12  walls, documents in the hands of someone else and so what

13  should be a simple process has become increasingly difficult

14  and I don't even know to what end.  I don't know in the end

15  whether it's going to show anything but they certainly -- the

16  Court will not countenance this kind of behavior."

17       Okay.  After the conclusion of the testimony, what

18  occurred at that time?

19  A.   The Court ruled that the orders were not complied with,

20  that there was obviously false and fraudulent statements made,

21  sworn to by the defendants, that they were withholding

22  documents, and that this was an ongoing, you know, conduct --

23  course of conduct by the defendants.

24       The judge set forth, you know, I don't know why you

25  haven't, if you haven't already, you know, filed your adversary

1   proceeding because it seems to me that you've made your prima

2   facie case pursuant to 727 of the Bankruptcy Code for denial of

3   discharge, given the course of conduct which has already been

4   set forth here.

5        The Court also agreed that our request for 7,500 dollars

6   in sanctions was reasonable, given the circumstances and that

7   because of the conduct by the defendants, that the sanction

8   itself was going to remain nondischargeable.  And furthermore,

9   the Court found that the Court would entertain further motions

10  based on this continued failure to produce documents.

11  Q.   Take a look at Plaintiff's Exhibit 14 in evidence.  Tell

12  me what that is.

13  A.   It's the order imposing sanctions against the debtor in

14  this case.  The date on that is May 20th, 2013.  This is

15  pursuant to the directives by the Court regarding the

16  defendants' conduct in this matter.

17  Q.   Okay.  Now, and pursuant to this order, the -- you just

18  mentioned the Court sanctioned the defendants 7,500 dollars for

19  their conduct, correct?

20  A.   Yes.

21  Q.   Okay.  Was that ever paid?

22  A.   No, it was never paid actually.

23  Q.   Okay.

24  A.   And nor, you know, do I expect it to be paid given the,

25  you know, case, you know, for the last four years.  To try to

1   get them to turn over documents has been impossible; to try to

2   get him to pay any money, even ordered by the Court and made to

3   be nondischargeable, it's certainly not going to be paid.  And

4   we tried actually, a number of times, to discuss this matter

5   with Narissa Joseph to try to come to a resolution regarding

6   the sanctions, regarding the entire case, everything, to sum it

7   all up, and all of our attempts --

8           MR. DAHIYA:  Objection.  Move to strike, Your Honor.

9   It's calling what he (indiscernible) he asked Narissa Joseph.

10  She's not here and --

11          THE COURT:  I think the record is clear that an order

12  for sanctions was issued and they haven't complied.

13          MR. DAHIYA:  Yeah, that's it.

14          THE COURT:  Move on.

15  Q.   Did the Court direct the defendants to produce a privilege

16  log?

17  A.   Yes, certainly.  It was -- it was their excuse for not

18  producing certain documents and that's really what you're

19  supposed to do when you don't produce documents and you have an

20  objection based on privilege.

21  Q.   Did the defendants produce a privilege log at any time?

22  A.   Never.

23  Q.   Okay.

24  A.   And they -- the defendants and their counsel, what they

25  did was they would say that they don't have any other

1    documents, and then we'd say we have -- well, you have these

2    documents, and then they would say, those documents are

3    privileged.  And then we would say, well, where's your

4    privilege log?  And then they would say, oh, we don't have

5    those documents anyway.  You know, it was a constant shell

6    game, you know, going back and forth to try to, you know,

7    uncover really evidence to try to determine whether or not they

8    have anything here or if there's any dischargeability if

9    they're -- what their income, what their expenses are, every

10   single thing.

11   Q.    After the order for sanctions was issued, did the

12   defendants produce any documents whatsoever?

13   A.    No, no.  And it was made quite clear at the sanctions

14   hearing that they had documents that they didn't produce, yet

15   nothing was produced after that.

16   Q.    So to date --

17   A.    To date --

18   Q.    -- nothing has been produced --

19   A.    No, nothing has been produced.

20   Q.    -- since the sanctions were --

21   A.    Yeah, no.

22   Q.    Take a look at Plaintiff's Exhibit 18 in evidence.  What

23   is that?

24   A.    It's our statement of undisputed material facts.  This was

25   submitted with our motion for summary judgment.  Basically,

1    it's all the facts in the case that you're supposed to write

2    out when you move for summary judgment pursuant to the Court's

3    rules, and the other side -- and you cite where in the record

4    these facts are supported and the other side is supposed to, I

5    guess, refute these facts if it denies them and cite the record

6    where the evidence is to support their denial of the facts that

7    we submit.

8    Q.    And did the defendants ever submit a counterstatement of

9    facts?

10   A.    No, no counterstatement of facts was ever submitted.   In

11   fact, the defendants themselves never even submitted any type

12   of affidavit --

13          MR. DAHIYA:  Objection, Your Honor.  I mean that has

14   no --

15   A.    -- in opposition.

16          MR. DAHIYA:  -- that has no relevance here at all, if

17   summary judgment what was not given or given.  We're beyond --

18          THE WITNESS:  I'm not asking about summary --

19          THE COURT:  Stop.

20          MR. VLOCK:  It does have relevance, Your Honor,

21   because pursuant to the rule that Mr. Giordano just spoke

22   about, their failure to refute any of the facts in a 7056

23   statement is an admission of those facts, and those facts are

24   directly relevant to this hearing.

25          THE COURT:  All right.  I'll allow it.

1           MR. VLOCK:  Thank you.

2    Q.   Did the defendants ever submit any affidavits with regard

3    to the -- in opposition to the motion for summary judgment?

4    A.    No, actually they did not and, in fact, when I served the

5    motion for summary judgment and it was put on the Court's

6    calendar, the only documents we received was first an

7    opposition by Narissa Joseph who said basically that there --

8    the debtors tried to comply but they didn't do whatever or they

9    produced additional documents after their 2004 examination but

10   not all of the document still.

11        And then I put in a reply to that and the debtors still

12   didn't put in any affidavit.  What Mr. Dahiya put in his own

13   memo of law in opposition, I believe at, like, midnight the

14   night before the return date but even in his memo of law, there

15   was no sworn testimony at all by the defendants nor was there

16   any reference to any denial of the statement of facts.

17          MR. VLOCK:  Okay.  All right.  And we already moved in

18   all the rest of the exhibits.  So I don't have any further

19   questions, Your Honor.  Thank you.

20          THE COURT:  Counsel, your witness.

21          MR. DAHIYA:  Yes.

22          MR. VLOCK:  Judge, before he -- is there some water

23   around somewhere?

24          THE COURT:  Yeah, we have water.

25          MR. VLOCK:  I'm a little parched.

1          THE COURT:  Take this.  Take that.

2          THE WITNESS:  There's some at this table here.

3          MR. VLOCK:  Okay.  If you don't mind.

4          THE WITNESS:  And would it be too much to ask for me

5    to take a bathroom break?

6          THE COURT:  No.

7          THE WITNESS:  Really quick.

8          THE COURT:  Let's take a ten-minute break.

9          THE WITNESS:  Thank you, Your Honor.

10          THE COURT:  Mr. Dahiya, how long will your cross be?

11          MR. DAHIYA:  Mine will be concentrated in time.  I'm

12   not flooding with all --

13          THE COURT:  Just tell me how long it will be.

14          MR. DAHIYA:  I don't know.  It's like preaching to the

15   choir.

16       (Recess from 3:25 p.m. until 3:43 p.m.)

17          THE COURT:  Go ahead.

18          MR. DAHIYA:  Yeah.

19   CROSS-EXAMINATION

20   BY MR. DAHIYA:

21   Q.   Mr. Giordano, you made a statement that the Court asked

22   you to file this case.  Is that true?

23   A.   I'm sorry, the Court what?

24   Q.   The Court asked to you file this case.  Is that true?

25   A.   The Court directed us to file the adversary proceeding

 1  setting forth that we --

 2  Q.    Do you think this --

 3  A.    -- had already made our prima facie case.

 4  Q.    Just answer my questions.  That's all.  Nothing.  No

 5  explanations, please.

 6        Do you think it's proper?

 7  A.    The Court made a determination that we had already made

 8  our prima facie case --

 9  Q.    No, that's not --

10  A.    -- for --

11  Q.    Yes or no, answer -- that's it, yes or no.

12             MR. VLOCK:  Objection, Your Honor.

13             MR. DAHIYA:  No, that's --

14             MR. VLOCK:  He's berating the witness.

15             MR. DAHIYA:  -- this is serious.

16             THE COURT:  Stop talking.  What's the objection?

17             MR. VLOCK:  He's berating the witness from the

18  beginning.

19             THE COURT:  Ask a question, let him answer it.

20             MR. DAHIYA:  I'm asking a simple question.

21  Q.    You brought -- you said you brought this case because the

22  Court told you to.  Is that proper in your reasoning as a

23  lawyer representing a party in a court of law?

24             MR. VLOCK:  Objection.  Ambiguous, vague and

25  unintelligible.

1           MR. DAHIYA:  Now wait.  It's a question of ethics.

2    Sorry.

3           THE COURT:  Rephrase the question.

4    Q.   Mr. Giordano, what do you do?

5    A.   Could you please rephrase that question?

6    Q.   What do you do?  What's your work?

7    A.   I'm a father.  I raise children.  I --

8    Q.   No, I'm not asking biological --

9    A.   For a living?

10   Q.   -- functionally, financially for -- what do you do?

11   What's your work?  Profession?

12   A.   I'm an attorney.

13   Q.   And whom do you work for?

14   A.   Vlock & Associates and clients.

15   Q.   And who is the defendant -- who is the plaintiff in this

16   case?

17   A.   Cadles of Grassy Meadows II.

18   Q.   Is that your client?

19   A.   In this particular instance, yes.

20   Q.   And you want him to win?

21   A.   It's not a "him"; it's a corporation.

22   Q.   Yeah.  You want it to win?

23   A.   And I believe in all of my clients.

24   Q.   You are the attorneys prosecuting this case, isn't it?

25   A.   One of the attorneys, yes.

1  Q.    It is in your interest to win this case, isn't it?

2  A.    No, it's in my client's interest to win the case and from

3  my perspective --

4  Q.    Do you --

5  A.    -- winning the case makes the clients happy.

6  Q.    -- who -- ah, that --

7  A.    So that's why --

8  Q.    -- answer my question, that's all.  Who is paying you for

9  this case?

10        MR. VLOCK:  Objection.

11        MR. DAHIYA:  No, just -- more important --

12        THE COURT:  Sustained.  It's not relevant.

13  Q.    If you win this case, you get rewarded by your client,

14  isn't that true?

15  A.    No, it's not true.

16  Q.    If you win this case, your client is going to get you more

17  cases, isn't that true?

18        MR. VLOCK:  Objection, Your Honor.  This is --

19        THE COURT:  Sustained.

20        MR. DAHIYA:  I'm trying to --

21        THE COURT:  Sir --

22        MR. DAHIYA:  He is --

23        THE COURT:  Just listen.  Ask a relevant question and

24  you'll get an answer.

25        MR. DAHIYA:  Your Honor, he is an interested witness.

 1  He's got financial stakes in this outcome of this case.

 2  Q.    How do you bill your client?

 3          MR. VLOCK:  Objection, Your Honor.

 4          MR. DAHIYA:  Your Honor, he --

 5          MR. VLOCK:  This is completely irrelevant.

 6          MR. DAHIYA:  -- he --

 7          MR. VLOCK:  Complete --

 8          THE COURT:  Sir, will you stipulate that as an

 9  attorney for the firm representing the plaintiff, it's better

10  to win than lose?

11          MR. VLOCK:  Yes, Your Honor.  I'll stipulate to that.

12          THE COURT:  Move on.

13          MR. VLOCK:  Thank you.

14  Q.    Mr. Giordano, you said that the parties never gave you any

15  documents.  You said there's no utility bills.  There's no loan

16  applications.  There's no student bills, no bills of any kind.

17  Any paperwork give you the finances?  Did your office ever

18  receive any paperwork?  Any paperwork?

19  A.    Yes, we received paperwork.

20  Q.    Exactly.  What kind of paperwork did you receive?

21  A.    We received responses with objections.  We received

22  affidavits with false and fraudulent information on it.

23  Q.    Now answer the --

24  A.    We received --

25  Q.    Just don't -- don't characterize --

1           MR. VLOCK:  Objection, Your Honor.

2           THE COURT:  Sir?

3   A.   You're just asking me -- I'm not finishing asking (sic)

4   you.

5           THE COURT:  Guys?  This isn't going to be a circus.

6           MR. DAHIYA:  Your Honor, this -- you have --

7           THE COURT:  Stop.  When I talk, you don't.  When you

8   talk, I won't.  Ask -- there's no jury here.  Ask a question.

9   Let him answer.  Then you get to ask another question.  Don't

10  interrupt him when he's answering.

11          Go ahead.

12          THE WITNESS:  Can I continue my answer, Your Honor?

13          THE COURT:  Let --

14          MR. DAHIYA:  All right.

15          THE COURT:  Yes.

16  Q.   Did --

17          THE COURT:  Yes, he can finish his answer.

18  A.   So, yes, we received a number of different documents over

19  the course of this time.  We received stipulations to comply

20  with orders and subpoenas that were not complied with.

21  Q.   But I am asking --

22  A.   We received --

23  Q.   Sir --

24          MR. DAHIYA:  Please move to strike, Your Honor.

25  A.   I'm not --

1         MR. DAHIYA:  I'm asking a simple question.

2   A.   You asked what I received.

3   Q.   Did you receive --

4         THE COURT:  Stop.

5   Q.   -- some documents, yes or no?

6         THE COURT:  Ask -- ask -- just sit.  You're done with

7   that answer.  Ask a question.

8         THE WITNESS:  Okay.

9   Q.   Did you receive any paperwork, the documents that you

10  requested, any paperwork from the clients -- from my clients,

11  from the defendants, sorry.

12        MR. VLOCK:  Objection.  Asked and answered, Your

13  Honor.

14        THE COURT:  Answer the question.

15  A.   Yes.

16  Q.   You did.  But you just testified you received nothing.

17  A.   No, I didn't.

18        MR. VLOCK:  Objection.

19  Q.   But you just testified --

20        MR. VLOCK:  That wasn't the testimony.

21        THE COURT:  Hold it.

22        MR. DAHIYA:  Yeah.

23        THE COURT:  He gets to make an objection.

24        MR. DAHIYA:  Yeah.  Sorry.

25        THE COURT:  You don't get to tell him to stop.

1          MR. VLOCK:  He is misquoting the testimony and

2    assuming facts that aren't in evidence, Your Honor.  That

3    wasn't the testimony.  Therefore, his question is invalid.

4          THE COURT:  Rephrase the question.

5    Q.   You testified a few minutes back that you received no loan

6    applications, no student loans, no utility, no paperwork

7    regarding the finances of the debtor, Jeffrey St. Clair, and

8    his wife, Cathleen, that you received no paperwork.  And you

9    just now stated that you did receive some paperwork.

10          MR. VLOCK:  Objection, multiple, Your Honor.

11          THE COURT:  Do you understand the question?

12          THE WITNESS:  Not at all.

13   Q.   Okay.  Is there any paperwork that you received that can

14   tell me what paperwork did you receive in terms of what you

15   requested?

16   A.   Yes, it's outlined in actually our motion to -- for

17   summary judgment in this matter, what we didn't receive.  It's

18   outlined in the statement of facts which was not responded to

19   by the defendants.  It was outlined actually at the depositions

20   themselves where we made the demands for the items because they

21   were not received.  It's outlined in the multiple

22   appearances --

23   Q.   No, I'm asking the documents that you received --

24          MR. VLOCK:  Your Honor?

25   Q.   I'm not asking you --

1          MR. VLOCK:  He's --

2          MR. DAHIYA:  Move to strike, Your Honor.

3          MR. VLOCK:  Objection.

4   Q.   Keep it simple.  I'm asking the documents you received, no

5   the documents you didn't receive.  So --

6          THE COURT:  Don't answer.

7          MR. DAHIYA:  Next question.

8          THE COURT:  These work better if you actually get

9   answers to your questions, but you can be free to keep making

10  questions.  You're not -- he's not answering and you keep

11  moving onto the next question.  Don't be surprised when you

12  read the transcript.  If you want to get an answer, ask him a

13  question, let him answer, and then ask the next question.

14         MR. DAHIYA:  Okay.

15         THE COURT:  If you just want to ask questions, he

16  doesn't have to be there.  I'll let you stand there and ask

17  questions.

18  Q.   Did you ever serve a subpoena on the defendants?

19  A.   Yes.

20  Q.   How did you do it?

21  A.   Do you mind if I look at our exhibits because it has a

22  certificate of service, I believe, attached to it.

23  Q.   Yeah.

24  A.   I'm referring to Exhibit 4 -- Plaintiff's Exhibit 4.  The

25  certificates of service, and this is -- I know actually because

1    I remember when we did this from my office, were served on both

2    the debtors' counsel and the debtors' themselves.  Again, this

3    is going back over -- well over two years now.

4    Q.    But -- fine.  So you served the subpoenas on both these

5    parties -- on the parties and their attorney.  Now, you

6    testified that they did not comply with the subpoenas.  And

7    whom did you inform that they didn't comply to subpoenas?

8    A.    Both the debtors and their counsel.

9    Q.    Okay.  Could you show me -- look at Exhibit 5.  Do you

10   find the address there?

11   A.    I'm sorry, could you --

12   Q.    Exhibit 5.

13   A.    -- explain the question?

14   Q.    Exhibit 5.  You said -- you just testified that you had

15   served the subpoenas.  They were not -- the documents were not

16   received and you sent them a letter.  You sent them a letter,

17   both the parties you said.

18   A.    No, I did not say that.  You asked me if I had informed --

19   who I informed that they --

20   Q.    Yeah, whom did you inform?

21   A.    -- have failed to comply.

22   Q.    You said both the parties.

23   A.    Both the parties and their counsel.

24   Q.    See Exhibit 5 now.

25   A.    Yes.

1  Q.   Do you find anywhere in this letter, Exhibit 5, that's

2  your letter dated September 5th, 2012, do you find the address

3  of the debtors there?

4  A.   No, that letter, particularly, isn't where we informed the

5  debtors of their failure to comply with the orders.  The

6  debtors themselves -- we informed the debtors' counsel --

7  Q.   Is there an --

8  A.   I just want to answer --

9           THE COURT:  Hold it.

10          MR. DAHIYA:  Yeah.

11          THE WITNESS:  Can I finish my --

12          THE COURT:  What's not before the Court today --

13          MR. DAHIYA:  Yeah.

14          THE COURT:  -- is whether or not your clients received

15  a notice, didn't receive.  I've already found that they had

16  notice.  I've already found they intentionally did not turn

17  over documents.  I already have sanctioned them for all of that

18  conduct.  That went on over the course of months when they were

19  represented by counsel.  If you read the transcripts --

20          MR. DAHIYA:  Yes.

21          THE COURT:  -- you'll see counsel basically agreed

22  that she had asked the clients for documents and they didn't

23  give them any.  She said -- read her testimony in these

24  depositions.

25          MR. DAHIYA:  Yes.

1      THE COURT:  The only issue before the Court is whether
2  your clients' failure to abide by the order of the Court was a
3  refusal to abide by the order or they just didn't abide by the
4  order.  Whether they abided by it is no longer an issue.  They
5  have already been found.  It is not appealable.  It is a
6  finding of the Court.  It is the law of the case.

7      So the issues as to what they received and when they
8  received it is not relevant to anything anymore.  So the only
9  issue, and I suggest if you want to but it's up to you --

10      MR. DAHIYA:  Yeah.

11      THE COURT:  -- is whether they acted in a manner that
12  they refused to honor the Court order through their conduct or
13  they just didn't honor the Court order.  There's a subtle
14  difference between the two.  That was the difference between
15  summary judgment and not.  So you can go on about all these
16  other things.  It has nothing to do with my decision.

17      And with regards to whether or not the Court directed
18  someone, that is not what the transcript will reflect, but
19  that's my own interest in it.  So I will let you guys read the
20  transcript.  He can put it anyway he wants.  He's the witness.
21  Read the transcript as to the hearing and how the 727 issue
22  came up.  And I'm not going to take a position on it.  The
23  record is clear.  People can say whatever they want and he can
24  testify as to what he wants.  I'm not telling him to change it,
25  but I know the record.

1          MR. DAHIYA:  Uh-hum.

2          THE COURT:  So for purposes of this hearing, and what

3    I am trying to determine, is whether the conduct of these two

4    debtors was an overt refusal to obey an order or just they

5    didn't obey an order.  That's it.  So you are free to ask

6    something else.

7          MR. DAHIYA:  No, I see, Your Honor.

8          THE COURT:  But it isn't irrelevant to me.

9          MR. DAHIYA:  Yeah, I --

10          THE COURT:  Whatever the point you had may have

11    existed at another point in time.  It's way gone.

12          MR. DAHIYA:  I see what you mean, Judge.

13    BY MR. DAHIYA:

14    Q.    Look at Exhibit 8, please.  Your exhibits, yeah.

15    A.    I see.

16    Q.    Look at the last page of this Exhibit 8.  What kind of

17    signatures are these?

18    A.    I believe the Court -- this is in response to the Court's

19    order that they provide sworn responses to the 2004 order on

20    the subpoenas.  This is back in, like, January, I believe.  In

21    response to that, this was I be -- electronically filed on the

22    Court's ECF system by the defendants' counsel --

23    Q.    All right.

24    A.    -- Narissa Joseph and I guess she, rather than put any

25    type of sworn statement in here, she electronically signed on

1  behalf of the defendants and herself.

2  Q.   Okay.

3  A.   So they, you know -- it's for the purposes of ECF.

4  Q.   Look at page number 8.  It's the first -- page number 1st

5  of Exhibit 8, please.

6  A.   You said page 1?

7  Q.   Page 1 of Exhibit 8, yes.

8  A.   Yes.

9  Q.   Is this a statement under penalty of perjury or is it a

10 sworn statement?

11         MR. VLOCK:  Your Honor, this is now -- he's making a

12 legal argument here --

13         MR. DAHIYA:  No.

14         MR. VLOCK:  -- about a document --

15         THE COURT:  Let him ask the question.  If he wants

16 counsel's -- if he wants the witness' opinion --

17 A.   Yeah, it doesn't say that they're swearing anything --

18 Q.   Yeah.  Okay.  Thank you.

19 A.   -- in contrary to the Court's order --

20 Q.   Oh, okay.

21 A.   -- to submit sworn responses.

22 Q.   Do you know who the trustee is in this case?

23 A.   Yes.

24 Q.   What's his name?

25 A.   Richard Stern.

1    Q.    Have you ever spoke to him?

2    A.    Yes.

3    Q.    Regarding this case?

4    A.    Yes.

5    Q.    Regarding your matter?

6    A.    Excuse me?

7    Q.    Regarding your case, the adversary proceedings?

8    A.    Can you be more specific?  I --

9    Q.    Okay.  Did you ever ask Mr. Richard Stern if he has ever

10   received any paperwork from the debtors?

11          MR. VLOCK:  Objection, Your Honor.  It has no

12   relevance to this --

13          MR. DAHIYA:  It --

14          MR. VLOCK:  -- at all.

15          MR. DAHIYA:  The --

16          MR. VLOCK:  What the trustee did or did not receive

17   has nothing to do with our Rule 2004 or your orders or your

18   multiple orders.

19          THE COURT:  I'll let him answer.

20          MR. VLOCK:  Okay.

21   A.    Your question was if I asked Mr. Stern whether or not he

22   received any documents from the defendants?

23   Q.    Yes.

24   A.    I never asked him that.

25   Q.    Did you ever subpoena any documents from any third party

1    regarding this case?

2    A.    Did I subpoena --

3    Q.    Yeah.

4    A.    -- documents?  To be honest with you, I think we might

5    have tried to subpoena the defendants' accountant but I don't

6    recall specifically.

7    Q.    Was there any paper production by the accountant?

8    A.    To -- like I said, this is probably going back two years.

9    I don't recall what documents, if any, we received from any

10   other third party on this case.

11   Q.    Mr. Giordano, you are an attorney, and a competent lawyer,

12   right?  You've been practicing bankruptcy for --

13   A.    Correct.

14   Q.    You've been practicing bankruptcy -- you've been

15   practicing bankruptcy law for how long?

16   A.    I -- to be honest with you, I don't know.  I think I was

17   admitted in the Eastern District in 2004 maybe or 200- -- I

18   think it was 2005.  It's probably been over five years, seven

19   years maybe, eight years.  I don't know.  I don't remember.

20   Q.    Tell me, I mean, the 2004 examination -- you had 2004

21   examination in this case.  That's what you're fighting for.

22   You conducted a 2004 examination.

23   A.    Yes.

24   Q.    When this case was filed, did you ever serve any document

25   discovery request and a Rule 7030 -- 7034 deposition request

1  under Rule 7030, any of the adversary proceeding's discovery

2  documents?

3  A.    We filed -- we had a 2004 order which directed us to

4  subpoena the defendants, and that's what we served on them to

5  obtain their documents and deposition.

6  Q.    But you did not use any of the discovery devices given by

7  the Rule 7001?

8  A.    I don't recall if we did or didn't.  I don't remember if

9  we asked them to voluntarily turn over documents before they

10  refused to comply with the Court's order.  And in that case, if

11  we did that, they wouldn't have done that; certainly not

12  complying with the Court's orders, they're not going to comply

13  with my requests.

14  Q.    So your testimony is that you didn't -- you did not

15  comply.  You didn't use the discovery devices because you

16  thought staying within Rule 2004 was enough for you.

17            MR. VLOCK:  Your Honor?

18  Q.    Is that what --

19            MR. VLOCK:  I'm going to object.  Again, this

20  procedure of how we got to this point, whether or not we used

21  discovery devices under Rule 7000 is completely irrelevant to

22  the issues here.

23            THE COURT:  I am going to give him a few minutes to

24  ask questions.  He can use it anyway he wants.  I mean I've

25  already stated what the Court's view is of the case and what

1   the issue is.  It's up to the litigants to either resolve it in

2   my mind or avoid resolving it.  I don't know how else to say

3   this.

4              MR. VLOCK:  Well, I understand but it's also --

5              THE COURT:  Stop.

6              MR. VLOCK:  -- beyond direct, Your Honor.

7              THE COURT:  Yes, it is, but I'll let him ask a couple

8   of questions.  I agree with you, though.

9              MR. VLOCK:  Thank you.

10  Q.   Mr. Giordano, did you -- have you seen the judge's order

11  regarding sanctions -- imposing sanctions on the defendants?

12  A.   Yes.

13  Q.   Was there any deadline fixed by the judge to comply?

14  A.   In the order itself, I don't believe that actually set

15  forth a deadline for them to pay.

16  Q.   Did you ever request -- did you send a letter to the

17  debtors to pay the money?

18  A.   No, we requested it through a Narissa Joseph payment

19  actually.

20  Q.   How long do you think I have been on this case?

21  A.   Excuse me?

22  Q.   How long do you think I have been on this case?

23  A.   I know you've been on this case for -- since the time that

24  we fully submitted our motion for summary judgment.  I'd say

25  probably --

1    Q.    Six, seven months?

2    A.    Seven months or so.

3    Q.    Yeah.

4    A.    Eight months or so.

5    Q.    Do you remember if you ever requested me for the money,

6    compliance with the 7,500?

7    A.    Well, when asked to settle this matter with Narissa

8    Joseph, she was pretty emphatic that they had no intention of

9    paying that and there was also discussion as to whether or not

10   we --

11         MR. DAHIYA:  Move to strike, Your Honor.

12         THE COURT:  Ms. Joseph is still counsel of record in

13   this case?

14         MR. DAHIYA:  I don't think so.  I mean --

15         THE COURT:  Have I ever let her out?

16         MR. DAHIYA:  I'm the attorney for the debtors.

17         THE COURT:  You may be one attorney but I don't know,

18   have I ever had --

19         MR. DAHIYA:  You granted me to replace her.  Yes, Your

20   Honor.

21         THE COURT:  Did I?

22         MR. DAHIYA:  Yes, you passed her -- actually there was

23   an objection to it but finally, you agreed.  You didn't want to

24   let her go but then you agreed.  Anyway --

25         THE COURT:  Just asking.

1          MR. DAHIYA:  Thank you.  Thank you, Judge.

2          THE COURT:  That's it?

3          MR. DAHIYA:  That's it.

4          THE COURT:  Okay.  All right.  Step down.

5          THE WITNESS:  Any redirect?  Can I talk -- okay.

6          THE COURT:  You're done.  Step down.

7          Okay.  Here's where we are, not that far from where we
8    started.  Mr. and Mrs. St. Clair, as the debtors, have been
9    sanctioned by this Court.  Whether they have purged that
10   sanction or not, paid the money or not, is a separate question.
11   They were sanctioned by the Court for repeatedly failing to
12   comply with a variety of court orders having to do with
13   production of documents.

14          The record in the case is fairly clear.  Even Ms.
15   Joseph's representations to the Court on occasion concerning
16   why she made certain representations and what her clients had
17   told her.  So I suggest one looks at the transcripts in this
18   case carefully.

19          The issue of whether or not they failed to produce
20   documents has already been determined previously.  They did
21   fail to produce documents.  Basically they even admitted they
22   failed to produce documents.

23          The only point that the Court is dealing with in its
24   decision, which I am not prepared to render today, is whether
25   under the terms of 727 and dealing with the 727, there was a

1    motion that was proposed or had been brought up as to whether

2    to dismiss the case.  The way the 727 came up in part was, in

3    the course of a series of hearings before your participation in

4    the case, Mr. Dahiya --

5              MR. DAHIYA:  Yes, Your Honor.

6              THE COURT:  -- it became very clear to the Court that

7    these two debtors were, at best, failing to comply with court

8    orders and, taken on a more extreme basis, may, in fact, have

9    been hiding assets and perpetrating potentially a fraud on the

10   Court.  I'm not saying they were, but that was the issue that

11   arose which was more appropriately resolved by a 727, if one

12   chose to bring it, which plaintiffs did.

13             They were repeatedly told -- I gave these two parties

14   chance after chance after chance to honor the order of the

15   Court and produce or make a representation that they had no

16   documents.  That was what created that ultimate affidavit,

17   which I think after it was filed, counsel for the debtor at the

18   time, acknowledged that it wasn't accurate, not due to her

19   actions but due to her clients'.  That's also in the

20   transcripts.

21             So what I am left with is an analysis of whether or

22   not these debtors should be subject to 727 for a refusal to

23   honor multiple orders but certainly the orders that were the

24   basis of the sanction or their failure to comply with these

25   orders didn't meet 727 and, in fact, may result in just a

1   dismissal.  And that's what I have to figure out.

2          The conduct of the parties is well-laid out.  I think

3   over a course of a year or whatever it was, including testimony

4   on this stand in front of me, it became apparent that either

5   the debtors believed that they could selectively decide which

6   documents to give over and it may be because they felt that was

7   in compliance but they were told on a number of occasions, if

8   you represent your -- you're not representing yourself, and if

9   you don't turn things over that should be turned over, you're

10  liable, whether you guessed right or wrong.  That's up to you.

11  So there's no question that stuff wasn't turned over.

12         And, in fact, whether or not they both are in the same

13  boat, which is something -- and I don't know whether that's --

14  you represent both parties, but that's something I have to look

15  at as well, whether I believe that the role of Mrs. St. Clair

16  in refusing to comply is the same as Mr. St. Clair.  All of

17  that, I am going to look at.

18         Now, there really is little need for post-trial

19  briefs, but I believe Mr. Dahiya has raised some issues as to

20  whether or not a deposition is indeed a sworn statement.  And

21  if you wish to put in that and other issues and keep it under

22  ten pages -- because I am going to stop reading after ten; I

23  just throw them away -- I'll give you two weeks to do that.

24  You'll serve -- do you want more?

25         MR. DAHIYA:  Four.  I have Court of Appeals arguments,

 1  5th of May that I have a fifty-page --

 2          THE COURT:  This case isn't going any place.

 3          MR. DAHIYA:  But just four weeks, Your Honor, please.

 4          THE COURT:  I'll give you the four weeks.

 5          MR. DAHIYA:  Thank you, Judge.

 6          THE COURT:  Then you will serve it on plaintiff.

 7          MR. DAHIYA:  Okay.

 8          THE COURT:  And he will have whatever time -- what do

 9  you want?

10          MR. VLOCK:  Just two weeks will be fine.

11          THE COURT:  Two weeks.  That's it.  No sur-replies.

12  No additional.

13          MR. DAHIYA:  That's fine.

14          THE COURT:  Then I get it and then will render a

15  decision.

16          I understand that everybody's tempers were high in

17  this case.  I understand that you feel, Mr. and Mrs. St. Clair,

18  that it's an invasive process.  It is.  You are seeking a

19  discharge.  That is a privilege rendered by the Code.  That

20  privilege means you have to honor all the aspects that you --

21  all the little nits and gnats that may make absolutely no sense

22  to you, but that's the way it was written.  That's the laws

23  that we all deal with.  It's not a personal thing.

24          It's not a matter of -- and it shouldn't be.  It gets

25  there.  We've all been there.  I've been in their shoes.  I've

1  been in your shoes. And it's hard for me to say to you it's

2  just -- it shouldn't be personal because it's your lives. I

3  understand that. So do they. They're representing somebody.

4  They have a job. Your lawyer is represent -- you've been a

5  lawyer. Your lawyer is representing you today. They'll

6  represent somebody else tomorrow. He can be on that side

7  tomorrow. They're just lawyers. I mean that's all -- most of

8  us, other than somebody who has a real job as a healthcare

9  person, that's what we do.

10       So I hope you understand there's nothing personal -- I

11  have no prejudice against you. I don't take it personally

12  whether you obeyed my orders or not. I live at home; nobody

13  pays any attention to what I say, so I am used to that. And

14  we'll give you exactly what the law says. You have a competent

15  lawyer. If he wants to -- if he likes my decision, doesn't

16  like it, either of you, take it on up with somebody else.

17  That's okay, too.

18       So it's not going to happen -- I'm not going to get

19  any of this stuff for six weeks and you're not going to get an

20  answer in this case until the fourth quarter of this year,

21  based on the way my calendar is. So don't sit around waiting

22  every day.

23       MR. DAHIYA: All right. Just I have a question, Your

24  Honor. I just didn't want to bring some -- a person's

25  surprises. I was thinking of -- I spoke to my clients and the

1    first loan is in default and they need to catch up on the loan.

2    The only way -- the bank has refused to settle with them.  The

3    only way they could do is -- I might have to start a Chapter 13

4    proceeding.  So I just wanted to tell you that I'll be

5    preparing a motion to convert this case to 13.

6              THE COURT:  I think --

7              MR. DAHIYA:  What date do you feel is proper for me to

8    bring it?

9              THE COURT:  Well, I think it's not going to get

10   converted until I raise -- enter a decision in the case and

11   there's a Supreme Court case --

12             MR. DAHIYA:  Yes, Your Honor.

13             THE COURT:  -- on how you can convert, and this case

14   cannot be converted at this point.  I've written decisions on

15   it but the Supreme Court has also written decisions on it.

16   So --

17             MR. DAHIYA:  Is it the Marrama decision, you're

18   talking about, Your Honor?

19             THE COURT:  Yeah.  And it's a Chapter 7 case.  You

20   can't convert to another unless you're eligible for it and you

21   can't convert out of this one based on the current status of it

22   where the issue is a 727 or a 707.  That needs to be resolved

23   first.  Then, if appropriate, you can go into a Chapter 13.

24             MR. DAHIYA:  Judge, my thinking was that even in a

25   case, let's say for hypothetical, the discharge is denied.  I'm

1  taking from that premise because that might be the one that is

2  my great deterrence.  But on the Johnson scales on the --

3          THE COURT:  Who holds the first mortgage on this, you

4  guys?

5          MR. DAHIYA:  Yeah, the -- yes, sir.

6          MR. VLOCK:  The first mortgage.

7          THE COURT:  Who holds -- they just have a judgment.

8  Who holds the first mortgage on the house?  I don't care who.

9          MR. DAHIYA:  Who.

10          THE COURT:  That's -- you're trying to keep your

11  house.

12          MR. DAHIYA:  Yeah.

13          THE COURT:  I don't want to get into any legal

14  debates.

15          MR. DAHIYA:  No, no.

16          THE COURT:  Listen to me.

17          MR. DAHIYA:  Yeah.

18          THE COURT:  You owe them 148,000.12 or whatever it is.

19  I don't know who your other creditors are in this case.  They

20  didn't bring it as a 523.  They brought it as a 727.  If you

21  all can figure out how to resolve this, I would consider that.

22  I don't know why, but I would consider that, which means --

23          MR. DAHIYA:  I need to talk to them.

24          THE COURT:  -- you would talk to them.  You need to

25  understand in English what we're saying is you're not getting

1  out under them, but you may be able to go on with the rest of

2  your life in a 13.  Those guys you're never getting out under,

3  and maybe you could work out a deal how to do that.  But it's

4  that or 13 won't work for you, depending on --

5          Now, if I rule that the 727 is not applicable, fine.

6  Then you're just in 13 and you owe them the money anyway.

7  So -- because the claim is not going away.  If you file a 13,

8  as you know, that means we're going to do a disposal income

9  analysis which means the exact same issues that were not

10  covered here that we have to cover.  So all these records which

11  you say you don't have, a Chapter 13 trustee is going to make

12  you have, and if you can't produce them -- so you need to

13  somehow go to the next round in peace of this round because

14  people can make your life really tough because you don't want

15  to be going into that 13 and produce things, which you have to

16  pass records that doesn't exist, according to where we are

17  today.

18          MR. DAHIYA:  No, they -- they had a lot of documents

19  that were given to Mr. Stern and -- but I am not concerned so

20  much about the documentation because the Chapter 7 trustee has

21  a lot of documents.  What I am concerned about is what you

22  said, we will be stuck with them in case the decision comes

23  against us.  Our main aim is to keep the house, Your Honor.

24          THE COURT:  If you want to keep the house, you've got

25  to resolve something with them.

1            MR. DAHIYA:  Yeah, yeah.  That's --

2            THE COURT:  And then if you all can resolve it, I have

3    no interest in hurting these people.

4            MR. ST. CLAIR:  Judge --

5            MR. DAHIYA:  I'll let you know if there's a

6    resolution.

7            MR. ST. CLAIR:  -- can I just say something?

8            THE COURT:  I don't think you should.

9             MR. ST. CLAIR:  Okay.  It's --

10           THE COURT:  Ask your lawyer.  It's always a bad thing

11   to do but --

12           MR. ST. CLAIR:  I know, but --

13           MR. DAHIYA:  Let him speak as an attorney, Your Honor.

14           MR. ST. CLAIR:  After the deposition, Judge, he

15   gave -- I gave letters of engagement, invoices, a ton of

16   document from our office to Narissa Joseph.

17           THE COURT:  Sir, the record is closed.

18           MR. GIORDANO:  Objection, Your Honor.

19           THE COURT:  It's not relevant.  That's why I said --

20   listen, forget the proceeding we just went through.  Forget

21   you're a lawyer for a moment, sir.

22           MR. ST. CLAIR:  I wasn't acting like a lawyer.

23           THE COURT:  Listen to me.  Listen to me.  Your wife

24   wants to keep your house.  She wants to get back to a normal

25   life.  This may be intramural fun for people; not for her.  The

1  only way you're going to get from here to there is if you --

2  even if you think it's wrong, everybody thinks settlements are

3  wrong, he's a smart guy.  They're smart guys.  Listen to what

4  they say.  Cut a deal or don't cut a deal.  If I were you, I

5  would try to figure out how to cut a deal.  And if you do, as I

6  say, I'm not trying to hurt you.  But in the end if you don't,

7  and it comes out wrong, you've got a lot of trouble because

8  there's no way you're going to keep that house and he'll

9  explain all that --

10          MR. ST. CLAIR:  Yeah.

11          THE COURT:  -- to you.

12          MR. ST. CLAIR:  Just --

13          THE COURT:  All right, guys.

14          MR. VLOCK:  Thank you, Your Honor.

15          MR. GIORDANO:  Thank you, Your Honor.

16          THE COURT:  Thank you.

17          MR. VLOCK:  Appreciate your time.

18          THE COURT:  Court's adjourned.

19      (Whereupon these proceedings were concluded at 4:18 PM)

20

21

22

23

24

25

1

2                              I N D E X

3

4  WITNESS                EXAMINATION BY        PAGE

5  Jeffrey St. Clair   Mr. Dahiya           15

6  Jeffrey St. Clair   Mr. Giordano         40

7  Cathleen St. Clair  Mr. Dahiya           68

8  Cathleen St. Clair  Mr. Giordano         87

9  Steven Giordano     Mr. Vlock            99

10 Steven Giordano     Mr. Dahiya           152

11

12                             EXHIBITS

13 PLAINTIFF'S            DESCRIPTION           PAGE

14 1                   Adversary Complaint   102

15 2                   6/26/201 Order        102

16 3                   7/18/12 e-mail        102

17 4                   8/6/12 Subpoenas      102

18 5                   9/5/12 Letter         102

19 6                   9/11/12 Motion        102

20 7                   10/4/12 Stipulation   102

21 8                   2/15/13 Response      102

22 9                   2/27/13 Order         102

23 10                  3/3/13 Affidavit      102

24 11                  3/13/13 Transcript    102

25 12                  3/14/13 Transcript    102

```
1                            EXHIBITS

2    PLAINTIFF'S          DESCRIPTION          PAGE

3    13                   3/14/13 Transcript    102

4    24                   5/13/13 Transcript    102

5                         Pages 12, 16, 17, 19

6                         And 21

7    14                   5/20/13 Sanction      102

8    18                   8/8/13 Statement of   102

9                         Facts

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2                          C E R T I F I C A T I O N

3

4    I, Penina Wolicki, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7

8

9

10

_____

11

PENINA WOLICKI

12

AAERT Certified Electronic Transcriber CET**D-569

13

14

eScribers

15

700 West 192nd Street, Suite #607

16

New York, NY 10040

17

18

Date:  April 1, 2015

19

20

21

22

23

24

25

Case 8-13-08044-reg    Doc 40    Filed 04/01/15    Entered 04/01/15 12:40:05

CADLES OF GRASSY MEADOWS II, L.L.C. v.
ST. CLAIR, et al.

Adv. Proc. No. 13-08044-reg
April 24, 2014

# A

**abide (4)**
145:19;163:2,3,3
**abided (1)**
163:4
**ability (6)**
21:13;29:21;
32:14;33:7;38:15;
86:5
**able (15)**
16:12,24;17:3;
19:2,7;26:25;29:17;
37:22;38:7,18;
49:12;62:21;113:20;
124:15;178:1
**Absolut (1)**
49:6
**absolute (1)**
37:25
**Absolutely (12)**
12:8;16:22;17:17;
21:4,8;29:22;33:7,7,
17;122:8,21;174:21
**abundantly (1)**
124:23
**abused (1)**
29:5
**accept (1)**
39:10
**accepted (2)**
115:20;121:20
**access (1)**
34:16
**accordance (1)**
120:22
**according (1)**
178:16
**account (9)**
29:3,5;60:4;66:10,
14;123:5;144:22,24;
145:3
**accountant (7)**
137:1,20;138:2,
24;139:13;167:5,7
**accountants (2)**
137:16,19
**accounts (20)**
29:6;60:7,9,10,13,
13,15;66:3,6;123:5;
125:10,10;128:6;
142:18,19;143:6;
144:16,19;145:6,8
**accurate (2)**
10:14;172:18
**accused (1)**
29:2
**acknowledged (1)**
172:18
**across (4)**
19:4;22:2;133:21,
25

**acted (1)**
163:11
**acting (1)**
179:22
**action (2)**
99:19,24
**actions (3)**
146:4,5;172:19
**actually (42)**
26:24;57:25;62:3;
67:8;69:21;73:20;
94:8;103:19,25,25;
104:15;105:22;
106:3;108:9,14;
114:13,24;117:5;
118:24;119:9;122:8;
125:5;126:3;128:15;
129:2;132:8;133:9;
137:8;140:12,13;
141:6;142:10;
147:22;148:4;151:4;
159:16,19;160:8,25;
169:14,19;170:22
**added (1)**
27:4
**additional (3)**
39:1;151:9;174:12
**address (3)**
15:23;161:10;
162:2
**adjourn (4)**
108:10,22;109:21;
110:8
**adjourned (9)**
109:3,12,15,20;
110:7;111:23;
120:10;130:8;
180:18
**adjournment (2)**
104:15;105:1
**admissibility (5)**
5:6;9:18;13:6;
24:19,21
**admissible (2)**
5:10;12:13
**admission (2)**
4:24;150:23
**admit (3)**
25:18;142:8,16
**admits (1)**
7:13
**admitted (13)**
5:18;40:23,25;
41:2,5,8;111:7;
125:8;130:25;131:5,
7;167:17;171:21
**adult (1)**
134:2
**adversary (8)**
99:22;102:8,11,
20;146:25;152:25;
166:7;168:1
**affects (1)**

**36:9**
**affidavit (30)**
31:20;45:9;56:16;
57:2,4,16;92:7,14,
25;93:3,7,17;94:23;
95:1;112:24;120:14,
22,24,25;121:4,6,14,
19;122:5,6;125:1;
128:3;150:12;
151:12;172:16
**affidavits (8)**
102:17;119:11;
140:19;141:2,9,14;
151:2;156:22
**again (33)**
19:1,24;26:1,1;
27:4;28:14;29:14,
20;31:23;32:22,23;
34:16,19;38:1;42:4,
20;46:23;50:2,4;
52:4;65:1;88:10;
93:24;106:9,15;
107:14;108:25;
110:10;112:1;119:1;
134:5;161:2;168:19
**against (6)**
82:13;83:12;
123:7;147:13;
175:11;178:23
**age (3)**
70:6,24;128:13
**ago (6)**
19:11;46:11;66:2;
94:9;99:20;100:23
**agree (6)**
6:7;49:1;87:1;
105:5;107:24;169:8
**agreed (12)**
6:15;104:5;105:6;
108:10,14;109:20;
110:6;120:13;147:5;
162:21;170:23,24
**agreed-upon (1)**
110:4
**agreeing (1)**
104:25
**agreement (1)**
104:8
**agreements (2)**
105:18;125:11
**ah (1)**
155:6
**ahead (10)**
13:18;45:20;46:8;
51:17;56:7;94:1,1;
122:18;152:17;
157:11
**aim (1)**
178:23
**airplane (1)**
28:18
**airstrip (1)**
28:18

**allegations (1)**
27:21
**alleging (2)**
10:9,10
**allow (3)**
36:25;112:9;
150:25
**allowing (1)**
24:3
**Almost (2)**
26:15;28:23
**alone (1)**
9:19
**along (1)**
20:3
**alternative (2)**
107:11,18
**although (4)**
114:7;118:14;
127:24;128:1
**always (10)**
72:10;76:9,15,17,
18,19;79:19,21;
86:17;179:10
**Ambiguous (2)**
94:12;153:24
**amount (3)**
88:15;89:23,23
**analysis (2)**
172:21;178:9
**and/or (5)**
67:15;110:19;
111:2,14;143:2
**Ann (3)**
15:14,24;69:17
**announcement (1)**
34:3
**answered (13)**
29:20;42:16,22;
43:12;65:22;77:18,
25;88:11;89:12;
93:19,20;96:20;
158:12
**anxiety (1)**
19:2
**anymore (1)**
163:8
**anyplace (1)**
14:25
**apologize (3)**
34:20,21,23
**apparent (1)**
173:4
**Apparently (2)**
103:23;127:23
**appealable (1)**
163:5
**Appeals (1)**
173:25
**appear (14)**
20:16;53:4,20;
104:6;108:12;109:8,
23;110:17,21;

**111:21;113:3;**
**119:16;120:1,16**
**appearance (11)**
102:25;103:1;
109:13,21;110:9,18;
111:5,13;117:9,21;
120:8
**appearances (2)**
4:5;109:10;159:22
**appeared (7)**
53:23;54:1;84:8;
110:3;111:1;140:24,
25
**appearing (4)**
4:6;93:7;110:12;
111:19
**appears (2)**
9:11;138:25
**applicable (1)**
178:5
**application (3)**
20:16;90:13;143:3
**applications (4)**
90:7;124:9;
156:16;159:6
**appointed (1)**
20:7
**Appreciate (1)**
180:17
**appropriate (5)**
29:7;126:9,9,14;
176:23
**appropriately (2)**
77:25;172:11
**approved (1)**
5:22
**approximately (4)**
110:20;114:5;
115:13;124:19
**areas (1)**
113:16
**arg (1)**
45:24
**argue (3)**
10:4;43:18,20
**arguing (2)**
23:22;24:21
**argument (6)**
23:6;84:19;
112:17;118:6;146:2;
165:12
**arguments (1)**
173:25
**arms (1)**
45:3
**army (1)**
70:12
**arose (1)**
172:11
**around (3)**
63:21;151:23;
175:21
**arrest (1)**

CADLES OF GRASSY MEADOWS II, L.L.C. v.
ST. CLAIR, et al.

Adv. Proc. No. 13-08044-reg
April 24, 2014

120:3
**arrested (1)**
113:4
**articulate (1)**
100:8
**ashamed (3)**
25:17;26:1;38:3
**aside (1)**
39:16
**aspects (1)**
174:20
**aspersions (1)**
32:9
**assets (4)**
34:6;126:21;
143:5;172:9
**assistant (5)**
71:22;90:3;114:7;
136:17;138:8
**Associates (6)**
4:11,13;113:15;
128:17,19;154:14
**assu (1)**
55:6
**assume (2)**
31:17;87:1
**assumes (2)**
55:5;90:19
**assuming (2)**
58:2;159:2
**attached (1)**
160:22
**attaching (1)**
104:8
**attachment (1)**
104:2
**attack (1)**
134:9
**attacked (5)**
29:2,3,3;60:21;
134:10
**attacker (1)**
134:11
**attacking (4)**
29:4;134:12,13,13
**attempt (1)**
106:13
**attempted (1)**
99:15
**attempting (2)**
23:16;116:3
**attempts (6)**
99:17;103:5;
106:11;123:23;
128:25;148:7
**attend (1)**
28:4
**attended (1)**
28:15
**attention (2)**
4:18;175:13
**attested (1)**
45:10

**attitude (2)**
28:24;30:9
**attorney (35)**
16:1,23;19:12,24;
20:2;32:23;40:19;
41:18;56:10,15;
60:14;82:14;92:15;
97:25;98:1;102:14;
113:13,23;122:24;
123:2,13;128:9,15;
131:1,5;133:14;
144:22;145:4;
154:12;156:9;161:5;
167:11;170:16,17;
179:13
**attorneys (2)**
154:24,25
**attorney's (1)**
95:19
**audit (1)**
123:6
**August (1)**
63:23
**authority (3)**
71:15;76:24;86:15
**av (1)**
48:2
**available (2)**
32:16;48:2
**avoid (1)**
169:2
**aw (1)**
127:14
**aware (14)**
38:16;53:17;58:3,
6;87:18;88:14,20;
89:1,3,9;92:7,18;
93:5;114:3
**away (3)**
113:24;173:23;
178:7

**B**

**back (18)**
6:22;51:19;52:5;
68:15,20;80:4;
100:20;105:19;
111:3,4;112:13;
133:9;149:6;159:5;
161:3;164:20;167:8;
179:24
**bad (2)**
129:25;179:10
**baked (1)**
13:21
**balance (2)**
140:4,6
**Baldwin (7)**
15:15,24;47:2,4,5,
6;69:17
**bank (4)**
29:19;124:5;

145:10;176:2
**bankruptcy (37)**
16:11,12,18;19:10,
13,23,23,25;20:5,13;
33:1,18,19;34:5;
37:25;38:3;53:3,14,
18,22;82:13;83:18;
87:4;99:22;100:22,
25;102:7;103:15;
114:16;126:18;
127:10;129:13;
136:23;147:2;
167:12,14,15
**banks (4)**
114:22;124:5,6,6
**bar (2)**
33:1;123:6
**based (8)**
10:2;34:14;86:2,4;
147:10;148:20;
175:21;176:21
**basement (19)**
25:25;26:4,15;
62:6,10;63:2,19;
73:5,10;74:8,9,11,
18;75:3,4,5,8,19;
76:6
**basic (1)**
6:12
**basically (7)**
32:13;117:8;
119:4;149:25;151:7;
162:21;171:21
**basis (6)**
7:15;29:10;31:6;
54:6;172:8,24
**bat (1)**
136:19
**bathroom (1)**
152:5
**became (4)**
48:2;124:23;
172:6;173:4
**become (3)**
16:23;138:7;
146:13
**becomes (1)**
118:24
**beforehand (2)**
109:1;131:8
**beg (1)**
29:16
**began (2)**
28:11,23
**beginning (1)**
153:18
**begs (1)**
43:20
**behalf (2)**
4:13;165:1
**behavior (4)**
17:9;23:17;133:6;
146:16

**behind (2)**
21:7;134:22
**belie (1)**
45:12
**bench (1)**
119:9
**benefit (1)**
110:6
**benefits (1)**
20:6
**berating (2)**
153:14,17
**Besides (3)**
41:2;133:5,8
**best (11)**
21:13;29:21;
32:14;33:7;34:13;
38:15;42:25;50:11;
79:25;86:5;172:7
**better (4)**
41:18;99:6;156:9;
160:8
**beyond (5)**
28:17;30:8;
145:24;150:17;
169:6
**biased (1)**
16:25
**big (1)**
48:7
**bill (7)**
32:1,2;74:5,5;
128:11;140:12;
156:2
**bills (20)**
16:13,20;19:2;
25:15,15,23,23;48:1;
75:15;76:3,3;85:19;
96:5,6;140:13,14,14;
156:15,16,16
**binder (5)**
6:7,8,11,12,19
**biological (1)**
154:8
**birth (1)**
29:25
**birthday (1)**
64:22
**bit (2)**
99:5;131:11
**BJ's (4)**
85:19;91:15;
129:12,14
**blah (5)**
45:12,12,12,12,12
**blame (1)**
141:18
**blank (1)**
121:12
**bleachers (1)**
91:6
**bleed (1)**
132:17

**blowing (1)**
134:19
**boat (2)**
28:18;173:13
**bona (1)**
70:11
**book (1)**
57:5
**books (1)**
57:10
**borrow (1)**
83:9
**borrowed (2)**
82:23;83:10
**both (21)**
11:5;27:8;29:4;
30:20;39:9;72:13;
110:16;116:11;
118:13;121:7,13;
131:16;138:16;
161:1,4,8,17,22,23;
173:12,14
**bother (1)**
49:21
**bottles (1)**
132:22
**bottom (2)**
114:6;134:18
**bought (1)**
129:11
**bounds (5)**
19:19;21:24;
23:21;25:1;36:23
**box (2)**
6:9;54:23
**boxes (1)**
97:16
**brains (1)**
46:2
**break (4)**
125:19;135:8;
152:5,8
**breathed (1)**
27:5
**Briefly (1)**
40:4
**briefs (1)**
173:19
**bring (11)**
4:17;5:8;26:16;
35:11;41:13,13;
99:19;172:12;
175:24;176:8;
177:20
**brings (2)**
6:9;133:9
**broad (2)**
94:4;115:16
**broke (2)**
132:14,15
**Brooklyn (2)**
15:15;113:14
**brother (2)**

Case 8-13-08044-reg     Doc 40     Filed 04/01/15     Entered 04/01/15 12:40:05

CADLES OF GRASSY MEADOWS II, L.L.C. v.
ST. CLAIR, et al.

Adv. Proc. No. 13-08044-reg
April 24, 2014

59:10,12
**brother-in-law (3)**
59:8,14;125:8
**brought (6)**
99:22;113:4;
153:21,21;172:1;
177:20
**building (3)**
77:6,6,7
**bunch (4)**
61:22;85:1;129:9;
133:12
**burden (2)**
10:22;80:3
**business (1)**
75:24
**buyer (1)**
35:12

**C**

**cabinet (1)**
73:12
**cable (4)**
32:1,2;47:25;74:5
**Cablevision (2)**
129:2,7
**Cadles (10)**
4:3;35:1,15,16,20;
37:11;57:23;120:11;
121:9;154:17
**calculated (1)**
136:3
**calendar (6)**
109:14;110:12;
126:4,4;151:6;
175:21
**call (12)**
11:10,10;14:10,
18;15:8;68:15;
97:19;98:19;123:19;
124:4;126:4,5
**called (6)**
21:24;22:1;84:13;
86:7;99:12;123:8
**calling (3)**
14:19;130:25;
148:9
**calls (4)**
103:12;105:4;
106:15;107:21
**calm (4)**
42:12,14;72:7,10
**came (16)**
21:16;34:15;35:9;
49:10;79:10,11;
86:1;94:22;95:19;
96:23;111:4;112:13;
126:3;137:9;163:22;
172:2
**Can (71)**
4:5,21;9:11,12;
10:19;11:4;13:7,7;

15:4,6;18:11;23:10,
23;24:14,17;29:23;
30:8;31:18;35:14,
19;37:4;39:14;40:7;
42:14;48:16,22;
56:24;57:15,21;
68:14,17;71:19;
73:25;74:15;75:8;
76:3;80:20;85:8;
87:25;88:11;94:16;
96:22;97:14;101:3;
102:5;112:11;
115:18;116:13;
139:6;140:16;
143:13;145:14;
157:12,17;159:13;
160:9;162:11;
163:15,20,23,23;
166:8;168:24;171:5;
175:6;176:13,23;
177:21;178:14;
179:2,7
**capable (1)**
10:6
**capacity (2)**
22:23;28:21
**cards (1)**
124:7
**care (5)**
16:25;17:2;39:1;
71:24;177:8
**carefully (1)**
171:18
**caring (1)**
71:25
**case (72)**
9:5;20:7;22:3;
24:3;27:1,2,11,24;
34:5,10;36:1;43:22;
48:7;80:7,13;81:6,
24;82:12,24;87:3;
104:1;111:2;124:8;
129:6;147:2,14,25;
148:6;150:1;152:22,
24;153:3,8,21;
154:16,24;155:1,2,5,
9,13,16;156:1;163:6;
165:22;166:3,7;
167:1,10,21,24;
168:10,25;169:20,
22,23;170:13;
171:14,18;172:2,4;
174:2,17;175:20;
176:5,10,11,13,19,
25;177:19;178:22
**cases (3)**
123:3;125:14;
155:17
**casting (1)**
32:9
**catch (1)**
176:1
**Cathleen (8)**

4:7;16:5,7;68:10;
103:2;104:1;135:1;
159:8
**ceiling (2)**
144:7;146:11
**cell (2)**
128:7,13
**certain (22)**
9:9;45:8;50:6,9;
54:24;58:18;65:2;
67:20;89:23;94:3,4,
4;112:19;123:13,17;
125:6,12,22;142:14,
16;148:18;171:16
**certainly (7)**
39:10;48:9;
146:15;148:3,17;
168:11;172:23
**certificate (1)**
160:22
**certificates (1)**
160:25
**certification (1)**
13:8
**certified (2)**
12:10,10
**chair (1)**
75:10
**chance (4)**
50:17;172:14,14,
14
**change (2)**
23:11;163:24
**changed (1)**
10:11
**changing (2)**
5:24,25
**Chapter (8)**
19:22;20:4;27:12;
176:3,19,23;178:11,
20
**characterize (1)**
156:25
**chasing (1)**
120:19
**check (6)**
74:4,5;97:16,19,
20,21
**checklist (28)**
85:11,25;86:3,4;
91:13;95:10,12,14,
18,20,24,25;96:2,4,8,
9,18,25;97:2,4,9,14,
15,17,19,22;98:3,9
**chief (5)**
13:7;17:19;21:25;
24:2;36:18
**child (1)**
39:4
**childish (1)**
133:13
**children (22)**
17:2;38:11,14;

63:21;69:12,24,24;
70:1,2,6,7,14,24;
71:1,3,10,12,13;
73:13,14;76:2;154:7
**chime (1)**
135:21
**choice (2)**
63:16;107:22
**choir (1)**
152:15
**chose (3)**
34:20;142:9;
172:12
**chosen (1)**
27:23
**circuit (1)**
37:5
**circumstance (2)**
39:9;136:2
**circumstances (2)**
26:25;147:6
**circus (2)**
44:13;157:5
**cite (2)**
150:3,5
**Civil (5)**
9:20;12:12;28:14;
41:21;42:4
**claim (1)**
178:7
**claimed (1)**
67:1
**claiming (4)**
82:18,20;84:2,4
**Clair (100)**
4:4,7,7;15:8,14;
16:7;19:20;23:5,10;
39:10,13;40:6,19;
42:20;44:4,15,22;
46:11,18,18;50:4;
51:19;53:1;54:17;
56:16;57:11;59:7;
60:20;61:5;65:20;
68:10,13;69:1,7,12;
72:10,12;74:21;
76:22;83:22;86:14;
87:14;91:25;99:10;
103:2,2;104:1;
113:12;114:2,4,25;
122:24;124:14,16;
125:6;126:18;
127:23;128:5,16,18,
22;129:7,9,20;130:2,
6;132:7,14;133:6;
135:2,4,5,21,21;
136:3,13,16;137:22;
138:1,17,20;139:1;
141:6,17;142:5;
143:19;145:2;159:7;
171:8;173:15,16;
174:17;179:4,7,9,12,
14,22;180:10,12
**Clairs (5)**

99:13,16,24;
100:25;116:11
**Clair's (3)**
69:23;129:6;136:9
**clarify (3)**
50:22;52:22,24
**cleaning (1)**
63:19
**clear (19)**
7:16;28:20;32:5;
50:2;53:23;71:20;
119:23;121:20;
124:23;131:24,25;
136:2;141:25;
145:20;148:11;
149:13;163:23;
171:14;172:6
**clearly (3)**
49:11,12;136:14
**CLERK (8)**
4:3;15:12;18:9;
68:6,8;98:21,24;99:1
**client (24)**
10:9;10;11:2;19:5;
24:11;68:14,15;
74:13,14,20,23,24,
25;99:12;125:7,8,13;
134:13;143:20,24;
154:18;155:13,16;
156:2
**clients (15)**
8:5;10:15;19:8;
99:18;108:11;
125:12;154:14,23;
155:5;158:10,10;
162:14,22;171:16;
175:25
**clients' (4)**
123:3;129:24;
163:2;172:19
**client's (4)**
23:17;66:14;
75:16;155:2
**closed (1)**
179:17
**Code (4)**
53:3;102:7;147:2;
174:19
**collect (1)**
21:2
**collected (2)**
21:5;97:24
**collecting (1)**
132:22
**college (4)**
38:17;127:9,18,20
**comfortable (3)**
12:20;77:11,13
**coming (6)**
31:1;111:3;
119:15;130:25;
131:5;132:15
**commenting (1)**

Case 8-13-08044-reg    Doc 40    Filed 04/01/15    Entered 04/01/15 12:40:05

CADLES OF GRASSY MEADOWS II, L.L.C. v.
ST. CLAIR, et al.

Adv. Proc. No. 13-08044-reg
April 24, 2014

134:14
**comments (2)**
30:21;132:4
**communication (1)**
105:2
**companies (1)**
129:16
**company (6)**
81:14;82:18,20;
90:16;128:21,22
**compare (1)**
65:15
**compassion (1)**
133:3
**compelling (1)**
107:18
**competent (3)**
46:7;167:11;
175:14
**complaint (10)**
27:21,22,24;
82:12;83:11,12;
102:6,9,13,20
**complete (3)**
122:22;125:1;
156:7
**completed (2)**
97:20,24
**completely (8)**
108:4;113:11;
125:2;126:23;134:7;
135:19;156:5;
168:21
**compliance (9)**
103:4,6,9,13;
105:1,17;108:3;
170:6;173:7
**complied (27)**
23:12;32:13;33:5,
8;39:21;44:17;
79:20,21;87:6,8,15;
88:2,6;89:15,18,25;
92:19;104:14,23,23;
106:9;141:12;142:3,
4;146:19;148:12;
157:20
**comply (56)**
21:12;22:23;
41:24;42:2;44:15;
45:22,23;46:5;
48:19;49:1,5,18;
54:12,21;71:15,16,
18;72:14;79:22;
87:5,7,19,24;88:15,
21;102:16;103:3,6;
104:3,16;105:6;
106:13,18;107:19,
25;108:11,21;
109:13;111:7,18;
118:2;119:25;151:8;
157:19;161:6,7,21;
162:5;168:10,12,15;
169:13;171:12;

172:7,24;173:16
**complying (8)**
34:14;78:16;
79:16;103:16;
110:18;111:10;
118:1;168:12
**compounded (2)**
56:24;90:9
**compromise (1)**
143:4
**computer (2)**
129:4,6
**con (1)**
50:19
**concentrated (1)**
152:11
**concept (2)**
19:13;89:9
**concerned (2)**
178:19,21
**concerning (3)**
66:6;101:24;
171:15
**concluded (1)**
180:19
**conclusion (2)**
126:4;146:17
**condensed (1)**
14:22
**conduct (25)**
17:9;30:15;
102:13,19;108:25;
119:24;130:23;
131:9,12;134:6;
135:17,18;141:10,
13,25;146:22,23;
147:3,7,16,19;
162:18;163:12;
164:3;173:2
**conducted (1)**
167:22
**conducting (1)**
125:19
**confidential (3)**
67:2;118:22;
129:24
**confidentiality (1)**
112:21
**confined (2)**
100:11,17
**confused (2)**
50:20,25
**consented (2)**
7:9,10
**consequences (3)**
20:4,10;71:19
**consider (3)**
12:16;177:21,22
**considering (1)**
123:12
**constant (3)**
131:17;135:19;
149:5

**cont (1)**
9:6
**contact (3)**
41:22;90:15;108:7
**contemporaneous (1)**
116:24
**contents (1)**
5:19
**continuation (1)**
141:1
**continue (2)**
130:10;157:12
**continued (7)**
130:5,5,13;
131:14;135:3,11;
147:10
**continuing (2)**
102:19;141:12
**contracts (1)**
127:18
**contrary (5)**
61:13;87:21;88:1,
5;128:2;165:19
**control (24)**
56:20;57:18,24;
58:1;60:18;65:21;
66:19;90:15;92:12,
23;114:1;119:1,13;
121:2,10;122:7,9,23;
123:17,21;124:10;
136:10;140:15,20
**conversation (1)**
108:10
**conversations (3)**
44:23;55:10;104:4
**convert (4)**
176:5,13,20,21
**converted (2)**
176:10,14
**copies (5)**
10:14;12:10,11;
85:19;137:7
**copy (3)**
79:1,7;110:15
**corporation (1)**
154:21
**Costco (3)**
91:15;129:12,14
**counsel (46)**
7:5;14:24;17:23;
22:16;23:16;29:18;
34:21;40:14;47:19;
50:22;54:18;57:23;
62:7;69:8;80:25;
84:6;91:20;101:23;
103:11;107:2,5;
110:9,17;111:5;
115:5;117:17;118:4,
13;121:8;141:18,20,
21;146:3,4,6;148:24;
151:20;161:2,8,23;
162:6,19,21;164:22;
170:12;172:17

**counselor (3)**
59:23;61:2;82:7
**Counsel's (2)**
146:4;165:16
**countenance (1)**
146:16
**counterstatement (2)**
150:8,10
**country (1)**
29:25
**couple (5)**
18:2;19:4;59:1;
133:2;169:7
**course (22)**
24:3;32:2;48:11;
71:6;102:19;108:25;
119:24;127:6,19;
128:5;131:16;134:6;
141:9,12,16;143:11;
146:23;147:3;
157:19;162:18;
172:3;173:3
**COURT (629)**
4:2,5,9,14,19,21,
23;5:3,13,20,24;6:1,
3,10,15,18,22,25;
64:2,4,7,11,13,19,21;
65:3,9,11,18,24;
66:10,15,17,25;67:6,
11,15;68:5,17,21,24;
69:7,11,23;70:1,4,
12,17,21;71:15,19;
72:7,9,12,14,16,18,
21;73:2,9,16,19,23;
74:2,7,13,17,21,25;
75:3,5,7,9,15,19,21,
24;76:1,4,7,9,11,15,
18,20;77:9,12,15,17,
24;78:3,6,13,15,18;
79:2,10,11,17;80:10,
12,16,20,22,25;81:2,
5,9,13,15,22;82:7,10,
13;83:8,17,18,22;
84:4,8,11,16,19;
85:9,20,23;86:2,6,9,
12;87:1,11,15,18,20,
20,21,25;88:1,4,5,11,
14,19,20,25;89:5,7,9,
12,17,20,20,24,24;
90:2,10,21;91:2,6,
20,23;93:12,15,20,
24;94:14,18;95:4,6,
16;96:11,14,22;
98:15,18;99:20,24;
100:4,8,12,14,18,24;
101:6,9,12,14,19,22;
102:10,16,24,25;
103:19;104:21;
105:11,14;106:12,
19;107:11;108:15,
23,24;109:18,19;
110:6,13;112:8,16,
23;113:1,4;115:23;
116:2,7,10,18,23;
117:3,22,22;118:9,
12,19;119:1,5,8,16,
20,24;120:1;121:17,
23;122:1,3,11,15,18;
123:9,15,22;124:1;
126:6;131:4,10,23;
132:5;133:14,15,18;
134:17;137:7,12,17,
23;138:4;140:24;
141:8,11,24;142:14;
143:2,9,18;144:7,8,
11;145:17,19,24;
146:16,19;147:5,9,9,
15,18;148:2,11,14,
15;150:19,25;
151:20,24;152:1,6,8,
10,13,17,21,23,24,
25;153:7,16,19,22,
23;154:3;155:12,19,
21,23;156:8,12;
157:2,5,7,13,15,17;
158:4,6,14,21,23,25;

Case 8-13-08044-reg    Doc 40    Filed 04/01/15    Entered 04/01/15 12:40:05

CADLES OF GRASSY MEADOWS II, L.L.C. v.
ST. CLAIR, et al.

Adv. Proc. No. 13-08044-reg
April 24, 2014

159:4,11;160:6,8,15;
162:9,12,12,14,21;
163:1,1,2,6,11,12,13,
17;164:2,8,10,18;
165:15;166:19;
168:23;169:5,7;
170:12,15,17,21,25;
171:2,4,6,9,11,12,15,
23;172:6,6,7,10,15;
173:25;174:2,4,6,8,
11,14;176:6,9,11,13,
15,19;177:3,7,10,13,
16,18,24;178:24;
179:2,8,10,17,19,23;
180:11,13,16,18

**courtesy (1)**
6:12
**courthouse (2)**
119:21;120:13
**courtroom (2)**
69:8;125:18
**courts (1)**
41:16
**Court's (26)**
45:6;48:20;54:3;
55:3;92:19;103:6,
13;105:18;106:6;
108:5;111:7;114:1;
117:15;120:1,7,22;
146:10;150:2;151:5;
164:18,22;165:19;
168:10,12,25;180:18
**cover (1)**
178:10
**covered (1)**
178:10
**crate (1)**
75:11
**create (1)**
128:23
**created (1)**
172:16
**credit (5)**
114:22;124:7;
145:3,5,8
**creditors (4)**
20:8;123:19;
138:12;177:19
**crisis (1)**
63:17
**cross (15)**
10:17,19;11:6,10;
12:21;14:18;15:3,
17;18:21;24:17,24;
27:25;36:25;122:15;
152:10
**cross- (1)**
11:5
**CROSS-EXAMINATION (6)**
15:21;27:23;
36:16;40:9;87:12;
152:19
**cross-examine (1)**

12:3
**crossing (1)**
14:20
**crosswise (1)**
56:5
**curious (1)**
61:14
**current (2)**
138:9;176:21
**cursed (1)**
60:22
**cursing (1)**
130:24
**custody (5)**
56:20;113:25;
123:25;122:6;136:9
**cut (3)**
180:4,4,5

# D

**D7 (1)**
5:7
**Dahiya (274)**
4:6,6,17,20;5:4,15,
22,25;6:2,16,20;7:3,
6;8:7;9:17,24;10:1,3,
5,12,16,20,22,25;
11:8,11,13,16,18,20,
23;12:1,4,7,9,19,23;
13:1,12;14:4,6;15:8,
20,22;17:8,13;18:10,
11,14,16;19:18;22:5,
20,22;23:8;24:17,23,
25;25:2,6,9,11,12;
27:20;28:3;30:17;
31:1,3,13,15;34:25;
35:7,11;36:3,5;
37:10,17;39:6,8,12,
24;40:2,4;41:9;
42:10,12,22;43:12,
14;44:9,24;46:24;
50:12,15,19,24;51:4,
9;52:11,15,18,21,23;
53:15;54:5,7;55:5,7;
56:23;57:19;58:2,22,
24;59:19;60:24;
65:22;67:4;68:12,14,
18,25;69:10,22;70:3,
5,10,23;72:6;76:21;
78:14,16;80:9,13,15,
21;81:1,4;82:2,4;
83:7,18,21;86:13;
87:10,23;88:3,8,17;
89:16,18;90:9,19;
91:1,5;92:4;93:11,
19,22;94:12,17;95:3,
11,15;96:10,13,20;
100:2,5,10,13,16,19;
101:10,13,16,21;
102:12;104:17,20;
105:7,9,13,16;
110:24;112:6,10;

115:18,25;121:15,
18,24;122:2,10,14,
16;131:2,20;132:6,9,
12;137:3;148:8,13;
150:13,16;151:12,
21;152:10,11,14,18,
20;153:13,15,20;
154:1;155:11,20,22,
25;156:4,6;157:6,14,
24;158:1,22,24;
160:2,7,14;162:10,
13,20,25;163:10;
164:1,7,9,12,13;
165:13;166:13,15;
170:11,14,16,19,22;
171:1,3;172:4,5;
173:19,25;174:3,5,7,
13;175:23;176:7,12,
17,24;177:5,9,12,15,
17,23;178:18;179:1,
5,13
**damaged (1)**
26:14
**damn (1)**
132:20
**date (28)**
51:24;52:3,8;53:9;
60:16;85:4;92:25;
102:2;103:24;107:8;
110:4,8,8;112:2,2,
16,16,24;118:3;
124:16,18;140:21;
143:8;147:14;
149:16,17;151:14;
176:7
**dated (5)**
102:24;107:3;
120:8;121:10;162:2
**dates (13)**
20:14;53:21;
55:19,20;56:13,14;
104:22;105:1,6;
108:13;110:19;
119:20;124:20
**day (14)**
64:21;78:9;93:1,5;
121:12;127:7;
128:12;130:8,10,12;
135:10,12;136:5;
175:22
**days (2)**
131:16;134:12
**deadline (2)**
169:13,15
**deadlines (1)**
106:20
**deal (9)**
36:24;39:17;42:4;
45:1;174:23;178:3;
180:4,4,5
**dealing (11)**
23:9,14,14;27:22,
23,24,25;81:12;

144:11;171:23,25
**dealings (3)**
35:15,20;82:21
**dealt (1)**
117:23
**debate (1)**
45:4
**debates (1)**
177:14
**debt (4)**
37:1,18;39:1;
102:6
**debtor (16)**
36:25;67:6;
118:13;126:19;
137:6;145:18,20,24;
146:1,2,4,5,8;
147:13;159:7;
172:17
**debtors (27)**
4:8;31:4;103:1;
107:18;109:21;
110:16;118:4;
119:10;120:15,21;
135:20;141:3;143:4;
151:8,11;161:8;
162:3,5,6;164:4;
166:10;169:17;
170:16;171:8;172:7,
22;173:5
**debtors' (9)**
103:10;107:2;
115:21;118:4,13;
121:13;161:2,2;
162:6
**debtor's (3)**
36:11,25;146:6
**debts (4)**
38:7;86:21,22;
123:20
**dec (1)**
49:4
**decade (1)**
41:19
**decide (3)**
19:10;49:4;173:5
**decided (4)**
45:23;63:5;
130:10;133:11
**decision (14)**
10:2;50:5;51:14;
86:2,6,9,10;163:16;
171:24;174:15;
175:15;176:10,17;
178:22
**decisions (2)**
176:14,15
**declared (2)**
100:22;146:9
**declaring (1)**
102:6
**deemed (1)**
146:4

**deems (1)**
145:25
**default (1)**
176:1
**defendant (1)**
154:15
**defendants (43)**
4:7,25;8:17;9:7;
102:13;103:3;106:7;
108:8;109:4,22;
110:2,9,15,16;111:5,
17;112:18;113:6;
114:23;117:11,16;
120:21;121:7;
141:13;146:21,23;
147:7,18;148:15,21,
24;149:12;150:8,11;
151:2,15;158:11;
159:19;160:18;
165:1;166:22;168:4;
169:11
**defendants' (8)**
9:11;102:6;107:5;
115:5,9;147:16;
164:22;167:5
**defense (2)**
99:25;100:20
**Definitely (2)**
72:1;76:23
**definition (1)**
51:11
**degraded (1)**
29:18
**demand (7)**
51:5;60:7;64:4;
127:16;128:1;130:1;
144:15
**demanded (2)**
127:13;144:21
**demands (4)**
59:25,25;115:15;
159:20
**demonstrates (1)**
127:19
**demoralized (1)**
29:18
**denial (3)**
147:2;150:6;
151:16
**denied (3)**
9:10;37:22;176:25
**denies (1)**
150:5
**deny (2)**
37:20;134:3
**depend (1)**
17:2
**depending (2)**
128:11;178:4
**deplorable (1)**
131:13
**deposed (1)**
78:8

Case 8-13-08044-reg    Doc 40    Filed 04/01/15    Entered 04/01/15 12:40:05

CADLES OF GRASSY MEADOWS II, L.L.C. v.                                    Adv. Proc. No. 13-08044-reg
ST. CLAIR, et al.                                                                    April 24, 2014

**deposition (98)**
5:11,16,17;7:1,2;
8:5,12;9:19;10:10,
14;11:2,4,9,14;
14:21;15:18;17:18;
20:21;21:25;22:9,11,
12,24;23:4;24:10,20,
22,24;28:1,4;30:5,6,
16;31:17;34:19,21;
35:5;36:17,22;
41:10;45:9,15;58:14,
21;59:8,11,14,17,22,
25;60:6,16;61:7,10,
15;62:3;77:5;78:7;
83:15;85:16;91:14;
93:8,9,17;94:2,7,10,
11,18;101:25;
120:12;124:16;
125:3;126:16;127:5;
128:5;130:8,13;
131:12,14;132:4;
133:7,18,20;134:7,9;
135:3,4,4,13,20;
136:8;144:1;145:5;
167:25;168:5;
173:20;179:14

**depositions (25)**
5:6,14;6:24;9:22;
10:8,9;11:25;12:17,
21;14:16;28:15;
30:16,18,20;31:8;
101:17,18;106:2;
109:3;113:2,5;
131:23,25;159:19;
162:24

**depressing (2)**
132:20,20

**designated (1)**
24:20

**designation (1)**
25:20

**designed (1)**
145:21

**desk (1)**
75:10

**desperate (1)**
19:4

**despite (8)**
19:12,24;103:5;
105:3;106:11;109:5;
111:11;129:6

**destroy (1)**
121:16

**destroyed (26)**
21:19;45:11;
46:12,19,22,23;
47:10,22,22;51:12;
62:5,7,11,12,16,18,
22,25;63:4,7,8,9;
116:13,15,25;118:16

**determination (3)**
47:16;141:11;
153:7

**determine (6)**
30:7;51:1;74:2;
113:22;149:7;164:3

**determined (2)**
87:21;171:20

**deterrence (1)**
177:2

**devices (3)**
168:6,15,21

**dialog (1)**
42:18

**difference (2)**
163:14,14

**different (14)**
8:20;9:25;43:15;
55:11;73:6,15;
74:10;75:13;79:23;
93:25;128:6;135:17;
145:23;157:18

**difficult (3)**
145:21,23;146:13

**direct (21)**
7:23;11:3,13,16,
25;14:17,19;15:19;
21:23;22:2;28:1;
36:14,19,22;43:10;
68:11;99:7;119:16;
145:25;148:15;
169:6

**directed (7)**
119:5,8,20;
126:12;152:25;
163:17;168:3

**directives (1)**
147:15

**directly (2)**
106:16;150:24

**directs (1)**
102:25

**disagrees (1)**
146:2

**disbarred (1)**
29:10

**discharge (9)**
20:8;37:20,22;
86:21;120:17,19;
147:3;174:19;
176:25

**dischargeability (2)**
113:21;149:8

**dischargeable (1)**
37:3

**discharged (1)**
38:7

**disciplinary (1)**
123:7

**disclosed (2)**
34:5,8

**discoverable (1)**
126:20

**discovered (1)**
49:10

**discovery (6)**

145:22;167:25;
168:1,6,15,21

**discuss (2)**
27:1;148:4

**discussed (11)**
19:12;22:12,14,
16;27:3,18;38:12,13,
14;55:12;142:21

**discussing (1)**
99:13

**discussion (11)**
25:4;54:2,7,8,12,
14,17,20;67:24;68:1;
170:9

**discussions (3)**
22:15;55:2;135:20

**disgusting (1)**
63:14

**dismiss (20)**
53:13,17,22;
67:15;107:17,22;
108:7;109:11;
110:11,19;111:2,12,
14;112:14;120:10;
140:25;141:2,5;
143:2;172:2

**dismissal (1)**
173:1

**disobey (1)**
32:25

**disobeyed (1)**
86:14

**disobeying (1)**
32:18

**disposal (1)**
178:8

**dispute (2)**
9:5,6

**disrupt (3)**
17:6;131:11;134:8

**disrupted (1)**
135:19

**District (7)**
41:5,8;83:17;
99:20,23;100:24;
167:17

**disturbed (3)**
28:9;60:20;61:7

**doc (1)**
57:22

**docket (7)**
64:1;109:6;110:8;
119:10;120:6,6;
143:7

**docu (1)**
118:25

**document (38)**
12:15;21:7,14;
26:17;51:11;57:19;
58:8,9;63:25;64:2,3;
78:24;106:10;107:8;
109:7;113:19;
114:15;115:1,5,19,

19,20,24;116:3,10,
14,19;120:9;121:19,
20;122:25;123:1;
128:24;143:7;
151:10;165:14;
167:24;179:16

**documentation (7)**
90:6,17;113:7,8;
127:19;137:19;
178:20

**documentations (1)**
27:15

**documents (216)**
5:1;6:8;8:25;
20:24;21:3,5,10;
23:1,2,25;23;26:4,
17,20,23;27:19;31:9,
19,19,22;32:15;
45:11,11;47:17,19,
20,21,25;48:5,7;
49:10,15,21;50:15,
16;51:5,5,21,22;
52:7,7;53:4,8,9;54:2,
24;55:3,8,9;57:22,
24;58:12,16;59:24;
64:25;65:21;66:19;
67:1;72:18;73:2,5,9;
74:7,9,17,22;84:4,
13,17,21;85:1,6,11,
13;86:7;92:20,22;
94:3,4,5,6,8,10,19,
20,20;95:2,10,25;
102:1,15,18;103:1;
104:5;106:1,3;107:6,
10;109:2;112:20;
113:25;114:2,14,18;
115:10,11;116:4,5,
13,15,22,24;117:14,
17,25;118:1,6,14,15,
16,20;119:3,4,12;
120:14,20;121:2,8,9,
18;122:6,23;123:10,
11,14,17,20,23,24;
124:8,24,25;125:9;
127:6,12;129:1,19,
24;130:16;135:15;
136:9,14,19,21;
137:18;138:11;
139:19;140:2,19,22;
141:15,17,19,21,22,
23;142:1,9,12,13;
143:12;144:15,18;
145:20;146:5,9,10,
10,12,22;147:10;
148:1,18,19;149:1,2,
2,5,12,14;151:6,9;
156:15;157:18;
158:5,9;159:23;
160:4,5;161:15;
162:17,22;166:22,
25;167:4,9;168:2,5,
9;171:13,20,21,22;
172:16;173:6;

19,20,24;116:3,10,
14,19;120:9;121:19,
20;122:25;123:1;
128:24;143:7;
151:10;165:14;
167:24;179:16
*(repeated — see above)*

178:18,21

**dollars (10)**
88:16;89:2,3,21;
114:5,6;132:22;
140:5;147:5,18

**Donald (1)**
38:3

**done (6)**
6:12,12;8:9;13:22;
17:23;25:17;26:2;
61:21;79:23;89:21;
92:15;106:11;137:5,
25;158:6;168:11;
171:6

**door (4)**
24:9;125:18,21;
126:3

**doubt (1)**
110:7

**down (16)**
12:2;20:1;28:15;
42:12;48:12;62:16;
68:5;74:14;132:16,
19,21;133:2,15;
135:22;171:4,6

**downplayed (1)**
127:14

**dragged (3)**
80:6,13,25

**drawn (1)**
81:11

**dry (1)**
62:21

**due (4)**
49:23;116:13;
172:18,19

**during (26)**
30:15;31:23;
58:14,19;59:11,14,
17,22,25;61:7;67:14;
94:2,6,18;104:4;
106:21;127:6;
131:16;133:18,20;
134:12;135:13,20;
141:16;144:1;145:5

**duty (1)**
21:9

---

**E**

**earlier (3)**
49:9;51:20;101:24

**early (2)**
115:7,8

**easier (2)**
38:24,25

**easily (1)**
72:3

**Eastern (3)**
41:5,8;167:17

**ECF (6)**
108:15;110:15;
117:22;119:14;

Case 8-13-08044-reg    Doc 40    Filed 04/01/15    Entered 04/01/15 12:40:05

CADLES OF GRASSY MEADOWS II, L.L.C. v.
ST. CLAIR, et al.

Adv. Proc. No. 13-08044-reg
April 24, 2014

164:22;165:3

**Edgar (1)**
127:20

**effectively (1)**
8:7

**effects (2)**
36:9;39:11

**effort (5)**
21:19;51:20;52:6;
53:8;55:17

**efforts (2)**
21:2;145:9

**eight (3)**
26:7;167:19;170:4

**either (14)**
9:7;11:5;75:11;
83:19;90:6;109:9;
111:4;115:7,24;
119:3;126:12;169:1;
173:4;175:16

**electronic (1)**
117:10

**electronically (4)**
121:10,12;164:21,
25

**elements (2)**
8:12;31:5

**eligible (1)**
176:20

**eliminated (1)**
125:2

**else (15)**
22:13;37:21,24;
73:14;77:7;79:24;
96:19;116:21;133:6;
137:20;146:12;
164:6;169:2;175:6,
16

**e-mail (5)**
64:5;103:23;
104:7;105:3;107:21

**e-mails (2)**
103:12;106:15

**embarked (1)**
145:20

**emphatic (1)**
170:8

**employment (3)**
25:23;127:17,20

**end (6)**
64:22;78:9;144:3;
146:14,14;180:6

**ended (1)**
142:3

**ends (2)**
16:13;17:24

**enforcement (1)**
23:18

**engaged (1)**
84:5

**engagement (5)**
127:22,25;143:15,
20;179:15

**engagement' (1)**
143:25

**English (1)**
177:25

**enlisted (1)**
38:18

**enough (3)**
33:2;131:23;
168:16

**entail (2)**
20:1;71:23

**enter (2)**
37:4;176:10

**entered (7)**
23:12;25:7;72:13;
89:1,20,24;109:6

**entertain (1)**
147:9

**entire (7)**
8:11;26:15;36:25;
108:25;134:11;
141:9;148:6

**entitled (2)**
14:13;129:25

**enumerated (1)**
7:12

**environment' (1)**
71:12

**equipment (2)**
129:4,6

**escrow (4)**
29:3,5;144:22,24

**especially (3)**
126:21;128:12;
131:10

**Essentially (1)**
11:1

**establish (1)**
51:10

**established (2)**
45:6;70:4

**establishing (1)**
23:4

**ethics (1)**
154:1

**evasive (1)**
142:11

**even (39)**
12:13;29:2,8,9,19;
62:24;70:12;73:11;
74:15;75:13,22;
80:17;81:7,7,17;
103:6,14,19;104:24;
106:10;107:8;
114:18,24;115:1;
122:25;125:13;
128:24,25;133:10;
135:24;146:3,14;
148:2;150:11;
151:14;171:14,21;
176:24;180:2

**event (1)**
13:19

eventually (1)
110:13

**Evers (3)**
127:9,18,20

**everybody (2)**
19:3;180:2

**everybody's (1)**
174:16

**Evidence (44)**
5:9,10,19;7:1,11,
17;13:7;17:19;
21:25;23:21;24:2,2;
36:17,24;90:19;
101:4,7;102:1,5,22;
103:22;105:21;
106:24;107:15;
108:17;115:3,21;
120:4;121:4,20;
124:11;130:3;
132:13;134:25;
142:23;144:5,6;
145:1,16;147:11;
149:7,22;150:6;
159:2

**exact (2)**
131:12;178:9

**exactly (17)**
20:25;24:9;32:10;
47:24;57:2;62:14;
64:22;86:8;116:8;
117:22;128:10;
135:12;140:9,12;
142:10;156:20;
175:14

**exam (1)**
114:25

**examination (27)**
5:6;10:17;11:6;
22:16;40:17;58:15;
68:11;78:11;93:8;
99:7;102:23;120:20;
124:13,18,20,23;
125:23,25;126:25;
127:7;130:6;135:1;
141:9;151:9;167:20,
21,22

**examinations (11)**
53:5;104:7;106:2;
108:13;109:9;
111:22;119:15,17,
21;134:12;141:3

**examined (1)**
77:3

**example (5)**
47:25;85:14;
113:11;121:25;
124:5

**Excellent (1)**
46:9

**excited (1)**
72:2

**Excuse (6)**
18:5;38:20;100:4;

148:17;166:6;
169:21

**excused (1)**
68:14

**exercise (1)**
84:25

**exhibit (46)**
27:18;57:4,5,9,9;
101:1;102:4,21;
103:22;104:13;
105:21,22;106:24;
107:15;108:17;
115:3;120:4;121:3;
124:11;130:3;132:1,
9,10,11;134:24;
142:23;143:14;
144:4,6,14,25,25;
145:15;147:11;
149:22;160:24,24;
161:9,12,14,24;
162:1;164:14,16;
165:5,7

**exhibition (1)**
30:6

**exhibits (19)**
4:15,22,24,25;5:5;
6:9,9,10,14;7:19,20;
101:6,12,17,22;
102:2;151:18;
160:21;164:14

**exist (2)**
119:4;178:16

**existed (7)**
47:19;49:16;
51:12,12;116:25;
146:11;164:11

**exists (1)**
62:3

**expand (1)**
31:11

**expect (2)**
6:10;147:24

**expected (2)**
131:5;135:16

**expenses (7)**
16:13;113:22;
126:22;138:14,16;
140:11;149:9

**experience (1)**
29:14

**explain (8)**
20:4;43:20;49:8;
75:8;78:23;82:16;
161:13;180:9

**explained (6)**
32:10;38:4;49:11,
12,19;145:5

**explaining (2)**
22:14;45:25

**explanation (1)**
43:21

**explanations (1)**
153:5

explicitly (1)
24:18

**explore (1)**
96:22

**extend (1)**
104:2

**extending (2)**
120:17,18

**extensive (1)**
128:20

**extent (5)**
5:16;20:15;31:24;
41:21

**extreme (1)**
172:8

**extremely (3)**
78:9;86:23;130:23

---

**F**

---

**fabrication (2)**
122:22;125:1

**faced (1)**
118:11

**facie (3)**
147:2;153:3,8

**facing (2)**
111:11;125:17

**fact (27)**
34:15;38:17;51:1,
2;103:4;104:23;
105:2;106:10;109:1,
5;111:2,11;117:19;
123:9,9;125:15;
126:2;129:7;138:16;
139:16;140:4;146:1;
150:11;151:4;172:8,
25;173:12

**facts (21)**
7:15;23:10,11;
45:12;55:5,6;58:2;
90:19;149:24;150:1,
4,5,6,9,10,22,23,23;
151:16;159:2,18

**fail (2)**
55:7;171:21

**failed (10)**
23:5;55:9;72:14;
87:18;102:15;111:7;
144:18;161:21;
171:19,22

**failing (3)**
145:18;171:11;
172:7

**failure (12)**
45:22,22;46:5;
54:2;55:8;72:17;
88:15;147:10;
150:22;162:5;163:2;
172:24

**failures (4)**
54:12,21;55:3;
119:25

Case 8-13-08044-reg    Doc 40    Filed 04/01/15    Entered 04/01/15 12:40:05

CADLES OF GRASSY MEADOWS II, L.L.C. v.                    Adv. Proc. No. 13-08044-reg
ST. CLAIR, et al.                                                        April 24, 2014

**fairly (2)**
28:20;171:14
**fairness (1)**
39:21
**faith (5)**
99:15;103:11,18;
106:17;108:3
**false (4)**
102:17;143:10;
146:20;156:22
**familiarity (1)**
131:9
**families (1)**
39:11
**family (7)**
16:25;17:2,6;
22:13;25:15;38:10;
70:21
**far (3)**
28:2;115:2;171:7
**faster (1)**
70:17
**father (1)**
154:7
**favor (1)**
91:25
**fax (1)**
85:12
**February (8)**
112:3,13,23;
115:8;117:6,16;
119:7;120:7
**Federal (4)**
5:9,12;9:20;13:7
**fee (1)**
19:8
**feel (36)**
23:3;26:23;28:13;
29:12;39:21;77:8,11,
13,18,21;78:1,7,11,
20;79:1,19,22;80:1,
5,6,11,12;81:10,11,
23;82:7;83:5;87:3,7,
8,22;88:1,5,7;
174:17;176:7
**feeling (1)**
87:5
**feelings (2)**
17:5;84:24
**feels (3)**
82:5,5,6
**feigned (1)**
142:11
**felt (17)**
17:1,1;26:24;27:8;
28:13;29:13;38:23,
25;63:16;72:25,25;
77:25;79:21;80:4;
134:10,10;173:6
**few (5)**
132:19,21,22;
159:5;168:23
**fide (1)**

**fairly (2)**
70:11
**fields (1)**
28:19
**fifty-page (1)**
174:1
**fighting (1)**
167:21
**figure (7)**
23:20;51:16;85:1,
5;173:1;177:21;
180:5
**file (15)**
16:11;19:10;38:3;
73:12;99:10,21;
102:10;120:21,21,
24;125:13;152:22,
24,25;178:7
**filed (29)**
16:12,18;20:13,
16;31:20;37:2;
76:11,12,13,15,17;
82:12;83:12;86:19;
100:25;108:6;
120:11,14,17;
127:10;137:5,10;
139:17;140:18;
146:25;164:21;
167:24;168:3;
172:17
**files (3)**
74:14,20;75:1
**filing (5)**
20:4;102:8,20;
114:16;136:23
**finally (1)**
170:23
**finances (2)**
156:17;159:7
**financial (4)**
114:21;136:25;
138:11;156:1
**financially (2)**
33:3;154:10
**financials (1)**
28:20
**find (11)**
19:20;38:17,18;
39:2;48:13;123:6;
125:15;128:25;
161:10;162:1,2
**finding (2)**
141:24;163:6
**fine (20)**
9:16;10:5,5;11:4,
23;12:1,23;14:4,6;
15:20;24:23,25;
66:17;81:9;89:10;
91:5;161:4;174:10,
13;178:5
**finger (4)**
133:18,20,23;
134:2
**finish (8)**

4:19;31:2;51:25;
55:25;56:3;130:11;
157:17;162:11
**finished (3)**
52:1;56:4;135:3
**finishing (1)**
157:3
**firm (4)**
113:14;122:25;
123:1;156:9
**first (30)**
7:9,14;14:10,12;
18:2;20:1;26:3;
42:17;43:6;79:11;
81:15;91:12;100:22;
102:5;109:13,20;
114:24;116:4;
118:17;125:2;127:7,
8;137:8;151:6;
165:4;176:1,23;
177:3,6,8
**fishing (1)**
30:6
**five (6)**
43:15;68:15,15;
127:22;142:3;
167:18
**fixed (1)**
169:13
**flat-screen (1)**
129:10
**flood (5)**
46:12,19;47:7;
62:5;116:25
**flooded (1)**
26:15
**flooding (1)**
152:12
**floods (1)**
118:16
**floor (1)**
75:11
**floored (1)**
134:9
**floors (1)**
146:11
**fly (1)**
126:8
**focus (1)**
48:4
**focused (1)**
23:4
**follow (4)**
41:20;44:21;
124:3;126:8
**following (2)**
24:6;132:3
**foreclosure (1)**
16:16
**forget (3)**
113:20;179:20,20
**forgot (2)**
21:14,15

**forma (1)**
20:18
**formality (1)**
20:19
**forth (28)**
53:4;59:10;88:24;
92:22;95:9;99:12;
107:9;110:14,15;
112:17,24;113:3;
114:8;117:22;119:2;
120:12;121:8;126:6;
134:14;140:19;
141:17,19,21;
146:24;147:4;149:6;
153:1;169:15
**forward (3)**
80:5;106:2;125:24
**found (20)**
6:5;23:11;31:10;
47:20;48:5,25;49:1;
55:9;72:13;84:21;
87:18;88:1,5,21;
114:24;127:8;147:9;
162:15,16;163:5
**four (13)**
17:2;38:11;69:15;
70:1,2;95:17;99:11,
19;106:5;147:25;
173:25;174:3,4
**fourteen (1)**
115:14
**fourth (1)**
175:20
**framing (1)**
35:7
**fraud (1)**
172:9
**fraudulent (4)**
102:17;143:10;
146:20;156:22
**free (2)**
160:9;164:5
**friends (1)**
38:2
**front (3)**
35:10;84:8;173:4
**fruitful (2)**
31:11;126:24
**fruitless (1)**
120:19
**frustrating (1)**
19:9
**frustration (3)**
38:19,22,23
**fucking (5)**
132:14,15,17,22;
133:3
**full (7)**
16:6;20:12;36:23;
99:1;103:5;141:5;
143:8
**fully (5)**
21:21;96:6;

108:11;118:1;
169:24
**fun (1)**
179:25
**functionally (1)**
154:10
**fundamental (1)**
23:7
**funds (1)**
29:3
**further (9)**
65:7;68:4;98:14;
106:12;122:6;
130:14,21;147:9;
151:18
**furthermore (1)**
147:8

## G

**game (1)**
149:6
**gave (42)**
26:17,18;27:5;
32:11,13;43:21;
48:1;49:9;50:3;
56:10;58:8,12,12;
61:17,21,22,25,25;
62:12;65:2,3,6,10;
67:21;73:22;85:12;
95:16,18;106:19;
112:8,18;119:20;
137:16,21,22;138:1;
145:13,25;156:14;
172:13;179:15,15
**gender (1)**
16:25
**general (3)**
46:24;67:4;89:16
**generally (3)**
8:13;128:20;
129:15
**generic (1)**
59:6
**gestures (1)**
133:19
**gets (2)**
158:23;174:24
**giggle (1)**
135:23
**GIORDANO (132)**
4:12,13;5:2,21;
6:6;7:8,20,24;8:3;
17:7,16;18:1,4,19,
22;19:14;21:22;
22:7,10,23,25;24:6,
8,14;27:17;28:6,8;
30:11,13;33:13,22,
25;35:4,18;36:2,4,
13;37:8;40:8,11,13,
16,18,41:10;42:6;
43:2,5,17,19,25;
44:2,3,12;45:14,18,

Case 8-13-08044-reg    Doc 40    Filed 04/01/15    Entered 04/01/15 12:40:05

CADLES OF GRASSY MEADOWS II, L.L.C. v.
ST. CLAIR, et al.

Adv. Proc. No. 13-08044-reg
April 24, 2014

21,25;46:4,9,10;
48:17;51:18;52:4,
25;57:6;59:4;61:5,
12,24;63:23;64:1,3,
5,9,12,16,18;65:19;
66:8;67:8;68:3,19,
22;69:18;70:8,16,20;
72:5,8,11;77:16,23;
78:2,4,12;80:8,14,
17,24;81:21;82:1,3,
5;83:6,14,19;86:25;
87:13;88:9,13;89:8,
13,14,19;91:9,18;
93:16;94:25;95:13;
98:13,20,22;99:3,9;
133:5;150:21;
152:21;154:4;
156:14;167:11;
169:10;179:18;
180:15

**G-I-O-R-D-A-N-O (1)**
99:4
**given (27)**
31:19,20,20;
40:10;45:11;56:15;
62:7;65:15;67:21;
72:25;78:20;85:13;
91:16;95:9,12;97:2,
5,24;106:22;137:19;
147:3,6,24;150:17,
17;168:6;178:19
**gives (1)**
36:24
**giving (9)**
24:2;65:13;72:24;
74:3;78:16;91:20;
100:14;133:19;
134:2
**gnats (1)**
174:21
**God (2)**
94:4;132:19
**goes (2)**
46:4;78:14
**Good (14)**
4:2,6,12;9:2;
15:15;20:3;45:1;
94:14;99:15;103:11,
18;106:17;108:3;
114:4
**good-faith (4)**
21:2;51:20;52:6;
53:8
**government (1)**
77:1
**granted (1)**
170:19
**Grassy (4)**
4:3;35:15;120:11;
154:17
**gravity (1)**
20:12
**great (4)**

36:24;45:1;134:1;
177:2
**Greatly (1)**
26:13
**Grossman (5)**
53:20;54:18;
107:6;118:4;126:5
**grounds (1)**
24:19
**guess (27)**
7:14;15:18;32:8;
99:17,18;100:24;
101:20;103:2;104:9,
22;105:23;107:3;
110:14;112:22;
115:10;120:24;
121:6;125:11,17;
126:9,19;137:1;
143:3,6,7;150:5;
164:24
**guessed (1)**
173:10
**guy (1)**
180:3
**guys (16)**
7:22,22;13:2;
30:23;44:13;51:16;
61:3;62:2;64:7;
67:22;157:5;163:19;
177:4;178:2;180:3,
13

**H**

**hand (4)**
68:6;91:18;108:2,
4
**handles (2)**
138:17,20
**hands (2)**
26:18;146:12
**handwritten (1)**
121:13
**haphazardly (2)**
25:17;26:2
**happen (4)**
8:10;31:22;47:23;
175:18
**happened (26)**
55:18,19;64:24;
104:12,20;107:12;
108:6,24;109:1;
110:5,10;111:16;
112:5,14;113:1;
116:9;117:8,20;
124:15;131:25;
134:6;135:13;137:9;
141:4;142:9,10
**happening (2)**
20:14;27:1
**happens (1)**
39:16
**happy (2)**

119:24;155:5
**harassed (3)**
81:10;82:5,8
**harassful (1)**
82:9
**Harassment (1)**
82:11
**hard (3)**
19:7;62:2;175:1
**hashed (2)**
104:9,10
**head (1)**
136:22
**heads (1)**
27:10
**health (1)**
16:21
**healthcare (1)**
175:8
**hear (4)**
36:8;37:7;58:5;
59:18
**heard (6)**
31:18;69:20;
109:18;121:23;
122:1;126:5
**hearing (17)**
7:9;109:19,20;
117:5;119:7;120:10;
141:1,4,5,16;142:5;
143:9;146:3;149:14;
150:24;163:21;
164:2
**hearings (2)**
53:21;172:3
**hearsay (2)**
104:17,17
**held (3)**
117:6;119:21;
120:10
**help (2)**
29:16;39:2
**hereby (1)**
102:1
**Here's (1)**
171:7
**herself (1)**
165:1
**hesitates (1)**
56:2
**hey (1)**
105:4
**hiding (1)**
172:9
**high (2)**
28:16;174:16
**highly (1)**
81:25
**himself (4)**
5:22;6:13;22:15;
126:19
**hired (1)**
99:18

**history (1)**
46:3
**Hold (13)**
14:12;22:22;
26:21;37:15;68:21;
80:10,16,16,16;
121:17;139:8;
158:21;162:9
**holds (4)**
90:16;177:3,7,8
**home (7)**
25:16;26:12;
71:10,12;75:23;
80:2;175:12
**homework (1)**
73:14
**honest (2)**
167:4,16
**honestly (4)**
37:23;53:19,24;
77:18
**honesty (1)**
39:21
**Honor (211)**
4:10,12,17;5:2,7,
10,21,25;6:4,16;7:4,
9,13,24;8:2,7,16;9:1,
18;10:3,5,16,23,25;
12:1,5,9,23;13:3;
14:11;15:5,9,15,16;
17:7,16;18:4,14,19;
19:14;21:22;22:11,
25;23:25;24:17;
25:6,11;27:17,20,21;
28:8;30:11;33:13,22,
25;34:20;35:4;
36:13;37:8;38:25;
39:18,24;40:2,8,13,
16;41:9;42:6,17,23;
43:2,11,19;44:2,9,
10;45:18;46:9,24;
48:9,17;50:13;
52:11;53:15;54:5;
55:5;56:23;57:7,20;
58:24;59:19;60:24;
61:6,8,12,24;62:13;
63:24;64:10;65:22;
66:8;67:4;68:3,4,14,
19,23;69:10,18;70:8,
16;72:5,11;77:23;
78:12,14;80:8,9,14;
81:21;82:1;83:6,14,
19;86:25;87:23;
88:3,9,18;89:13,16,
19;90:20;91:1,18;
93:19;94:13,25;95:3,
11,13;96:10,21;
98:13,19;100:2,5;
101:3,8;102:3;
104:18;105:7;
110:24;112:6;
115:18;116:8,16,20;
121:15,18;122:20;

123:13;131:2,20;
132:3;137:3,8;
138:6;144:10;148:8;
150:13,20;151:19;
152:9;153:12;
155:18,25;156:3,4,
11;157:1,6,12,24;
158:13;159:2,10,24;
160:2;163:12,13;
164:7;165:11;
166:11;168:17;
169:6;170:11,20;
172:5,14,23;174:3,
20;175:24;176:12,
18;178:23;179:13,
18;180:14,15
**hope (3)**
38:9;39:13;175:10
**hopefully (1)**
130:11
**house (21)**
16:14;21:16;
31:23;38:24,25;
46:25;47:1,7;51:7;
62:6,9;63:20;85:2;
128:7;129:5;177:8,
11;178:23,24;
179:24;180:8
**household (8)**
25:21;73:5;76:3;
96:5,7;138:14,15;
140:11
**humiliated (3)**
29:12,13,17
**humiliating (2)**
29:14,15
**Hurricane (6)**
46:12,20;97:7,7;
116:13,15
**hurt (1)**
180:6
**hurting (1)**
179:3
**husband (11)**
72:14,17;73:7;
82:15;83:24;84:2,
12;85:12;89:2;98:4,
10
**husband's (2)**
73:3;74:14
**hypothetical (1)**
176:25

**I**

**iceberg (1)**
115:2
**idea (2)**
20:19;62:14
**identified (1)**
129:9
**identify (1)**
102:5

Case 8-13-08044-reg    Doc 40    Filed 04/01/15    Entered 04/01/15 12:40:05

CADLES OF GRASSY MEADOWS II, L.L.C. v.
ST. CLAIR, et al.

Adv. Proc. No. 13-08044-reg
April 24, 2014

**ignorant (1)**
108:5
**II (1)**
154:17
**imagine (4)**
17:4;29:20,23;
65:14
**impact (6)**
18:18,24,24;
26:12;33:1,2
**impacting (2)**
38:22,23
**imploring (1)**
107:5
**important (8)**
6:5;36:8;82:2;
86:21,23,24;87:2;
155:11
**imposed (1)**
145:18
**imposing (2)**
147:13;169:11
**impossible (6)**
103:4;125:24,24;
126:23;136:1;148:1
**impressed (1)**
26:24
**impression (3)**
27:6;62:19;82:24
**improper (2)**
22:18;24:10
**Improperly (1)**
81:1
**inadequate (1)**
133:1
**inadmissible (1)**
137:4
**inappropriate (1)**
29:8
**incapable (1)**
115:16
**inches (1)**
28:16
**included (1)**
7:11
**including (2)**
12:17;173:3
**income (4)**
113:22;126:21;
149:9;178:8
**increasingly (1)**
146:13
**incurred (1)**
37:2
**indeed (1)**
173:20
**Indicating (1)**
133:23
**indifferent (1)**
28:10
**indiscernible (1)**
148:9
**individually (1)**

9:7
**infer (1)**
9:12
**inflection (1)**
30:19
**inform (2)**
161:7,20
**information (25)**
30:7;60:12;66:5;
72:23,24,24;79:25;
91:14,15,16;113:17,
19;127:6;130:18;
135:15;136:25,25;
137:1,15,15,22;
138:2,6,11;156:22
**informed (4)**
161:18,19;162:4,6
**informing (1)**
107:7
**initial (3)**
27:8,16;83:11
**Initially (6)**
28:10;31:19;
73:21;103:9,10;
112:18
**insistent (1)**
19:5
**instance (2)**
115:15;154:19
**instances (1)**
23:3
**instructed (1)**
145:11
**insulted (1)**
28:13
**insulting (3)**
28:12,23;29:1
**integrity (1)**
29:4
**intend (1)**
8:3
**intended (2)**
8:1,2
**intent (12)**
9:9;17:22;22:22;
25:2;32:23;45:16,
21;46:5;48:14,19;
61:6;126:11
**intention (2)**
78:14;170:8
**intentionally (3)**
9:13;32:25;162:16
**interacted (1)**
19:3
**interest (4)**
155:1,2;163:19;
179:3
**interested (4)**
30:23,24;61:3;
155:25
**interesting (1)**
107:23
**interim (1)**

109:10
**Internet (1)**
129:8
**interpretation (2)**
23:18;115:16
**interrupt (2)**
4:21;157:10
**intervention (4)**
103:20;106:12,19;
107:11
**into (19)**
7:1;15:13;18:9;
20:12;26:3;34:15;
47:20;59:1;63:2;
88:19;101:7;102:1;
118:9;123:8;132:2;
135:4;176:23;
177:13;178:15
**intramural (1)**
179:25
**intramurals (1)**
61:4
**introduce (1)**
7:1
**introduced (5)**
5:1;7:21;14:20;
47:17,18
**introducing (1)**
101:20
**introduction (1)**
5:14
**invalid (1)**
159:3
**invasive (1)**
174:18
**invoices (4)**
25:24;130:1;
144:12;179:15
**involved (1)**
131:7
**IOLA (12)**
29:6;60:4,9,13,15;
66:3,6,10,13;123:4;
125:10;142:18
**irrelevance (1)**
17:16
**irrelevant (5)**
80:14;83:20;
156:5;164:8;168:21
**issue (26)**
6:23;9:10;13:8;
17:21,21,25;23:7,13;
31:14;35:10;37:1;
38:12;44:16,16;
55:11;84:22;126:10;
146:7;163:1,4,9,21;
169:1;171:19;
172:10;176:22
**issued (9)**
9:5,6;30:24;37:1;
44:14;88:20;130:2;
148:12;149:11
**issues (10)**

13:21;28:1;31:9;
35:7;48:7;163:7;
168:22;173:19,21;
178:9
**items (15)**
67:9;18;98:7;
106:5;114:11;
115:12;117:25;
118:10,12,25;
123:18;129:9,10,18;
159:20

**J**

**January (7)**
52:9;53:10;
111:14;115:7,7;
117:8;164:20
**Jeffery (2)**
13:1;31:18
**Jeffrey (21)**
15:8,14,23,25;
18:17;19:22;25:13,
22;27:12;28:4;
31:16;34:5;35:23;
37:11,19;38:21;
72:2;103:2;104:1;
124:13;159:7
**jeopardy (1)**
33:3
**job (4)**
114:4;134:20;
175:4,8
**Johnson (1)**
177:2
**joined (1)**
39:2
**joint (6)**
4:23;7:12;13:11;
24:4;101:5;120:25
**jointly (2)**
76:11,12
**joke (1)**
16:9
**Joseph (40)**
20:1;21:6;22:15;
26:16;32:10;67:24;
78:23;79:9;82:13;
84:5;85:12,20,23;
91:17;92:16;103:11,
23;104:5,9;106:16;
107:2,24;108:8,10;
110:2,14;114:14;
115:6;121:11;
125:20;141:6,8;
148:5,9;151:7;
164:24;169:18;
170:8,12;179:16
**Joseph's (1)**
171:15
**judge (34)**
17:12,13;24:25;
31:18;41:17;49:8,

18;50:10;53:20;
54:18,25;57:3;
61:17;62:20;63:17;
65:1;67:13;71:20;
107:6;117:13;118:4,
4;126:5;144:23;
145:11;146:24;
151:22;164:12;
169:13;171:1;174:5;
176:24;179:4,14
**judges (2)**
33:20,21
**judge's (2)**
124:3;169:10
**judgment (17)**
9:5,10;35:12;
99:23,25;100:21,24;
114:18;149:25;
150:2,17;151:3,5;
159:17;163:15;
169:24;177:7
**July (11)**
44:7;48:20;52:8;
53:10;55:13,21;
56:8;64:5,9;103:25;
105:19
**June (7)**
64:15,16,18,24;
85:3;102:24;111:9
**jury (1)**
157:8

**K**

**Karam (2)**
4:6;5:22
**keep (22)**
25:1,22,25;26:4;
40:10;44:24;71:14;
88:9;94:13;111:3;
118:18;123:3;
132:25;160:4,9,10;
173:21;177:10;
178:23,24;179:24;
180:8
**keeping (2)**
25:2;80:4
**keeps (2)**
14:22;25:15
**kept (8)**
21:7;62:5;74:11;
75:17,24;76:5,6;
118:19
**kids (2)**
69:5,14
**kind (16)**
16:9;19:3,8;20:18;
26:8;27:5,6,9;32:6;
100:18;112:12;
130:9;146:16;
156:16,20;164:16
**kitchen (1)**
26:1

Case 8-13-08044-reg    Doc 40    Filed 04/01/15    Entered 04/01/15 12:40:05

CADLES OF GRASSY MEADOWS II, L.L.C. v.
ST. CLAIR, et al.

Adv. Proc. No. 13-08044-reg
April 24, 2014

**knew (13)**
60:17;107:8;
113:24;114:4;
122:22,22,24;
123:16;127:11;
131:8;133:14;
136:18;140:6
**knowingly (1)**
9:12
**knowledge (9)**
9:9;10:11;19:25;
45:17,21;46:5;
89:25;116:12;122:7
**knows (1)**
56:25;67:7;133:17

**L**

**language (3)**
34:20;75:13;88:23
**last (11)**
37:22,25;38:9,9;
46:17;71:2;76:12;
127:22;143:23;
147:25;164:16
**late (2)**
115:7;130:10
**later (3)**
34:15;49:10;
128:16
**latitude (2)**
40:6;112:8
**law (23)**
7:15,16;10:2;
39:16;41:21;61:15,
18;113:13,13,18;
114:25;122:25;
123:1;127:8;129:19;
130:2;142:18;
151:13,14;153:23;
163:6;167:15;
175:14
**laws (2)**
144:8;174:22
**lawsuit (8)**
82:14;83:5,11,12,
13,16;84:24;87:4
**lawyer (23)**
27:10;33:14;
39:14;45:2;46:8;
54:15;55:2,10,12;
58:13;60:10;62:7;
79:5;85:17;153:23;
167:11;175:4,4,5,15;
179:10,21,22
**lawyers (1)**
175:7
**lay (1)**
137:4
**Leading (3)**
18:19;110:24;
112:7
**learn (1)**

136:8
**least (11)**
14:21;23:5;39:13;
102:14;106:5;
109:18;110:11,22;
111:1;126:24;131:6
**leave (5)**
9:15;34:3;38:24,
25;139:14
**leaving (1)**
12:20
**leeway (3)**
17:21,23;36:24
**left (4)**
38:17;69:8;
113:11;172:21
**legal (3)**
13:6;165:12;
177:13
**legs (1)**
29:15
**lender (1)**
35:12
**lending (1)**
35:8
**length (1)**
61:6
**lenient (1)**
119:1
**letter (13)**
51:5;107:3,13;
110:14,15;117:22;
143:25;161:16,16;
162:1,2,4;169:16
**letters (10)**
103:12;106:16;
107:1,21;125:11;
127:22,25;143:14,
20;179:15
**level (1)**
23:19
**liabilities (1)**
34:8
**liable (1)**
173:10
**license (2)**
33:3;74:10
**lie (1)**
5:20
**lied (4)**
84:1,2;102:16;
141:14
**lieu (1)**
109:15
**life (9)**
17:6;18:18,24,25;
22:13;126:20;178:2,
14;179:25
**light (3)**
34:15;38:4;137:10
**likes (2)**
33:24;175:15
**limit (1)**

122:3
**limited (7)**
15:18;19:25,25;
27:25;34:2;39:14;
126:17
**line (17)**
21:22;22:17;29:6;
48:18;52:5;59:7;
61:8;69:19;114:7;
132:7,14,16,19,21,
24;133:2;134:18
**lines (4)**
132:16,19,21;
133:2
**LIPA (1)**
140:14
**list (13)**
32:5,13;73:25;
74:3;75:2;78:25;
85:14;86:8,11;
96:24;97:18,18,19
**listed (3)**
106:3,4;113:16
**Listen (15)**
10:21,21;11:1,24;
31:12;37:6;45:2,3;
105:4;155:23;
177:16;179:20,23,
23;180:3
**listening (1)**
80:24
**lists (1)**
115:10
**literally (2)**
27:7;28:15
**litigants (1)**
169:1
**little (19)**
6:5;17:20;19:5,24;
26:1,2;28:2,10;37:6;
44:11;46:11;66:2;
94:9;99:5;113:8;
131:10;151:25;
173:18;174:21
**live (6)**
9:21,21;11:6;
69:16;71:10;175:12
**lives (1)**
175:2
**living (5)**
15:25;16:24;26:6;
71:21;154:9
**loan (27)**
35:1;85:15,17,18,
21,25;90:6,13,15,16,
16,17;91:16;94:10,
19,20,22;95:2;
114:20;124:7,9,9;
138:10;156:15;
159:5;176:1,1
**loans (14)**
90:5,7;91:11;
114:9,22;123:20;

138:8,9,12;139:23,
25;140:3,5;159:6
**local (1)**
86:14
**locate (1)**
145:9
**location (1)**
120:14
**log (14)**
66:23;67:1,7,9,16,
18,25;68:2;111:20;
112:23;113:1;
148:16,21;149:4
**long (14)**
16:8;26:6;40:19;
78:9;79:13;80:4;
81:11;99:9;103:18;
152:10,13;167:15;
169:20,22
**longer (5)**
23:10;25:4;44:15,
16;163:4
**look (40)**
24:10;73:18,19;
74:17,22;85:3;
91:25;101:1;102:4,
21;103:21;105:20;
106:24;107:15;
115:3;116:10,14,19;
120:4;121:3;124:11;
127:1;130:3;134:24;
135:22;139:2,6,22;
140:10;142:22;
144:4;147:11;
149:22;160:21;
161:9;164:14,16;
165:4;173:14,17
**looked (1)**
144:4
**looking (4)**
71:9;124:20;
132:25;133:19
**looks (1)**
171:17
**lose (4)**
23:1;35:25;72:2;
156:10
**Losing (1)**
71:10
**lot (10)**
18:17;21:18,19;
23:24;62:9;112:17;
128:9;178:18,21;
180:7
**lots (1)**
85:10
**love (6)**
33:17,21;41:16,17,
17;71:3
**Lower (1)**
99:5
**lunch (1)**
135:7

**M**

**ma'am (1)**
88:25
**mailed (1)**
98:2
**main (4)**
6:23;13:18;71:11;
178:23
**maintain (1)**
123:4
**maintained (2)**
62:16;144:19
**makes (2)**
125:23;155:5
**making (8)**
60:6;66:20;81:18;
84:16;114:5;134:16;
160:9;165:11
**man (3)**
16:25;29:14;38:1
**manner (2)**
28:9;163:11
**many (17)**
40:21;46:25;
53:23,23;58:25;
65:23;67:4;69:14;
78:7;79:9;82:3;90:9;
96:9;110:25;111:3;
115:12;128:6
**March (15)**
45:10;56:16;
60:16,17;93:2,4;
95:8;113:3;121:10;
124:14,16;127:1;
128:3;130:7;135:2
**marked (1)**
95:24
**Marrama (1)**
176:17
**marriage (1)**
74:10
**married (4)**
16:2,8;69:1,3
**Marshal (2)**
113:4;120:3
**marshals (1)**
120:15
**material (1)**
149:24
**matter (13)**
4:14;20:20;39:16;
99:18;108:22;
117:19;141:10;
147:16;148:4;
159:17;166:5;170:7;
174:24
**may (28)**
9:25;18:5;19:4;
22:19;23:17;34:2;
45:12;55:11;57:7;
60:15;91:18;103:14;

Case 8-13-08044-reg    Doc 40    Filed 04/01/15    Entered 04/01/15 12:40:05

CADLES OF GRASSY MEADOWS II, L.L.C. v.
ST. CLAIR, et al.

Adv. Proc. No. 13-08044-reg
April 24, 2014

116:12,25;122:17;
135:11;140:24;
143:1;147:14;
164:10;170:17;
172:8,25;173:6;
174:1,21;178:1;
179:25
**maybe (16)**
19:5;39:15;40:20,
22,23;43:16;48:16;
79:15;80:20,22;
85:2;96:5;114:5;
167:17,19;178:3
**Meadows (3)**
4:3;120:11;154:17
**mean (58)**
6:11,19;8:24;9:19;
10:20;11:8,13;16:22,
23;20:15;25:17;
28:14,17;29:8,20;
30:3;32:2,23;34:13,
19;37:21;44:20;
46:2,25;47:22;50:11,
12;53:2,3;54:7;
61:20;69:19;73:11;
80:15,23,25;95:5;
101:10,10;104:18;
105:7;106:15;112:6;
114:23;115:14,19;
118:17;125:24;
128:10;133:8;
136:23;137:4;
150:13;164:12;
167:20;168:24;
170:14;175:7
**means (8)**
37:1;54:14;80:17;
95:6;174:20;177:22;
178:8,9
**meant (2)**
72:25;73:1
**mechanisms (1)**
23:18
**Medgar (2)**
127:9,18
**medical (2)**
76:3;88:23
**meet (3)**
16:13;29:17;
172:25
**meeting (4)**
27:8,14,16;137:9
**memo (4)**
7:12;13:11;
151:13,14
**memory (2)**
82:2;133:10
**mental (1)**
61:6
**mention (1)**
129:19
**mentioned (2)**
138:24;147:18

**mess (2)**
21:18;49:13
**mic (1)**
99:5
**microphone (2)**
15:13;18:9
**middle (1)**
133:23
**midnight (1)**
151:13
**might (6)**
32:18;33:8;117:6;
167:4;176:3;177:1
**military (2)**
38:19;39:2
**mind (7)**
16:21;36:11;
134:19;140:18;
152:3;160:21;169:2
**Mine (1)**
152:11
**minute (1)**
12:5
**minutes (7)**
68:15,16;70:19;
79:15;125:2;159:5;
168:23
**minutiae (1)**
32:6
**misappropriating (1)**
29:2
**mishmash (1)**
114:14
**misplaced (1)**
21:19
**misquoting (1)**
159:1
**missing (9)**
91:14,14;98:5;
114:3,23;115:2,22,
22;118:1
**misspoke (2)**
47:15;144:2
**misstating (1)**
65:5
**moment (4)**
48:4,13;68:3;
179:21
**money (21)**
19:6;37:12,14;
66:14,14;82:18,20,
22,23;83:1,2,5,9,10;
127:15;144:23;
148:2;169:17;170:5;
171:10;178:6
**monthly (1)**
139:24
**months (14)**
20:17;103:19;
107:4;108:25;109:1;
116:3;117:13,13,13;
119:25;162:18;
170:1,2,4

**more (28)**
12:7;14:22;19:5;
20:6;28:11,12;
29:13;31:11;37:7;
44:1;47:19;48:2;
49:12;72:23,24;
74:11;88:23;96:16;
110:10;131:13;
133:12;135:17;
155:11,16;166:8;
172:8,11;173:24
**morning (9)**
4:2,6,12;15:16;
101:24;116:11;
130:7,7,11
**mortgage (8)**
25:15,23;37:12;
81:16,18;177:3,6,8
**most (3)**
37:3;62:24;175:7
**mother's (1)**
71:9
**motion (34)**
53:13,17,21;
67:15;107:17;108:6,
11;109:11,17,19;
110:11,19,22,23,25;
111:1,11,13,23;
112:14;120:10,12;
126:9;140:25;141:2,
5;143:2;149:25;
151:3,5;159:16;
169:24;172:1;176:5
**motions (1)**
147:9
**motivation (1)**
49:7
**move (40)**
13:18;19:14;
30:12,13,14;34:24;
35:10,22;39:5;42:6,
9,15;61:1;65:18,25;
66:8;70:13;77:9,12,
17;78:18;80:5;81:9;
82:10;87:2;88:11;
92:1;105:9;107:22;
122:3;131:2;132:1;
134:17;148:8,14;
150:2;156:12;
157:24;160:2;
170:11
**moved (3)**
21:20;101:23;
151:17
**moving (4)**
101:7,12;132:19;
160:11
**Mrs (8)**
40:1;138:17,19,20,
25;171:8;173:15;
174:17
**much (7)**
30:7;79:13;

123:19;127:15;
128:10;152:4;
178:20
**multiple (8)**
54:21;87:19;
128:17;143:9;
159:10,21;166:18;
172:23
**multi-thousand-dollar (1)**
129:10
**must (1)**
144:2
**myself (2)**
32:24;141:7

## N

**name (10)**
15:13;16:6;27:14;
68:9;81:14;99:1,3;
139:12,13;165:24
**names (2)**
125:14;130:25
**Narissa (33)**
20:1;21:6;22:15;
27:4;61:22,25;62:1,
12;64:6;65:1;67:21,
21,24;78:23;79:9;
82:13;92:16;103:11,
23;106:16;110:14;
114:13;115:5;
121:11;125:20;
141:6;148:5,9;
151:7;164:24;
169:18;170:7;
179:16
**narration (2)**
100:6;121:22
**narrow (3)**
9:10;35:9;48:12
**nature (3)**
41:23;53:24;131:6
**nearly (1)**
124:19
**necessitated (2)**
102:8,20
**need (16)**
23:20;29:20;
33:19;59:5;72:22;
98:6;115:20;121:19,
21;125:22;137:5;
173:18;176:1;
177:23,24;178:12
**Needless (1)**
105:17
**needs (6)**
24:8;10:52:12;
94:13;137:5;176:22
**neither (2)**
4:25;110:2
**nevertheless (1)**
127:16
**New (8)**

15:15;40:23;41:2,
5;47:5;138:2,24;
139:12
**next (15)**
42:15;97:16;
125:18,20,24;126:3;
130:6,7,11;132:24;
136:1;160:7,11,13;
178:13
**night (1)**
151:14
**ninety-something-thousand (1)**
114:6
**nits (1)**
174:21
**Nobody (3)**
42:13;127:11;
175:12
**nobody's (3)**
6:24;10:9,10
**noncompliance (1)**
143:9
**nondischargeability (1)**
31:7
**nondischargeable (3)**
102:7;147:8;148:3
**none (6)**
28:21,21;106:23,
23;137:15;140:23
**nonexempt (1)**
143:5
**Nonresponsive (3)**
19:15;43:3;66:9
**nor (4)**
110:2;128:25;
147:24;151:15
**normal (1)**
179:24
**Normally (2)**
17:10;19:6
**notary (1)**
121:11
**note (4)**
12:10;99:13,16,19
**notice (7)**
8:20;20:21,23,23;
21:1;162:15,16
**notices (1)**
49:17
**November (2)**
64:13,19
**number (14)**
23:3;62:4;68:20;
83:15,15;84:9,11;
102:15;136:13;
148:4;157:18;165:4,
4;173:7
**numbers (1)**
6:11

## O

**obey (2)**

Case 8-13-08044-reg    Doc 40    Filed 04/01/15    Entered 04/01/15 12:40:05

CADLES OF GRASSY MEADOWS II, L.L.C. v.
ST. CLAIR, et al.

Adv. Proc. No. 13-08044-reg
April 24, 2014

164:4,5

**obeyed (1)**
175:12

**object (17)**
6:3,25;8:4;13:10;
20:8;33:23;40:14;
50:17;60:9;66:5;
69:18;115:12;118:9;
120:17,18;125:21;
168:19

**objected (15)**
58:9,15;59:23;
65:20;67:10,19;
112:19,20;113:12;
118:15;125:9;128:1;
129:23;142:19;
144:23

**objecting (15)**
6:22,23,24;52:21;
59:16,22;66:18,20;
72:7;88:9;115:11;
117:25;118:5,12;
125:25

**objection (122)**
5:5,8,14,15,16,23;
7:7,8,13,15,21,9:22;
10:18;17:7,15;
18:19;19:14;21:22;
27:17;28:2,6;30:11;
33:13,22;35:4,18;
36:2,7;41:9;42:6,22;
43:2;44:10;46:24;
52:11,13,14,17;
53:15;54:5;55:5;
56:23;57:20;58:2,
22;59:19;60:24;
65:22;66:8;70:8,16;
72:5,11;77:15,16,23;
78:2,12,19;80:8;
81:21;82:1;83:6,14;
86:25;87:23;88:3,8,
17;90:9,19;91:1,3,3;
93:19;94:12;95:3,
11;96:10,20;100:2,5,
9,10,15,16;101:9,15,
16,19,23,23;104:17;
105:7;110:24;112:6;
121:15;122:1,10,12,
14;131:2,20;137:3;
148:8,20;150:13;
153:12,16,24;
155:10,18;156:3;
157:1;158:12,18,23;
159:10;160:3;
166:11;170:23;
179:18

**objectionable (1)**
67:2

**objections (9)**
4:16;12:15;24:18;
78:5;115:14,15;
118:7;126:17;
156:21

**objects (1)**
17:11

**obliterated (1)**
63:8

**obscenities (1)**
133:12

**obstructive (3)**
102:14;131:16;
135:18

**obtain (7)**
90:17;103:4,9;
114:22;123:19;
138:12;168:5

**obtained (2)**
99:23;100:24

**obtaining (1)**
132:18

**obviously (9)**
40:6;45:22;109:8;
110:18;127:11;
128:1;141:14;
142:20;146:20

**occasion (1)**
171:15

**occasions (6)**
59:2;84:9,12;
102:15;146:1;173:7

**occur (2)**
32:18;33:8

**occurred (3)**
36:10,10;146:18

**o'clock (2)**
98:15;130:9

**October (7)**
55:14;56:9;64:20,
23,24;109:3,4

**off (3)**
95:25;136:19,22

**offensive (1)**
6:5

**offer (1)**
107:17

**office (14)**
27:7;62:10;64:6;
75:15;79:12,14;
95:19;104:4;106:17;
128:8;129:5;156:17;
161:1;179:16

**officer (1)**
32:24

**offices (1)**
128:16

**often (1)**
27:3

**oil (1)**
28:19

**old (2)**
39:4;70:6

**oldest (1)**
38:16

**Once (9)**
20:13,16;49:12;
60:22;65:24;97:20,

23;100:23;133:12

**one (62)**
5:11;6:19;9:9,14,
17;12:4,7;13:3;
16:19;26:10;27:20;
29:5;38:2;42:15,24;
43:6;48:7;51:6,15;
68:3;70:12;73:7;
74:6,6;79:4;83:15;
96:16,25;101:17;
104:4,15;106:10;
107:8,25;108:2;
109:7;110:10,12;
113:18,19;115:1;
120:15;122:25;
123:1,19;124:6;
125:13;128:8,17,24;
129:13;131:15;
132:4;138:17,20;
143:3;154:25;
170:17;171:17;
172:11;176:21;
177:1

**ones (2)**
103:16;145:7

**ongoing (3)**
111:8;142:2;
146:22

**only (24)**
17:21;27:23;
29:23;32:25;36:16;
44:18;45:1;51:15;
57:23;74:21;84:22;
101:16;110:12;
119:11,12;121:9;
128:16;151:6;163:1,
8;171:23;176:2,3;
180:1

**onto (1)**
160:11

**open (1)**
20:17

**open- (1)**
142:2

**opening (1)**
126:19

**opens (1)**
24:9

**operate (1)**
108:3

**operates (1)**
113:13

**operating (9)**
60:7,10,13;123:5;
125:10;128:15;
142:18;144:16,19

**opinion (5)**
23:6;30:4;34:18;
137:4;165:16

**opportunity (7)**
12:14;13:10,15;
57:11;92:1;122:13,
15

**opposed (1)**
39:15

**opposite (1)**
131:12

**opposition (5)**
111:6;150:15;
151:3,7,13

**order (101)**
5:7;6:2;9:6,13;
22:1;23:10,11,12;
24:4,18;31:5;32:25;
44:5,5,7;45:6;46:5,6;
48:15,20;49:10;52:8,
10;53:2,2,3,7,10;
54:13;55:3,6;63:24;
64:7,9;67:3;71:16;
72:13,16;79:20;
87:15;88:21;89:1,15,
18,18,20,25,25;
102:23,24;103:3,5,7,
13,16;104:3,6,16;
105:18,23;106:18;
107:4,6,19,20;
108:12,16,22;109:7,
13;111:9,9,10,18;
115:9;118:8;120:7;
123:18;124:21,22;
128:2;136:15;142:3;
147:13,17;148:11;
149:11;163:2,3,4,12,
13;164:4,5,19,19;
165:19;168:3,10;
169:10,14;172:14

**ordered (13)**
23:6;66:22,25;
67:9;102:14,18;
103:14;108:16;
109:2;111:17;
112:24;119:20;
148:2

**orders (53)**
9:6,8;20:14;22:23;
23:4;25:5;30:24;
32:19;33:6;39:22;
41:20,24;45:5,22;
48:25;49:5;54:3,21;
71:16,18;72:14;
79:17;87:5,19,24;
88:2,6,15,22;92:19;
103:6;106:6;108:5;
111:8;114:1;117:15;
120:1;141:11;
143:10;145:19,25;
146:19;157:20;
162:5;166:17,18;
168:12;171:12;
172:8,23,23,25;
175:12

**origin (1)**
30:1

**originally (1)**
63:22

**others (1)**

72:18

**otherwise (5)**
13:9;24:8,12;67:2;
122:12

**ought (1)**
100:16

**out (42)**
13:13;19:21;22:1;
23:9,20;24:13;27:7,
7,10;29:6;35:11;
39:3;41:13,13;
48:13;51:16;62:21;
63:15,19,20;80:2;
81:11;85:1,5;104:9,
10;113:12;114:24;
123:6;127:8;133:12;
150:2;170:15;173:1,
2;176:21;177:21;
178:1,2,3;180:5,7

**outcome (1)**
156:1

**outlined (5)**
31:8;159:16,18,19,
21

**outrageous (1)**
134:8

**outside (8)**
21:24;22:10;
23:24;27:17;36:15;
40:15;69:20;83:14

**over (42)**
18:8;21:20;24:12;
27:9,19;31:9;41:18;
45:11;50:6,9;51:14;
52:4;59:24;60:9,12,
15,18;63:5;64:25;
66:13;67:22;78:11;
81:16;84:5;85:5,6,
24;86:3,3,7;88:10,
10;99:11;100:23;
104:9;119:24;
123:14;132:25;
141:10;144:12;
145:2,7;146:6;
148:1;157:18;161:3,
3;162:17,18;167:18;
168:9;173:3,6,9,9,11

**overrule (1)**
36:7

**Overruled (13)**
58:23;59:21;88:4;
90:10;94:14;95:4,5,
16;96:11,14,22;
105:14;131:4

**oversimplifying (1)**
66:7

**overt (1)**
164:4

**owe (7)**
82:18,20,22;83:1,
2;177:18;178:6

**owed (1)**
37:12

Case 8-13-08044-reg    Doc 40    Filed 04/01/15    Entered 04/01/15 12:40:05

CADLES OF GRASSY MEADOWS II, L.L.C. v.
ST. CLAIR, et al.

Adv. Proc. No. 13-08044-reg
April 24, 2014

**own (11)**
9:12;28:18,19;
46:2;103:6;110:7;
113:13,23;122:25;
151:12;163:19

**P**

**pace (1)**
92:5
**pack (1)**
96:23
**package (1)**
96:23
**page (25)**
96:16;127:1,5;
132:7,13,16,19,21,
24;133:3;139:6,22;
140:10;143:13,17;
144:5,14,25;145:15,
15;164:16;165:4,4,6,
7
**pages (4)**
96:9;106:5;132:4;
173:22
**paid (10)**
76:9,10,18;86:17;
127:15;147:21,22,
24;148:3;171:10
**paper (6)**
51:6;79:2;96:25;
97:1;135:22;167:7
**papers (6)**
28:16;78:20;
96:18,24,25;98:1
**paperwork (18)**
73:21,21;78:17;
97:24;115:21;
156:17,18,18,19,20;
158:9,10;159:6,8,9,
13,14;166:10
**parched (1)**
151:25
**part (11)**
7:22;26:2;30:21;
34:17;41:18;46:17;
47:21;73:8;119:8;
142:15;172:2
**partial (1)**
137:14
**participation (1)**
172:3
**particular (4)**
25:22;36:15;
125:7;154:19
**particularly (2)**
137:22;162:4
**parties (15)**
4:23;14:17;17:22;
30:15,25;109:15;
156:14;161:5,5,17,
22,23;172:13;173:2,
14

**parts (2)**
31:7;73:6
**party (4)**
121:24;153:23;
166:25;167:10
**pass (1)**
178:16
**passed (1)**
170:22
**passport (5)**
116:17,18,21,23;
117:1
**passports (1)**
74:10
**past (2)**
28:15;35:11
**pause (1)**
126:11
**pay (13)**
16:13,20;75:15,
16;76:19;89:4,21,22;
128:21,22;148:2;
169:15,17
**paying (2)**
155:8;170:9
**payment (2)**
127:17;169:18
**payments (5)**
75:16;81:18;
99:14,16;127:13
**pays (2)**
138:9;175:13
**peace (2)**
16:21;178:13
**penalty (1)**
165:9
**pending (1)**
133:10
**people (8)**
35:3;76:22;82:22;
129:4;163:23;
178:14;179:3,25
**percent (1)**
123:13
**perfectly (1)**
10:6
**perhaps (1)**
48:12
**period (2)**
103:18;106:21
**perjury (1)**
165:9
**permissible (1)**
145:25
**permitted (1)**
61:8
**perpetrating (1)**
172:9
**person (7)**
71:25;74:21;
113:10;127:10;
134:20;136:16;
175:9

**personal (5)**
17:5;29:4;174:23;
175:2,10
**personally (4)**
28:12;95:24;
104:10;175:11
**person's (3)**
125:25;133:19;
175:24
**perspective (1)**
155:3
**persuasive (1)**
146:3
**perused (1)**
6:17
**petition (4)**
19:23;100:25;
127:10;129:13
**phone (13)**
7:10;74:5;103:12;
104:9;105:4;106:15;
107:21;128:4,4,6,7,
7,11
**phones (3)**
128:7,7,13
**photocopies (1)**
85:10
**phrase (1)**
91:3
**physician's (5)**
71:22;90:3;114:7;
136:17;138:8
**physics (1)**
144:8
**pick (2)**
18:12;24:13
**picked (1)**
19:22
**picture (2)**
36:11,23
**piece (1)**
135:22
**pin (1)**
141:18
**place (13)**
5:17,17;14:21;
21:20;24:13;25:22;
26:3;31:11;77:5;
78:4;100:22;116:14;
174:2
**placed (2)**
73:13,15
**places (2)**
73:15;85:2
**plaintiff (23)**
4:10,13;12:18;
14:13;22:4,8;28:5;
31:8;35:1;53:13,17;
56:18;57:18;58:9,
12;77:3,4,8;81:12;
83:12;154:15;156:9;
174:6
**plaintiffs (2)**

121:1;172:12
**plaintiff's (31)**
34:21;53:21;
67:15;91:18;101:1;
102:2,4,21;103:21;
104:13;105:20,22;
106:24;107:15;
108:17;109:11;
115:3;120:4;121:3;
124:11;130:3;
134:24;142:22;
143:13;144:4,6,25;
145:15;147:11;
149:22;160:24
**play (1)**
41:12
**pleadings (1)**
101:10
**please (32)**
4:2,5,6;6;7:7;13:4;
15:12;18:9;57:5,8,
14;68:6,8;93:10;
98:18,21,24;99:2;
105:21;106:18,25;
115:3;120:5;124:12;
130:4;132:23;
143:18;153:5;154:5;
157:24;164:14;
165:5;174:3
**pm (6)**
98:17,17;120:13;
152:16,16;180:19
**podium (2)**
18:13;143:18
**point (17)**
20:11,20;22:11;
29:9;38:23;71:9;
105:3;107:25;
110:13;118:7,18;
126:6;164:10,11;
168:20;171:23;
176:14
**points (1)**
113:10
**portion (1)**
118:9
**pos (1)**
11:24
**position (8)**
5:24,25;9:11,14;
11:17,25;13:25;
163:22
**possession (24)**
31:10;56:20;
57:18,24;58:1;
60:17;65:21;66:19;
73:3,3,4;90:14;
92:10,23;113:25;
118:25;119:13;
121:2,9;122:8,23;
136:10;140:20;
143:7
**possible (1)**

145:22
**post (3)**
110:15;114:16;
141:2
**post- (1)**
12:14
**post-bankruptcy (1)**
114:15
**posted (1)**
63:24
**post-trial (1)**
173:18
**potentially (2)**
15:18;172:9
**practice (16)**
28:14;41:21;
60:10,13;61:16,19,
22;113:13,16,18,23;
125:7;129:20;130:2;
142:18;145:3
**practices (1)**
113:16
**practicing (7)**
113:12;122:24;
123:2,12;167:12,14,
15
**practitioner (1)**
42:5
**preaching (1)**
152:14
**precise (1)**
115:16
**prejudice (1)**
175:11
**preliminary (1)**
4:14
**premise (1)**
177:1
**prepared (5)**
8:14,21;95:20;
138:3;171:24
**preparing (1)**
176:5
**present (2)**
54:19,19
**preserve (1)**
21:20
**pressing (1)**
19:7
**pre-trial (8)**
4:23;5:7,20;7:12;
13:11;124:4;101:5,14
**pretty (3)**
56:25;128:20;
170:8
**previous (1)**
119:25
**previously (2)**
6:24;171:20
**prima (3)**
147:1;153:3,8
**prior (3)**
20:2;22:15;119:14

Case 8-13-08044-reg    Doc 40    Filed 04/01/15    Entered 04/01/15 12:40:05

CADLES OF GRASSY MEADOWS II, L.L.C. v.
ST. CLAIR, et al.

Adv. Proc. No. 13-08044-reg
April 24, 2014

**privilege (18)**
66:22;67:1,7,9,16,
18,25;68:2;111:20;
112:21,22;113:1;
148:15,20,21;149:4;
174:19,20
**privileged (7)**
67:2;118:21;
141:18,21;146:9,10;
149:3
**pro (2)**
20:18;58:11
**probably (4)**
58:20;167:8,18;
169:25
**probative (1)**
34:2
**problem (4)**
6:7;44:21;62:12;
73:8
**Procedure (3)**
9:20;12:12;168:20
**proceed (2)**
69:9;122:17
**proceeded (1)**
124:18
**proceeding (19)**
16:16;17:18;33:1;
35:6;47:18;99:22;
114:15,17,19;123:7;
126:12,18;131:6,10;
143:11;147:1;
152:25;176:4;
179:20
**proceedings (8)**
19:25;28:11;
53:24;126:21;143:1,
8;166:7;180:19
**proceeding's (1)**
168:1
**process (6)**
73:13;135:19;
145:21,22;146:13;
174:18
**produce (69)**
26:16,25;48:15;
51:20,21;52:6;53:4,
8;54:2;55:13,17,21;
56:8;63:1;66:22,25;
67:18;72:17,19;
84:13;90:24,25;
91:10,12;92:19;
94:24;95:10;102:15;
104:5;106:10;107:6;
112:20,24;113:6;
114:11;117:24;
118:21;125:13;
127:4,12;129:21,22;
135:14;137:12;
138:5,22;139:24;
140:2,8,17;142:1,9,
13,15,17;144:18;
146:8;147:10;

148:15,19,21;
149:12,14;171:19,
21,22;172:15;
178:12,15
**produced (53)**
26:23;47:12,23;
48:14;51:11;52:7;
53:9;54:24;55:22;
56:10,12,14,17;
57:18;73:3;84:17,
20;90:6;92:8,22;
95:2;102:19;106:6;
109:8;112:25;113:8;
114:20;119:3,12;
121:1;123:24;
124:10,24,25;128:2;
136:10,20,21;
137:14,18;138:14,
16;140:22;141:20;
142:13,21;145:12,
12;146:6;149:15,18,
19;151:9
**producing (8)**
111:18;113:24;
115:10;125:9;
129:23;135:15;
141:19;148:18
**production (9)**
58:15;66:5;
102:25;106:1;
114:13;116:4;
145:19;167:7;
171:13
**Profession (1)**
154:11
**professional (3)**
18:18,25;29:4
**professionally (2)**
28:12;33:2
**professor (7)**
114:25;127:8,11,
12,14,18,20
**progress (1)**
48:16
**promised (1)**
107:17
**promote (1)**
128:22
**proof (1)**
127:13
**proper (7)**
77:13;78:1,4;
101:24;153:6,22;
176:7
**properly (4)**
77:8,22;80:6,12
**proponent (1)**
8:14
**proposed (2)**
108:16;172:1
**prosecuting (1)**
154:24
**protect (1)**

38:16
**protection (1)**
19:23
**provide (10)**
26:20;79:24;
111:19,20;112:22;
117:9;119:11;
130:16;139:18;
164:19
**provided (6)**
49:24;113:17;
137:2;138:12;
139:15,16
**provider (2)**
38:1;129:8
**providing (1)**
71:11
**psyche (1)**
17:4
**public (1)**
125:15
**pulling (1)**
131:18
**purchases (3)**
129:14,15,17
**purged (1)**
171:9
**purpose (5)**
5:18;24:1;104:25;
125:23;131:11
**purposes (3)**
36:16;164:2;165:3
**pursuant (15)**
12:11;53:3;55:3;
102:18,23;105:23;
106:6;107:6;114:1;
128:2;147:2,15,17;
150:2,21
**pursue (1)**
38:2
**pursuing (1)**
48:19
**push (1)**
92:5
**put (27)**
7:23;8:5,11,17,19;
10:7,19,22;11:5;
12:15;15:6;16:12;
24:3;26:18;27:7,9,
24;36:19;55:9;
141:7;151:5,11,12,
12;163:20;164:24;
173:21
**putting (2)**
6:11;13:13;33:3

## Q

**quarter (1)**
175:20
**que (1)**
90:10
**Queens (1)**

139:14
**question-and-answer (1)**
135:18
**questioner (1)**
100:18
**questionings (1)**
28:9
**quick (1)**
152:7
**quiet (1)**
44:24
**quite (4)**
9:15;131:24;
135:16;149:13

## R

**raise (4)**
7:14;68:6;154:7;
176:10
**raised (2)**
101:24;173:19
**range (3)**
41:14;146:7,8
**rant (1)**
133:11
**rare (1)**
34:2
**rarely (3)**
41:22;127:23,24
**rather (2)**
25:17;164:24
**raw (1)**
63:9
**re (1)**
145:13
**read (16)**
30:16,18;57:11;
61:10;83:11,13;92:4,
4;115:20;132:2;
143:17;160:12;
162:19,23;163:19,21
**readily (1)**
111:6
**reading (5)**
115:18,21;133:9;
145:16;173:22
**ready (2)**
92:2;142:24
**real (3)**
17:21;134:2;175:8
**reality (1)**
38:6
**realized (1)**
83:25
**realizing (1)**
133:1
**really (32)**
16:9;19:13,24;
20:15;21:23;32:7;
33:22;35:9;40:8;
56:5;83:25;99:24;
100:20;114:12,24;

115:2;116:21;
126:11,23;127:15;
130:21;131:13;
133:13;134:1;
135:17;136:20;
143:9;148:18;149:7;
152:7;173:18;
178:14
**reason (9)**
17:8;22:25;63:5;
100:1,21;111:2;
125:5;134:21;
136:20
**reasonable (2)**
30:8;147:6
**reasoning (1)**
153:22
**reasons (2)**
16:19;19:22
**rebutting (1)**
24:1
**recall (68)**
20:25;30:2;41:15;
44:6;47:24;53:12;
55:12,19;57:2;
58:17;59:7,10,13,15,
16,22,23,24;60:1,3,4,
5,6,8;64:13;66:1,18,
20,20,22,25;67:12,
13,14;68:1;84:12,16;
93:6,7,12,14,18,21,
22;94:2,8;95:8;96:3,
4,5,6,7,15,17,21;
97:1,3,4,8,23;
110:25;112:15;
113:7;143:24;
144:17;167:6,9;
168:8
**recalled (1)**
66:3
**recalls (1)**
67:9
**receipt (1)**
113:18
**receipts (3)**
91:15;130:1;
144:12
**receivable (1)**
143:6
**receive (17)**
6:7;20:21;107:8,9;
108:7;122:25;
129:17;156:18,20;
158:3,9;159:9,14,17;
160:5;162:15;
166:16
**received (35)**
44:4;53:1,7;79:4,
5;102:1;107:20;
127:21;128:7,8,24;
129:6;151:6;156:19,
21,21,24;157:18,19,
22;158:2,16;159:5,8,

Case 8-13-08044-reg    Doc 40    Filed 04/01/15    Entered 04/01/15 12:40:05

CADLES OF GRASSY MEADOWS II, L.L.C. v.
ST. CLAIR, et al.

Adv. Proc. No. 13-08044-reg
April 24, 2014

13,21,23;160:4;
161:16;162:14;
163:7,8;166:10,22;
167:9
**receiving (1)**
21:1
**recent (3)**
32:2;47:25;48:2
**Recess (2)**
98:17;152:16
**recollection (3)**
115:6;116:20;
129:22
**recommended (1)**
20:2
**record (30)**
13:5,14;19:19;
30:20,22;43:24;
50:21;51:2;54:18;
55:24;68:9;69:7;
99:2;102:16;117:16;
119:3;125:15;126:7;
129:13;130:25;
132:2;143:8;148:11;
150:3,5;163:23,25;
170:12;171:14;
179:17
**records (58)**
25:15;46:12,16,19,
22,25,25;47:9,12,13,
14;51:7;55:13,18,21;
56:8,10,12,14,17;
57:17,17,25;60:7,17;
61:15,16,18,19;62:4,
9,10,15;63:4;75:24;
92:8;111:18;112:25;
119:13;123:3,4,8;
128:4,4,7,14;129:2;
142:17;144:8,10,11,
21;145:3,7,8,10;
178:10,16
**recourse (2)**
37:22;38:8
**recovered (1)**
21:21
**recreate (1)**
145:13
**redirect (7)**
12:22;14:3;15:4;
23:23;40:6,17;171:5
**redo (1)**
145:13
**redundant (2)**
28:17;69:19
**refer (1)**
101:3
**referable (14)**
60:7;91:11;
114:12;117:14;
123:1;124:8;125:9;
128:25;129:1,14;
142:18;144:16,21;
145:3

**reference (6)**
74:23,24;116:15;
131:24;143:14;
151:16
**referred (1)**
98:10
**referring (6)**
67:17;107:1;
108:18;121:5;124:5;
160:24
**reflect (3)**
43:24;69:7;163:18
**reflects (1)**
19:3
**refresh (1)**
116:20
**refusal (3)**
163:3;164:4;
172:22
**refusals (4)**
60:1;126:13;
130:14,21
**refuse (5)**
48:19;60:2,9,12;
125:21
**refused (13)**
58:18;60:15;
104:24;125:6,9;
127:3,3;129:21,22;
146:8;163:12;
168:10;176:2
**refusing (5)**
59:13,24;60:18;
125:25;173:16
**refute (2)**
150:5,22
**regard (20)**
7:8;13:5,6,8;
43:21;104:12;106:7;
113:18;114:20,21;
123:17;124:3,4;
127:12;128:9;
138:15,24;139:23,
25;151:2
**regarding (34)**
52:5;54:2,12,24;
55:2;59:8,13;60:4,
12;61:6;67:16,25;
68:1;90:17;94:10;
95:10;113:17;123:4;
137:1;140:3;141:8;
143:2,4,6;144:19;
147:15;148:5,6;
159:7;166:3,5,7;
167:1;169:11
**regards (3)**
67:15;145:19;
163:17
**registered (1)**
110:8
**rehash (1)**
121:19
**reiterated (2)**

59:25;119:10
**reiterates (1)**
120:7
**reiterating (1)**
104:7
**related (1)**
129:3
**relates (2)**
139:22;140:10
**relations (1)**
35:12
**relationship (1)**
35:9
**relationships (1)**
70:21
**relative (1)**
12:16
**relaxed (1)**
27:8
**Relevance (9)**
17:7,17;35:4;36:4;
86:25;112:21;
150:16,20;166:12
**Relevancy (1)**
70:8
**relevant (18)**
35:5;41:9;45:7,8;
80:15;83:21;96:13;
114:19;115:17;
126:21,23;131:3;
136:25;150:24;
155:12,23;163:8;
179:19
**relied (1)**
65:8
**relief (1)**
27:5
**reluctant (1)**
38:2
**remain (2)**
144:5;147:8
**remaining (1)**
145:8
**remark (1)**
130:23
**remarks (1)**
61:2
**remedy (1)**
37:3
**remember (23)**
9:4;14:2;15:17;
20:16;21:1;27:14,14,
16;54:23,25;57:3;
61:24;64:22;94:6;
129:12;135:8;
142:12,14,16;161:1;
167:19;168:8;170:5
**remembers (2)**
45:7;46:1
**render (2)**
171:24;174:14
**rendered (1)**
174:19

**repeat (4)**
37:19;57:15;
94:16;112:11
**repeated (1)**
135:24
**repeatedly (2)**
171:11;172:13
**Rephrase (4)**
54:11;154:3,5;
159:4
**rephrased (1)**
135:24
**replace (1)**
170:19
**reply (1)**
151:11
**reporter (3)**
133:15,15,18
**represent (5)**
11:25;173:8,14;
175:4,6
**representation (3)**
116:24;125:12;
172:15
**representations (9)**
47:18;48:6;84:16,
20;85:4;117:17;
118:3;171:15,16
**represented (4)**
59:10,14;146:4;
162:19
**representing (5)**
153:23;156:9;
173:8;175:3,5
**req (1)**
92:9
**request (9)**
28:4;63:25;64:2,3;
104:22;147:5;
167:25,25;169:16
**requested (11)**
6:6;51:5;57:23;
121:9;123:18;127:6;
136:14;158:10;
159:15;169:18;
170:5
**requesting (1)**
106:17
**requests (1)**
168:13
**require (1)**
114:10
**required (20)**
31:5;32:11;50:3;
54:2;72:18;85:2;
89:21;104:6;106:1,3,
5;109:2,2;110:17;
113:9;114:10;
119:11;123:2,4,25
**requirement (1)**
120:23
**requirements (2)**
23:14;41:19

**requiring (1)**
145:13
**reserve (2)**
24:19;126:13
**resolution (2)**
148:5;179:6
**resolve (5)**
99:17;169:1;
177:21;178:25;
179:2
**resolved (3)**
125:22;172:11;
176:22
**resolving (1)**
169:2
**resort (1)**
37:25
**respect (12)**
33:10,12,13,16,18,
20;49:23;76:22,24;
77:1;84:25;123:16
**respected (1)**
77:8
**respectful (1)**
131:11
**respectfully (9)**
5:11;6:4,16;7:3;
10:17;22:25;30:4;
43:11;50:12
**Respon (1)**
70:10
**respond (6)**
7:7;22:19;42:21,
25;45:1;85:8
**responded (3)**
28:25;34:19;
159:18
**responding (2)**
24:11;100:6
**response (15)**
59:3;66:21;105:2;
107:10,14,20,24,25;
115:8;116:4;117:5,
11;120:14;164:18,21
**responses (13)**
58:8,9;67:3;
106:21;111:20;
112:18,19;117:9,12;
133:16;156:21;
164:19;165:21
**responsibilities (1)**
29:16
**responsibility (2)**
17:1;70:10
**responsible (1)**
25:21
**responsive (3)**
43:8,22;116:12
**rest (4)**
8:24;10:8;151:18;
178:1
**resting (1)**
11:9

Case 8-13-08044-reg    Doc 40    Filed 04/01/15    Entered 04/01/15 12:40:05

CADLES OF GRASSY MEADOWS II, L.L.C. v.
ST. CLAIR, et al.

Adv. Proc. No. 13-08044-reg
April 24, 2014

**result (3)**
72:17;107:12;
172:25
**resume (1)**
98:15
**retain (1)**
143:20
**retained (1)**
27:4
**retainer (2)**
125:11;143:24
**retainers (1)**
127:24
**retention (1)**
144:12
**return (5)**
53:21;110:19;
112:2,2;151:14
**returns (8)**
76:4,6;86:19;
136:24;137:7,13,14,
21
**reversed (1)**
117:6
**revocation (2)**
31:6,6
**rewarded (1)**
155:13
**Richard (2)**
165:25;166:9
**rider (6)**
97:9,12,13;106:4;
113:10;136:15
**riders (2)**
106:4;114:8
**ridiculous (2)**
30:4;134:15
**right (68)**
4:14;5:2;6:18;
7:23;8:4;10:11;11:3,
6,21,21;13:17,23;
14:2,18;17:14;18:11,
22;19:16;24:16,22;
28:3;35:14;41:25;
42:3,21;46:20;
66:13;68:18,22;
72:12;87:14;89:8;
92:20,23;95:10;
100:19;101:22;
103:21;105:20;
108:23;109:17;
113:24;116:7;117:3;
121:23;124:1,15;
125:16,18;129:12;
130:13;132:11;
134:24;135:4;
136:18;138:4;
140:25;142:22;
144:7;150:25;
151:17;157:14;
164:23;167:12;
171:4;173:10;
175:23;180:13

**rise (1)**
23:19
**roadblocks (1)**
125:17
**rock (1)**
37:23
**role (1)**
173:15
**roughly (1)**
19:11
**round (2)**
178:13,13
**Rule (21)**
5:8,17;6:4;9:20;
10:16;12:11;40:15;
52:15;91:4;102:23;
105:23;107:7;
119:17;150:21;
166:17;167:25;
168:1,7,16,21;178:5
**ruled (2)**
44:14;146:19
**Rules (8)**
5:9,12;9:20;12:12;
13:8;36:23;41:12;
150:3
**ruling (5)**
17:12;54:25;
80:22;125:21;126:2
**rulings (1)**
126:7
**running (1)**
16:9
**runs (1)**
113:23

## S

**safe (3)**
71:12,14;79:19
**sailed (1)**
25:10
**salvageable (4)**
62:17;63:11,13
**same (21)**
14:21;17:14;
28:22;30:8;41:10,
12;71:7;88:10;
96:17;111:10;
132:10,19,21;
135:10,11,18;
144:14,25;173:12,
16;178:9
**sanc (1)**
89:9
**sanction (6)**
9:7;23:13;88:20;
147:7;171:10;
172:24
**sanctioned (9)**
34:10,12,18;88:14,
24;147:18;162:17;
171:9,11

**sanctioning (2)**
36:10;89:1
**sanctions (22)**
34:14;67:16;
107:18;110:19;
111:2,11,14;112:14;
140:25;141:6;143:3;
145:18,23;147:6,13;
148:6,12;149:11,13,
20;169:11,11
**Sandy (8)**
26:9,9,11,12;
46:12,20;97:7,7
**sarcasm (1)**
30:21
**sat (2)**
20:1;28:15
**satisfy (1)**
9:20
**save (3)**
80:2;129:16,16
**saw (12)**
42:25;75:21;76:1,
7,8;79:10,11,11;
81:15;91:21;113:14,
15
**saying (18)**
5:13;11:2;12:17,
18;29:5;33:23;55:8;
61:25;62:6;84:1;
105:4;118:13,17,20;
134:1;137:5;172:10;
177:25
**scales (1)**
177:2
**scheduled (1)**
113:2
**school (3)**
16:23;70:15;
136:17
**scope (7)**
22:10;23:24;
27:18;36:15,17;
69:20;83:15
**screaming (2)**
133:5,8
**season (1)**
97:4
**seated (5)**
4:2;15:12;68:8;
98:18,24
**Second (2)**
5:12;80:20
**Section (3)**
6:3;73:7;74:25
**seeing (1)**
8:14
**seek (2)**
106:19;107:11
**seeking (3)**
19:23;103:19;
174:18
**seemed (1)**

142:14
**seems (1)**
147:1
**selectively (1)**
173:5
**send (4)**
6:8;110:14;120:2;
169:16
**sense (4)**
29:22;32:8;70:10;
174:21
**sent (6)**
103:12;106:16;
107:2;120:16;
161:16,16
**sentence (2)**
4:19;5:13
**separate (1)**
171:10
**separately (2)**
76:13,14
**September (3)**
53:14;107:3;162:2
**series (2)**
145:25;172:3
**serious (2)**
37:3;153:15
**seriously (3)**
37:4,5,6
**serve (4)**
160:18;167:24;
173:24;174:6
**served (11)**
63:22,24;97:10;
105:23;118:7,8;
151:4;161:1,4,15;
168:4
**service (3)**
129:8;160:22,25
**services (1)**
143:21
**servicing (1)**
90:16
**set (18)**
46:7;53:3;92:22;
95:9;99:12;110:13;
112:16;113:3;114:8;
119:2;121:8;126:6;
128:21;141:17,21;
146:24;147:4;
169:14
**Sets (2)**
120:12,16
**setting (9)**
59:10;107:9;
110:15;112:24;
117:22;134:14;
140:19;141:19;
153:1
**settle (2)**
170:7;176:2
**settlement (1)**
143:5

**settlements (1)**
180:2
**Seven (5)**
26:7;119:25;
167:18;170:1,2
**several (1)**
146:1
**sewage (3)**
63:2,9,13
**Shall (1)**
14:10
**shambles (2)**
21:16,17
**shell (1)**
149:5
**ship (1)**
25:10
**shit (1)**
132:25
**shocked (1)**
124:20
**shoes (2)**
174:25;175:1
**short (1)**
12:15
**shot (1)**
23:21
**shoulders (1)**
37:23
**show (12)**
9:9;23:16;56:19;
57:4,5;61:8,13;
91:20;113:20;
128:10;146:15;
161:9
**showing (1)**
133:6
**shown (1)**
57:9
**sic (4)**
30:6;82:9;121:12;
157:3
**sick (1)**
71:24
**side (5)**
5:5;22:3;150:3,4;
175:6
**sides (1)**
30:20
**side's (1)**
30:20
**sigh (1)**
27:5
**sign (5)**
92:14;93:3,17;
104:24;105:5
**signature (2)**
121:12;145:10
**signatures (3)**
117:11;121:13;
164:17
**signed (10)**
45:9;64:7,8;93:7;

Case 8-13-08044-reg    Doc 40    Filed 04/01/15    Entered 04/01/15 12:40:05

CADLES OF GRASSY MEADOWS II, L.L.C. v.
ST. CLAIR, et al.

Adv. Proc. No. 13-08044-reg
April 24, 2014

94:23;95:1;108:14,
24;121:11;164:25
**significant (1)**
118:9
**signs (1)**
42:7
**simple (11)**
49:23;56:24,25;
94:13;112:7;134:21;
135:25;146:13;
153:20;158:1;160:4
**simplest (1)**
102:10
**simplify (1)**
54:17
**simply (2)**
80:9;136:20
**Sinclair (3)**
40:1;127:3,7
**single (3)**
111:4;114:15;
149:10
**sit (5)**
12:2;66:18;146:7;
158:6;175:21
**site (10)**
113:14,15,16;
128:14,15,17,18,19,
21,23
**sitting (1)**
54:23
**six (7)**
28:16;110:20,22;
111:1;119:25;170:1;
175:19
**sixty-four (1)**
113:9
**smart (3)**
136:18;180:3,3
**so- (1)**
109:1
**soaked (1)**
62:20
**so-called (1)**
35:12
**somebody (12)**
5:20;17:11;38:2;
128:23;134:19;
136:4,6,23;175:3,6,
8,16
**somehow (2)**
29:5;178:13
**someone (4)**
85:13;124:4;
146:12;163:18
**sometime (1)**
115:7
**sometimes (5)**
21:15;127:24;
128:22;132:22;
142:15
**somewhere (3)**
73:13;77:7;151:23

**son (1)**
38:16
**soon (1)**
32:15
**so-ordered (5)**
108:18,21,24;
109:5,12
**sorry (37)**
15:15;20:12;
22:17;24:5,7;25:19;
28:6,8;30:10;33:11,
21;36:3;37:13;
38:22,24;43:14,19;
48:24;56:2;58:4,6;
59:20;60:11;61:20;
64:17;69:2;112:11;
132:15;134:4;
138:19;144:5,5;
152:23;154:2;
158:11,24;161:11
**sort (7)**
23:21;49:13,17;
118:23;130:22;
136:17;143:5
**sorted (1)**
49:16
**sought (1)**
136:21
**sounded (1)**
20:3
**source (1)**
27:3
**sources (1)**
39:15
**South (1)**
47:6
**space (1)**
139:14
**speak (5)**
12:21;18:9;88:23;
107:24;179:13
**SPEAKER (1)**
22:19
**speaks (4)**
57:19;115:19;
116:1;121:20
**specific (14)**
25:20;31:8;43:21;
55:19,20;59:2;60:1;
83:16;106:4;108:13;
114:8;119:20,23;
166:8
**specifically (6)**
60:8;67:13;120:8;
127:2;143:17;167:6
**spell (3)**
15:12;68:8;99:1
**spend (1)**
79:13
**spewed (1)**
133:11
**spoke (6)**
6:6;7:10;143:15;

150:21;166:1;
175:25
**spot (1)**
118:13
**St (108)**
4:3,7,7;15:8,14;
16:7;19:20;23:5,10;
39:10,13;40:6,19;
42:20;44:4,15,22;
46:11,18,18;50:4;
51:19;53:1;54:17;
56:16;57:11;59:7;
60:20;61:5;65:20;
68:10,13;69:1,7,12,
23;72:10,12;74:21;
76:22;83:22;86:14;
87:14;91:25;99:10,
13,16,24;100:25;
103:2,2;104:1;
113:12;114:2,4,25;
116:11;122:24;
124:13,16;125:6;
126:18;127:23;
128:5,16,18,22;
129:5,7,9,20;130:2,
6;132:7,14;133:6;
135:2,4,5,21,21;
136:3,9,13,16;
137:22;138:1,17,20,
25;141:6,17;142:5;
143:19;145:2;159:7;
171:8;173:15,16;
174:17;179:4,7,9,12,
14,22;180:10,12
**stack (4)**
28:16;96:18,24,25
**stake (5)**
35:25;36:9;37:20;
71:8,10
**stakes (1)**
156:1
**stand (16)**
7:23;8:6,13;9:11;
14:1;18:11;36:16;
40:1;63:12;98:20,21,
22;141:7;142:6;
160:16;173:4
**standard (1)**
28:20
**standing (1)**
140:21
**start (9)**
11:5;15:3;52:4;
87:3,4,14;124:22;
125:16;176:3
**started (4)**
5:13;118:20;
130:7;171:8
**starting (4)**
70:22;132:13,24;
145:15
**state (7)**
15:12;40:23;41:2;

61:6;68:8;99:1;
129:20
**stated (5)**
7:13;24:18;31:20;
159:9;168:25
**statement (17)**
24:18;52:6;66:21;
88:17;94:16;118:11;
119:2;122:21;
149:24;150:23;
151:16;152:21;
159:18;164:25;
165:9,10;173:20
**statements (12)**
90:7,22;91:1,10;
114:21;122:5;
138:10;139:25;
140:6,8;143:10;
146:20
**states (3)**
6:3;41:3;61:13
**stating (1)**
92:7
**status (1)**
176:21
**stay (6)**
18:12;42:14;62:3;
68:17;72:10;137:24
**staying (3)**
14:25;71:1;168:16
**step (3)**
68:5;171:4,6
**Stephen (1)**
4:10
**Stern (4)**
165:25;166:9,21;
178:19
**Steven (3)**
4:12;98:20;99:3
**still (20)**
9:19;20:19;21:21,
21;31:24;88:1,5;
103:18;109:7;111:7,
10;118:1,1;142:2,19,
21;144:5;151:10,11;
170:12
**stipulate (3)**
104:25;156:8,11
**stipulated (1)**
4:24
**stipulation (13)**
104:2,8,24,24;
105:5;108:15,18,21,
23;109:2,12,16;
120:17
**stipulations (1)**
157:19
**stop (22)**
10:21,24;30:14;
35:19;36:6;43:13;
68:21,21,21;70:19;
80:20;88:25,25;
91:4;131:23;150:19;

153:16;157:7;158:4,
25;169:5;173:22
**stopped (1)**
19:9
**storage (1)**
73:5
**stored (2)**
73:9,12
**storm (5)**
21:18;26:8;64:13,
19;85:3
**story (2)**
8:21;19:20
**straight (2)**
135:11;136:1
**straightforward (2)**
134:21;135:25
**Street (4)**
15:14,24;69:17;
144:9
**stress (6)**
16:22;17:8;18:17;
19:1;80:3;81:23
**stressed (2)**
81:25;82:7
**stressful (3)**
16:23;82:9;84:25
**strictly (1)**
6:2
**strike (13)**
19:14;30:13;42:6;
43:8;46:17;66:8;
94:25;105:9;131:2;
148:8;157:24;160:2;
170:11
**Striking (1)**
144:7
**stuck (1)**
178:22
**student (17)**
85:15,17,18,21,25;
91:11,16;94:22;
138:7,8,9;139:23,25;
140:3,5;156:16;
159:6
**stuff (17)**
21:18,19,20;28:19,
21;32:1;50:6,9;
61:22;75:11;118:17;
124:9;129:1,11;
140:14;173:11;
175:19
**sub (1)**
141:1
**subject (4)**
23:18;45:5;
103:25;172:22
**submission (1)**
143:10
**submit (10)**
21:14;34:16;55:3;
61:21;67:9;85:15;
150:7,8;151:2;

Case 8-13-08044-reg    Doc 40    Filed 04/01/15    Entered 04/01/15 12:40:05

CADLES OF GRASSY MEADOWS II, L.L.C. v.
ST. CLAIR, et al.

Adv. Proc. No. 13-08044-reg
April 24, 2014

165:21
**submitted (15)**
4:16,22,23;21:6;
48:5;57:23;65:7;
102:17;108:15;
111:6;121:8;149:25;
150:10,11;169:24
**submitting (1)**
55:7
**subpoena (34)**
20:23;42:25;
43:22;44:5,14;45:5;
49:17;51:6;53:2,7;
54:3,13,22;55:4;
67:3;79:1,3,5,7;
97:10,12,14;106:6,
14;109:3;114:8;
115:9;118:8;136:15;
160:18;166:25;
167:2,5;168:4
**subpoenas (25)**
41:20,22;42:2,4,
21;53:10;105:22;
106:1,3,8,9,18;
107:7,19,20;108:12,
22;109:7;114:1;
157:20;161:4,6,7,15;
164:20
**subsequent (2)**
49:10;112:2
**subsequently (2)**
31:10;140:2
**subtle (1)**
163:13
**sudden (2)**
7:14;118:5
**sued (5)**
37:11;81:1,3,5;
82:12
**suffering (1)**
132:17
**suggest (3)**
29:9;163:9;171:17
**suing (1)**
83:3
**sum (2)**
134:18;148:6
**summary (13)**
9:4,10;99:23;
100:24;149:25;
150:2,17,18;151:3,5;
159:17;163:15;
169:24
**super-storm (3)**
26:9,11,12
**supplant (1)**
11:14
**support (3)**
38:10;85:19;150:6
**supported (1)**
150:4
**supposed (21)**
6:8;41:24;42:2,20;

85:15,17,18;111:21,
21;112:22;117:9,12,
24;118:2;119:14;
126:15;131:9;142:1;
148:19;150:1,4
**supposedly (1)**
115:10
**Supreme (3)**
37:5;176:11,15
**Sure (12)**
12:6;18:6;23:24;
32:11;52:25;67:21;
75:9;85:9;96:12;
112:13,13;120:16
**surprised (2)**
30:3;160:11
**surprises (1)**
175:25
**surprisingly (1)**
135:16
**sur-replies (1)**
174:11
**Susan (1)**
16:7
**sustain (2)**
19:16;28:2
**Sustained (8)**
78:3,6,13;81:22;
90:21;104:21;
155:12,19
**sustaining (1)**
78:19
**swearing (1)**
165:17
**sword (1)**
36:22
**swore (3)**
56:16;57:16,22
**sworn (22)**
7:16,18;10:8;
15:10,11;68:7;
98:23;111:19;117:9,
12;119:2,11;121:7,
11;143:11;146:21;
151:15;164:19,25;
165:10,21;173:20
**sympathies (1)**
39:16
**system (7)**
33:10,12,16,18,19;
41:17;164:22

## T

**table (3)**
133:22,25;152:2
**tail (1)**
29:15
**talk (7)**
7:5;29:7;157:7,8;
171:5;177:23,24
**talking (10)**
22:22;83:18;

89:19;91:4;92:16;
104:20;105:10;
127:9;153:16;
176:18
**tax (9)**
76:4,6;86:19;
136:24,24;137:7,12,
14,20
**taxes (12)**
76:9,10,15,17,18,
19;86:17;137:2,4,10;
138:3;139:17
**taxing (1)**
39:9
**teeth (1)**
131:18
**telephone (2)**
140:12,13
**telling (7)**
42:10,19;49:20;
51:2;84:12;104:19;
163:24
**temper (1)**
72:2
**tempers (1)**
174:16
**ten (5)**
41:18;125:2;
132:21;173:22,22
**ten-minute (1)**
152:8
**tenor (1)**
28:24
**tension (1)**
27:4
**term (1)**
94:4
**terms (8)**
25:21;101:4;
102:10;113:7,8;
135:14;159:14;
171:25
**testified (35)**
26:8;41:16;44:4;
46:11,16,19;51:20;
53:1,5;55:7;60:20;
61:5;90:3;94:18;
95:13;116:11;
127:23;128:5,16,23;
134:11;137:21;
138:1,6,16;139:23;
140:4,11;142:12;
143:19;158:16,19;
159:5;161:6,14
**testify (5)**
51:8;66:2;94:9;
143:23;163:24
**testifying (2)**
21:24;22:2
**testimony (25)**
7:16,19;9:21;11:2,
3,3,25;14:17;22:3,6;
33:5;36:15,20,22;

67:14,17;141:8;
146:17;151:15;
158:20;159:1,3;
162:23;168:14;
173:3
**theory (2)**
6:25;40:5
**thereafter (3)**
108:1;120:22;
140:24
**Therefore (2)**
14:17;159:3
**thick (1)**
96:18
**thinking (3)**
27:11;175:25;
176:24
**third (3)**
115:13;166:25;
167:10
**thirteen (1)**
115:13
**thirty (1)**
79:15
**thou (1)**
55:23
**though (6)**
41:25;62:25;
103:14;126:7;
135:24;169:8
**thought (17)**
16:24;20:18;29:6;
32:12;34:14,14,17,
18;42:16;49:18,24;
50:3;52:1;55:17;
65:2,3;168:16
**threatening (1)**
130:24
**three (10)**
7:11;20:17;70:14;
71:2;101:17;107:4;
110:11;128:18;
132:16;137:11
**threw (1)**
63:15
**throughout (2)**
128:4;134:6
**throw (1)**
173:23
**times (15)**
19:4;53:23,23;
65:23;78:7;79:9;
82:3;95:17;110:11,
20,22,25;111:1,3;
148:4
**tip (1)**
115:2
**tirades (2)**
133:5,8
**today (7)**
17:22;83:23;
140:21;162:12;
171:24;175:5;

178:17
**today's (1)**
146:3
**together (4)**
9:7;16:13;24:19;
70:3
**told (13)**
26:16;50:20;
66:12;72:22;102:10;
125:15,20;141:22;
146:10;153:22;
171:17;172:13;
173:7
**toll (2)**
16:21;17:4
**tomorrow (2)**
175:6,7
**ton (3)**
113:11;123:24;
179:15
**tonal (1)**
131:24
**took (3)**
5:17;58:14;142:5
**top (1)**
136:22
**totally (1)**
63:8
**touch (2)**
63:14;75:13
**tough (1)**
178:14
**towards (3)**
30:9;99:16;133:6
**track (1)**
40:10
**tracks (1)**
24:24
**transactions (1)**
35:20
**transcript (20)**
17:18;21:25;
22:12;24:10;35:5;
36:17;41:11;59:1;
124:13;127:1;130:5;
135:1;138:25;139:5,
14;143:1;160:12;
163:18,20,21
**transcripts (7)**
7:11;9:19;10:14;
12:9;162:19;171:17;
172:20
**treat (1)**
134:19
**Trial (4)**
4:3;8:21;12:15,17
**tried (9)**
38:15;49:8;82:16;
103:10,18;141:18;
148:4;151:8;167:5
**trouble (1)**
26:3;33:2;180:7
**true (36)**

Case 8-13-08044-reg    Doc 40    Filed 04/01/15    Entered 04/01/15 12:40:05

CADLES OF GRASSY MEADOWS II, L.L.C. v.
ST. CLAIR, et al.

Adv. Proc. No. 13-08044-reg
April 24, 2014

12:11;44:7,12;
51:2,21;52:7;53:9,
13;56:21;57:16,25;
58:8,14,18,20;60:18,
21;65:20;89:15;
90:5;91:10;94:17,21,
22;95:1;97:9;
143:19;144:15,18,
21;145:2;152:22,24;
155:14,15,17

**Trump (1)**
38:3

**trustee (10)**
20:7;27:12,13,15,
19;143:4;165:22;
166:16;178:11,20

**truth (2)**
10:13;51:2

**truthful (3)**
10:13;122:7,21

**try (25)**
19:7,17;21:19;
25:1;30:7;38:17;
42:14;62:3;79:25;
84:5;94:14;99:15,
17;100:8;106:11;
131:11,18;137:23,
23;147:25;148:1,5;
149:6,7;180:5

**trying (23)**
19:20;40:10;
43:19,20;45:2;51:10,
16;63:3;84:25;85:5;
99:13;103:12;105:5;
108:3;117:14;
132:17;134:20;
136:5,6;155:20;
164:3;177:10;180:6

**turn (25)**
12:2;37:24;50:5;
51:14;59:24;60:9,12,
15,18;63:5;64:25;
66:13;85:6,18,24;
86:3,3,7;88:19;
143:13;145:7;148:1;
162:16;168:9;173:9

**turned (11)**
27:19;31:9;50:9;
67:22;85:5;86:5;
144:12;145:2;146:5;
173:9,11

**turning (1)**
123:14

**TVs (1)**
129:10

**Twelve (3)**
40:20,22,23

**twice (1)**
120:25

**Two (24)**
10:16;19:11;31:4;
51:4,15;55:23;
70:19;83:15;96:25;

100:23;128:16,18;
134:12;135:20;
145:23;161:3;
163:14;164:3;167:8;
172:7,13;173:23;
174:10,11

**two-part (1)**
72:20

**type (11)**
103:19;108:7;
114:9;125:10,17;
128:11;131:18;
134:6;135:18;
150:11;164:25

**types (1)**
129:16

---

## U

**Uh-hum (1)**
164:1

**ultimate (1)**
172:16

**ultimately (2)**
51:11;137:12

**unacceptable (2)**
141:13,25

**uncover (1)**
49:14;149:7

**undated (1)**
115:6

**under (22)**
5:8,11,17;6:3,4;
9:8;13:7;23:15;24:4;
26:25;37:23;41:10;
102:7;107:7;123:18;
165:9;168:1,21;
171:25;173:21;
178:1,2

**underlying (6)**
37:18;83:16;
114:18;123:20;
137:15;138:10

**understands (1)**
87:1

**understatement (1)**
131:17

**undisputed (1)**
149:24

**unfortunately (1)**
38:20

**UNIDENTIFIED (1)**
22:19

**Unintelligible (4)**
52:11,18;94:13;
153:25

**universe (1)**
48:13

**unless (5)**
18:12;49:25;
107:9;120:13;
176:20

**unobjected (2)**

101:4,6

**unprofessional (3)**
130:23,24;134:8

**unresponsive (1)**
99:17

**unsophisticated (1)**
136:16

**untoward (1)**
61:2

**up (32)**
8:22;15:10;17:24;
18:12;21:16;31:21,
24;35:9;37:2;40:10;
83:24;94:22;99:12;
100:18;123:19;
124:3,4;126:8,19;
128:21;130:11;
132:3;134:18;148:7;
163:9,22;169:1;
172:1,2;173:10;
175:16;176:1

**uploaded (2)**
117:21;119:14

**upset (4)**
31:17;42:13;82:5;
134:10

**upstairs (5)**
73:6,10,11,22,24

**use (14)**
6:18,19,23;7:1;
9:22;36:21;46:2;
85:4;101:20,24;
127:24;168:6,15,24

**used (4)**
25:25;143:23;
168:20;175:13

**uses (4)**
127:24,25,25;
129:7

**using (1)**
63:10

**usually (4)**
127:25;129:3;
143:20,24

**utilities (1)**
25:16

**utility (2)**
156:15;159:6

---

## V

**vague (3)**
95:3;115:16;
153:24

**value (1)**
34:2

**variety (1)**
171:12

**various (2)**
20:24;102:1

**verbal (1)**
133:16

**via (1)**

108:15

**view (5)**
9:12,23,25;71:9;
168:25

**viewing (1)**
14:16

**violated (5)**
9:8,13;25:8;30:25;
31:4

**violation (1)**
31:5

**violations (1)**
9:8

**Vir (1)**
5:22

**VLOCK (86)**
4:10,11,11,13;
7:25;8:2,16,19,23;
9:1,3;13:3,5,13,17,
20,23;14:5,7,10,13,
15,24;15:2,5,7;
98:19;99:5,8;101:3,
8;102:3;112:11;
117:4;122:4,17,19;
124:2;132:2,7,10,13;
133:4;138:13;
150:20;151:1,17,22,
25;152:3;153:12,14,
17,24;154:14;
155:10,18;156:3,5,7,
11,13;157:1;158:12,
18,20;159:1,10,24;
160:1,3;165:11,14;
166:11,14,16,20;
168:17,19;169:4,6,9;
174:10;177:6;
180:14,17

**voice (1)**
30:19

**voluntarily (3)**
108:4;109:15;
168:9

**voluntary (2)**
103:13,15

---

## W

**W-2s (2)**
114:23;127:17

**Wait (4)**
51:25;58:22;
139:18;154:1

**waiting (2)**
138:2;175:21

**waived (4)**
13:9,24,24;118:7

**walked (1)**
27:7

**walls (1)**
146:12

**wants (12)**
7:14;17:23;41:13;
42:13;163:20,24;

165:15,16;168:24;
175:15;179:24,24

**wasting (1)**
70:9

**water (5)**
18:5,7;140:14;
151:22,24

**waves (1)**
45:3

**way (17)**
29:6;31:23;34:18;
47:20;80:1;83:19;
118:22;132:18;
134:20;164:11;
172:2;174:22;
175:21;176:2,3;
180:1,8

**ways (1)**
43:16

**Web (10)**
113:14,14,16;
128:14,15,17,18,19,
21,23

**week (1)**
120:15

**weeks (6)**
173:23;174:3,4,10,
11;175:19

**well-laid (1)**
173:2

**weren't (9)**
16:12;32:1,11;
48:14;62:6,23,25;
65:12;85:5

**whatnot (1)**
30:19

**what's (24)**
8:9;15:18,23;16:6;
29:7;38:16;45:7;
52:13,17;54:6;70:6,
14,24;87:4;100:8,14;
106:4;123:6;145:17;
153:16;154:6,11;
162:12;165:24

**whatsoever (4)**
52:8;117:14;
145:9;149:12

**whenever (1)**
129:3

**Where's (2)**
47:1;149:3

**Whereupon (1)**
180:19

**whole (11)**
21:22;22:17;
75:13;85:1;100:6,
17;102:19;126:11;
129:9;139:5;146:7

**who's (5)**
16:4;25:21;27:11;
134:20;136:23

**wife (16)**
16:4;17:3;19:12;

Case 8-13-08044-reg    Doc 40    Filed 04/01/15    Entered 04/01/15 12:40:05

CADLES OF GRASSY MEADOWS II, L.L.C. v.
ST. CLAIR, et al.

Adv. Proc. No. 13-08044-reg
April 24, 2014

25:16;27:2;28:22;
38:11,12,13;39:10;
45:9;54:15,19;
138:21;159:8;
179:23
**willfully (1)**
21:7
**willfulness (1)**
25:3
**willing (1)**
69:8
**win (7)**
154:20,22;155:1,2,
13,16;156:10
**winning (1)**
155:5
**wish (1)**
173:21
**Withdrawn (1)**
28:8
**withheld (1)**
102:18
**withholding (2)**
143:12;146:21
**within (10)**
19:19;23:21;25:1;
36:16,23;41:14;
45:8;120:15;124:10;
168:16
**without (5)**
32:9;33:3;69:9;
101:23;106:11
**witness (170)**
5:4;8:8;9:1;10:7;
11:6;14:10,18,19,20,
23;15:6,11,14;18:5,
7,15;21:23,23;22:1;
30:21;33:23;36:8,
15;39:18,20;42:8,16;
44:18,20,25;47:2,4,
6,8,11,14,24;48:9,11,
22,24;49:3,6,8,18,
20;54:10;56:2,4,19;
57:9;58:6;61:17,20;
62:8,19,24;63:7,12,
16,19;64:15,17,20;
65:1,5,10,14;66:12,
16;67:13;68:7,10,20;
69:25;72:15,20,22;
73:4,11,17,20,25;
74:4,9,15,19,23;
75:2,4,6,8,10,18,20,
22,25;76:2,6,8,10,12,
17,19;77:10;81:7;
82:9,11;83:24;84:7,
10,15,18;85:8,10,22,
25;86:4,8,10;89:3,6,
11,22;90:1,12;91:21,
24;93:14;95:7;
98:23,25;99:3;116:6,
8,16,19;117:2;
122:20;123:12,16,

23;137:4,8,14,18;
138:1,5;144:10,13;
150:18;151:20;
152:2,4,7,9;153:14,
17;155:25;157:12;
158:8;159:12;
162:11;163:20;
171:5
**witness' (1)**
165:16
**witnesses (4)**
4:25;8:14;9:21;
24:4
**woes (1)**
22:12
**wondering (1)**
47:21
**words (3)**
63:10;120:18;
143:25
**work (13)**
13:2;38:17,18;
39:2;62:9;99:21;
128:10;154:6,11,13;
160:8;178:3,4
**worked (1)**
125:14
**working (4)**
99:9;103:10;
113:15;132:10
**worse (2)**
29:19;131:13
**worth (1)**
106:5
**wreaks (1)**
17:4
**write (2)**
135:21;150:1
**written (3)**
174:22;176:14,15
**wrong (5)**
11:22;173:10;
180:2,3,7

## Y

**year (8)**
76:13,13,16;
114:5;124:19;
127:10;173:3;
175:20
**years (19)**
19:11;26:7;40:20,
21,22,23;41:18;
99:11,20;100:23;
127:22;131:8;
137:11;147:25;
161:3;167:8,18,19,
19
**York (5)**
15:15;40:23;41:2,
5;47:5
**young (1)**

17:2
**youngest (1)**
39:4

## 1

**1 (5)**
101:1;102:2,4;
165:6,7
**10 (6)**
57:5,9;68:20;
91:19,21;121:3
**100,000 (1)**
114:5
**11 (3)**
57:5;124:11;144:4
**114 (1)**
127:1
**12 (6)**
130:3;132:11,12;
133:2;143:13,17
**12:14 (1)**
98:17
**127 (1)**
140:10
**13 (12)**
60:16;132:19;
134:24;176:3,5,23;
178:2,4,6,7,11,15
**13th (5)**
124:14,16;127:1;
140:24;143:1
**14 (3)**
60:17;102:2;
147:11
**148,000.12 (1)**
177:18
**14th (2)**
130:7;135:2
**16 (2)**
144:5,8
**17 (2)**
70:25;144:14
**18 (2)**
102:2;149:22
**18th (1)**
103:25
**19 (1)**
144:25
**1st (1)**
165:4

## 2

**2 (3)**
98:15;102:21;
120:13
**2/27/2013 (1)**
120:8
**2:06 (1)**
98:17
**200- (1)**
167:17

**2002 (1)**
40:25
**2004 (69)**
5:6,12,18;7:11;
10:16;22:16;44:5,7,
14,21;45:5;52:8,10,
15;53:2,2,4;58:15;
63:22,23;93:8;
102:23;103:16;
104:3,6,7;105:23;
106:2;107:4,7,19;
108:12,13,22;109:6,
9;111:9,18,21;
114:25;115:9;
119:15,17,21;
120:20;124:13,18,
19,22;125:23,25;
126:24;127:7;128:2;
130:6;134:12;135:1;
136:15;141:3,8;
151:9;164:19;
166:17;167:17,20,
20,22;168:3,16
**2005 (1)**
167:18
**2012 (21)**
44:8;48:20;52:8;
53:10,14,18;55:13,
14;56:8,9;64:6,9,11,
14,18,19;102:24;
103:25;105:19;
107:3;162:2
**2013 (19)**
52:9;53:11;56:16;
93:1,2,4;95:8;
111:14;112:3,13;
121:10;124:14,17;
127:2;128:3;130:7;
135:2;140:24;
147:14
**2017 (1)**
132:7
**20th (1)**
147:14
**21 (1)**
145:15
**217 (2)**
132:13,16
**218 (2)**
132:24;133:3
**22 (1)**
70:25
**23 (1)**
132:21
**24 (7)**
102:2;142:23;
143:14;144:5,6,25;
145:16
**24th (1)**
109:4
**25th (1)**
109:4
**26th (3)**

64:9,18;102:24
**27th (7)**
112:3,13,23;117:6,
16;119:7;120:7

## 3

**3 (3)**
45:10;103:22;
104:13
**3/13 (1)**
120:12
**3/14 (1)**
120:13
**3:25 (1)**
152:16
**3:43 (1)**
152:16
**3001 (3)**
15:14,24;69:17
**30f (1)**
12:12
**30th (2)**
111:14;117:9
**32 (1)**
9:20
**341 (1)**
137:9
**37,000 (1)**
140:5
**38 (1)**
127:5
**3rd (2)**
121:10;128:3

## 4

**4 (4)**
105:21,22;160:24,
24
**4:18 (1)**
180:19
**402 (2)**
5:8;6:4
**403 (1)**
5:8

## 5

**5 (8)**
106:24;132:7,14;
161:9,12,14,24;
162:1
**5:30 (1)**
130:9
**523 (1)**
177:20
**5th (3)**
107:3;162:2;174:1

## 6

**6 (2)**

Case 8-13-08044-reg    Doc 40    Filed 04/01/15    Entered 04/01/15 12:40:05

CADLES OF GRASSY MEADOWS II, L.L.C. v.
ST. CLAIR, et al.

Adv. Proc. No. 13-08044-reg
April 24, 2014

107:15;130:9

## 7

**7 (7)**
 19:22;20:5;27:12;
 70:25;108:17;
 176:19;178:20
**7,500 (7)**
 88:15;89:2,3,21;
 147:5,18;170:6
**7000 (1)**
 168:21
**7001 (1)**
 168:7
**7030 (2)**
 167:25;168:1
**7034 (1)**
 167:25
**7056 (1)**
 150:22
**707 (1)**
 176:22
**727 (21)**
 9:9;23:13,15,19;
 27:20;31:6;36:5;
 37:1,16;102:7;
 147:2;163:21;
 171:25,25;172:2,11,
 22,25;176:22;
 177:20;178:5
**73 (3)**
 139:6,8,9

## 8

**8 (8)**
 70:25;115:3;
 132:16;164:14,16;
 165:4,5,7
**8th (1)**
 109:3

## 9

**9 (2)**
 120:4;132:24
**96 (1)**
 139:22
**99.9 (1)**
 123:13